# EXHIBIT P

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| RODNEY K., SR., MARY K., MARY K., GUARDIAN AD LITEM FOR R.K., JR., MINOR; STACEY S.T. AND G.T.B., MINOR, BY HIS GUARDIAN AD LITEM STACEY S.T.; KENNESHA Q. AND COLBY Q. AND J.C., MINOR, BY HIS GUARDIAN AD LITEM KENNESHA Q., | CIVIL ACTION NO. 1:18-cv-343-TFM-N |
| Plaintiffs, | |
| VS. | |
| MOBILE COUNTY BOARD OF EDUCATION, et al., | |
| Defendants. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEO CONFERENCE DEPOSITION OF:

RUTH HART

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DECEMBER 28TH, 2020
MOBILE BAY REPORTING
110 DAUPHIN STREET
MOBILE, AL. 36602

```
 1      field to a softball player from UMS-Wright,
 2      he needed medical attention.
 3          So while he was icing, I ran out, went
 4      to the softball field and did my treatment
 5      with the softball player there.  Was gone 10,
 6      11 minutes or so.  Came back, and then I put
 7      him in a splint, the SAM splint with an ACE
 8      wrap.
 9  Q.  All right.  And then what happened?
10  A.  Before going to the softball field, I did try
11      calling the dad and told him, you know, that
12      "R[Redacted] was in -- has an injury, an injury,
13      would you please pick him up, because of a
14      possible fracture."  He was saying things
15      like, "What do you mean?  What happened?"
16          And I was, like, "I'm not sure, I just
17      know -- it seems like he was in a fight, can
18      you please come get him?"
19          "Well, how -- how can he break his arm?
20      Non-contact practice."
21          I told him, "I don't know, I think he
22      was in a fight, can you come get him, he
23      needs to go to the ER in terms of a broken
```

```
 1            arm."  Went to the softball field and came
 2            back.  And R^Redacted was still in the athletic
 3            training room icing.  And then I believe
 4            Coach Riley asked him to come to his office
 5            and figure out, like, what's going on, like,
 6            what happened, who did this.
 7     Q.     When R^Redacted was in the athletic training room
 8            while you were at the softball field, was
 9            there anyone in there with him to your
10            knowledge?
11     A.     My student athletic trainers.
12     Q.     Okay.  And you mentioned that Coach Riley
13            came to see R^Redacted; did he take R^Redacted back
14            into his office?
15     A.     Yes.
16     Q.     Did you go in there with him?
17     A.     Yes.
18     Q.     And do you have any recollection about what
19            Coach Riley may have said to R^Redacted at that
20            time when you were in there with him?
21     A.     Trying to figure out what happened, who did
22            it.
23     Q.     And what did R^Redacted tell Coach Riley to the
```

```
1            best of your recollection?
2       A.   Oh, that I got jumped or beat me, fight me.
3            I don't remember.  I just know that he said
4            they jumped -- they jumped me in the locker
5            room, which is around the corner of the
6            fieldhouse inside.
7                 And I know Coach Riley was like, "Well,
8            can you give me the names?"  Lord, I can't
9            remember their names.  "Give me the names of
10           the athletes and I'll get to -- you know,
11           I'll see what I can do to get this
12           straightened out, along the lines of --
13           something along that line.
14      Q.   Okay.
15      A.   Like, he -- Coach Riley was going to do his
16           best to get the situation taken care of.
17      Q.   So you mentioned earlier or testified earlier
18           that you called R[Redacted]'s father?
19      A.   Uh-huh.
20      Q.   Did anyone ever eventually come and get
21           R[Redacted]?
22      A.   Yes, there was a -- there was a couple of
23           different people that came in.  One was an
```

1  uncle friend that came in.  They came into
2  the fieldhouse, and I thought he was here to
3  pick up R<sup>Redacted</sup>.  And he was, like, "No, I'm
4  just here to check on him." And then a few
5  minutes later, another uncle -- I think it
6  was Brian -- and Gabby came to the door.
7     And we -- you know, I explained to him,
8  like -- this was pretty much what the SOAP
9  notes says -- like he got jumped, you know,
10 there's a possible fracture.  We need to get
11 him taken to the ER and get appropriate
12 treatment as soon as possible.  And -- yeah.
13 Q. You testified just now about two different
14 gentlemen.  Did either of those gentlemen go
15 into Coach Riley's office while they were at
16 the fieldhouse?
17 A. I know -- from what I remember, Brian and
18 Gabby were standing in the doorway of Coach
19 Riley's office.  The first gentleman, I
20 don't -- I don't remember him coming in.  I
21 know he came into the fieldhouse.  I don't
22 remember if he came into the office or not.
23 Q. All right.  Did you have any conversations

| | | |
|---|---|---|
| 1 | | with the second gentleman, who we know as |
| 2 | | Brian K[Redacted], did you have any conversations |
| 3 | | with him about what happened to R[Redacted], Jr.? |
| 4 | A. | I told him exactly what I told Rodney, Sr., |
| 5 | | he got in a fight, I'm not sure how it |
| 6 | | happened. R[Redacted] doesn't remember how -- he |
| 7 | | doesn't know if it was -- what kind of |
| 8 | | mechanism it -- how the mechanism of injury |
| 9 | | occurred. |
| 10 | | And just -- just told him, you know, |
| 11 | | these are the steps that you need to do to |
| 12 | | make sure he's safe. I remember explaining, |
| 13 | | you know, the fracture is, you know, at the |
| 14 | | lower portion of the arm. Put him in a SAM |
| 15 | | splint. We iced, SAM splint. He needs to |
| 16 | | get seen by a doctor and x-rays to rule out |
| 17 | | if there is a fracture or not. |
| 18 | Q. | Did you tell anyone on April 27th, 2018, that |
| 19 | | R[Redacted] had been a victim of hazing? |
| 20 | A. | No. |
| 21 | Q. | Did you tell anyone on April 27th, 2018, that |
| 22 | | R[Redacted] had been a victim of bullying or |
| 23 | | harassment? |

1    A.   Huh-uh, no.
2    Q.   Did you tell anyone on April 27, 2018, that
3        R[Redacted]'s fracture was close to the growth
4        plate or in the growth plate?
5    A.   No.
6    Q.   Would you have even been able to know whether
7        the growth plate was affected in any way or
8        if the possible fracture was located near the
9        growth plate based on your care and
10       treatment?
11   A.   No.
12   Q.   How would one typically go about finding the
13       location of the fracture and its proximity to
14       a growth plate?
15   A.   An x-ray.
16   Q.   Okay. Do you have an x-ray machine in the
17       athletic trainer's office at Davidson High
18       School?
19   A.   No.
20   Q.   All right. So was anyone else with Brian K[Redacted]
21       when he arrived to retrieve R[Redacted], Jr.?
22   A.   Gabby was.
23   Q.   Okay. And that is R[Redacted]'s sister, correct?

1   A.  Yes.
2   Q.  Did you know Gabby before this incident?
3   A.  Just from softball.
4   Q.  You understood that she played softball?
5   A.  Uh-huh.
6   Q.  Is that a "yes"?
7   A.  Yes.
8   Q.  Okay.  So did you see R[Redacted] leave with his
9       uncle and Gabby?
10  A.  Yes.
11  Q.  All right.  And did they leave together?
12  A.  Yes.
13  Q.  All right.  Did anyone else from the K[Redacted]
14      family or any K[Redacted] friends come to the
15      fieldhouse after R[Redacted] and Brian K[Redacted] and
16      Gabby left?
17  A.  No, not to my knowledge, not while I was
18      there, no.
19  Q.  Okay.  If anyone has stated, reported, or
20      testified that R[Redacted] K[Redacted], Jr., was found by
21      his family members sitting alone on the curb
22      with a bandage and swollen arm after this
23      incident, would that be a truthful statement?

1   A.  No.
2   Q.  Was he literally handed off from you to the
3       uncle and his sister?
4   A.  Yes.
5   Q.  Did you watch them walk away?
6   A.  Yes.
7   Q.  Okay. And, at that time, R[Redacted]'s arm had
8       been iced, wrapped, and basically provided
9       the appropriate care and treatment to get him
10      to the ER?
11   A.  Yes.
12   Q.  Okay. In your time at Davidson High School,
13      did you ever treat any other athlete for
14      injuries received due to fighting with a
15      teammate?
16   A.  No.
17   Q.  In your time at Davidson, did you treat any
18      other athlete for injuries received due to
19      horsing around in the locker room or
20      fieldhouse?
21   A.  No.
22   Q.  In your time at Davidson, did you treat any
23      other athlete for injuries received due to

1  Q. And you understand that the family has not
2     named you in the lawsuit or brought any
3     allegations --
4  A. I understand that.
5     MR. CABRAL BONNER: I don't think I have
6     any additional questions.
7     MR. SHEEHAN: Mr. Bonner, 10 days ago
8     you said you were going to answer the amended
9     interrogatories. You still have not provided
10    the answers to the interrogatories, nor
11    properly responded to the requests for
12    production.
13    MR. CHARLES BONNER: Yes, and we're still
14    working on it. And I also explained to you
15    that it was the holidays and that we have a
16    new shelter-in-place order that has impeded
17    the progress of getting that discovery
18    completed. But we're --
19    MR. SHEEHAN: When will you be providing
20    that information?
21    MR. CHARLES BONNER: Just as soon as we
22    can. My office is working on it right now --
23    it's taking time because we're under a

1   renewed lockdown order.  Okay?
2       MR. SHEEHAN:  Well, it's not okay.
3   Because it's over two months that you've had
4   the amended answers -- amended
5   interrogatories, and you still haven't
6   responded even properly to the requests for
7   production.
8       MR. CHARLES BONNER:  Yeah, well, we did
9   respond to your first set, which turned out
10  to not be the set that was compliant with the
11  court's scheduling order.  And so my office
12  is redoing those, as I explained to you in
13  the last deposition.
14      But we've been impeded in that progress
15  because of the lockdown order.  So that's the
16  state of the record.
17      MR. SHEEHAN:  So when we will receive the
18  answers to the amended interrogatories as
19  well as --
20      MR. CHARLES BONNER:  Just as soon as we
21  can get them to you.  I can't -- I can't give
22  you a specific time right now because of the
23  lockdown order.  But as soon as we can get to

 1   them, we will get them to you.  Okay?  You
 2   have two complete sets that covers the same
 3   information that you've already requested.
 4   So you don't have any prejudice because you
 5   have the information in your possession.
 6        And you also have at least two responses
 7   to the document production.  You have amended
 8   Rule 26-A responses.  You have every video,
 9   every document we have.  So you have no
10   prejudice.  We will get the other information
11   to you as quickly as we can based on the
12   conditions that we're operating under with
13   the COVID-19 lockdown.
14        MR. SHEEHAN:  We have not received
15   responses from Mr. or Mrs. C$^{Redacted}$, nor L$_d^{Redacted}$
16   C$^{Redacted}$, nor T$_{acte}^{Red}$ B$_d^{Redacte}$, nor J$^{Redacted}$ C$^{Redacted}$n,
17   or Mr. and Mrs. Q$^{Redacted}$.  Nor have we
18   received proper responses to the request for
19   production, which, again, are over two months
20   past due.
21        MR. CHARLES BONNER:  I understand.  Two
22   months right during the time of the
23   lockdowns.  But you also propounded discovery

1  to the plaintiffs in a group fashion.  For
2  example, you propounded it to T$_{\text{acte}}^{\text{Red}}$ B$_{\text{d}}^{\text{Redacte}}$ and
3  his mother in one group.  The same way with
4  the K$_{\text{cted}}^{\text{Reda}}$ and the same way with Q$^{\text{Redacted}}$ .  So
5  the responses went out to you on behalf of
6  all of them; however, those were the
7  responses when you were not in compliance
8  with the 40 interrogatory limitation.  And
9  they are now being adopted and adjusted to
10  comply with the limitation based on your
11  subsequent tailored interrogatory production.
12  So Mr. Sheehan, all I can tell you is
13  what I repeated to you two other times on the
14  record.  Okay?
15  MR. CABRAL BONNER:  Can we go off the
16  record and let the witness go?  We don't need
17  to continue this conversation while Ms.
18  Hart --
19  MR. CHARLES BONNER:  Yeah.  No, no no.
20  We need it on the record.
21  MR. SHEEHAN:  We need to be on the record
22  because --
23  MR. CHARLES BONNER:  Yeah.

1  MR. SHEEHAN: -- oftentimes, you use the
2  excuse that you did not read the letter or
3  did not -- so we need to make sure that you
4  understand that we are requesting that you
5  properly respond to the requests for
6  production, as well as answer the
7  interrogatories, which, again, are over
8  two-months old.
9  MR. CHARLES BONNER: We understand. I
10 make no excuses about anything, sir, and I
11 take responsibility for everything that my
12 office does. I've explained to you we will
13 get you the responses as soon as we can, as
14 soon as the COVID-19 lockdown permits.
15 MR. SHEEHAN: Well, the COVID lockdown
16 might be for another year, so we need those
17 responses --
18 MR. CHARLES BONNER: Well, it may take
19 us --
20 MR. SHEEHAN: -- that are past due now.
21 MR. CHARLES BONNER: It may take us
22 whatever time. And I understand your
23 position, there's no point of repeating

1 yourself is going to change the facts that
2 I've represented to you.
3     MR. SHEEHAN:  So as I understand it,
4 you're not telling us when you're going to
5 respond properly to the requests for
6 production, nor properly as to each and every
7 plaintiff, is that what I understand?
8     MR. CHARLES BONNER:  You understand what
9 you understand.  I don't know what you
10 understand.  I only know what I've said, and
11 the record reflects what I said.  You can
12 order the transcript and read it.
13     MR. SHEEHAN:  So, again, you're not
14 telling us when you're going to respond
15 properly to the discovery requests?
16     MR. CHARLES BONNER:  Ms. Court Reporter,
17 you can charge Mr. Sheehan for this portion
18 of the deposition transcript.  I will not pay
19 for it.
20     MR. SHEEHAN:  And I'll be glad to pay for
21 this conversation in an attempt to have the
22 responses to the interrogatories and the
23 requests for production properly responded

```
 1   to.
 2          THE REPORTER:  Mr. Bonner, would you like
 3   a copy of Ms. Hart's deposition?
 4          MR. CHARLES BONNER:  I would, minus the
 5   colloquy between Mr. Sheehan and me.
 6          MR. SHEEHAN:  And Mr. Sheehan will be
 7   glad to pay for the discussion on the record
 8   as to when we could expect proper responses
 9   to the discovery, which is now over two
10   months due.
11          MR. CHARLES BONNER:  And I disagree that
12   it's over two months.  We did respond within
13   the context of your illegal non-compliance
14   discovery, but we will get it to you, sir.
15          MR. SHEEHAN:  And just so the record is
16   clear, you did not properly respond to the
17   response.
18          MR. CHARLES BONNER:  All right.  Very
19   good.  You have your position and we
20   understand each other.
21          MS. SHEEHAN:  Thank you, sir.
22          MR. CHARLES BONNER: You're welcome.
23   Thank you. Happy holidays.
```