**IN THE UNITED STATES DISTRICT COURT**
**for the**
**SOUTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **Rodney K., Sr., Mary K. Kaneesha Q., et al.,** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | **CASE NO.: 1:18-CV-343-KD-N** |
| v. | ) | |
| | ) | |
| **Mobile County School Board, et al.** | ) | |
| | ) | |
| **Defendants** | ) | |

## PLAINTIFFS' NOTICE OF MOTION FOR SUMMARY ADJUDICATION OF ISSUES ON CLAIMS AGAINST MARTHA PEEK

**COMES NOW** the Plaintiffs RODNEY K. SR., MARY K., AND, R. K. JR.; STACY S. T., AND G. T. B.; COLBY Q., KENNESHA Q., AND J. C.; AND L. C. SR., TIFFANIE C., L. C. JR. **(**PLAINTIFFS) and pursuant to **Rule Fed. R. Civ. P. 56** and **Civil Local Rule 7** move this Court for any order adjudicating the following counts set forth below in favor of PLAINTIFFS and against Defendants MARTHA PEEK, Superintendent of the Mobile County Public School System.  Plaintiffs bring this action because the undisputed material facts establish that they are entitled to the adjudication of the following causes of action their favor.

Count 2      Violation of Fourth Amendment (42 U.S.C. § 1983)

Count 3      Violation of Fourteenth Amendment (42 U.S.C. § 1983)

Count 4      *Monell* Claim Against Mobile County Board of Education (42 U.S.C. 1983)

## STATEMENT OF THE CASE

On August 3, 2018, Plaintiffs Rodney K., Sr.; Mary K.; R. K., Jr.; G. T. B.; Stacy S. T.; Kennesha Q.; Colby Q.; and J.C. originally filed their Complaint against Defendants the Board, the individual Board Defendants, Superintendent Martha L. Peek, Principal Lewis Copeland, and Coach Fred Riley, Coach Bobby J. Pope, Coach Miller, and Coach Eubanks (collectively, the "Defendant Coaches"). Doc. 1 ¶¶ 19-36.

On September 7, 2018, the Board, the individual Board Defendants, and Martha Peek, who was at all relevant times, the Superintendent of the Mobile County Public School System, filed their Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Doc. 16. Plaintiffs filed their response to the Motion to Dismiss as well as their Motion to File Plaintiffs' First Amended Complaint on September 28, 2018. Docs. 27-28. The Court granted Plaintiffs' Motion to File Plaintiffs' First Amended Complaint, which rendered moot the original Motion to Dismiss, and Plaintiffs filed their First Amended Complaint on November 28, 2018. See Docs. 30, 33 In the First Amended Complaint, Plaintiffs L. C., Sr., Tiffanie C., and L. C., Jr., were added as parties and all of the claims from the original Complaint were brought except for premises liability and negligent training, hiring, retention, and supervision. *Compare* Doc. 1 *with* Doc. 33. On December 6, 2018, Defendant Board and the individual Board Defendants filed a Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), in which they move the Court to dismiss Plaintiffs' claims against them. Doc. 37.  On July 25, 2019 the Court issued an order granting in part and denying in part the Motion to Dismiss. Doc 37.  The Court granted the motion as to Counts 1 (Violation of Tile IX), 5 (violation of Ala. Code § 16-1-23), 9 (negligence), 10 (negligence

per se), and 11 (violation of Ala. Code § 16-1-24.1).   The Court denied the Board Defendants motion as to Counts 2 (violation of Fourth Amendment (42 U.S.C. § 1983)), 3 (Violation of Fourteenth Amendment (42 U.S.C. § 1983)), and 4 (Monell Claim Against Mobile County Board Of Education (42 U.S.C. 1983)).

Plaintiffs' remaining claims from the First Amended Complaint include: Count 2, violation of the Fourth Amendment, which is brought against all of the Defendants; Count 3, violation of the Fourteenth Amendment, which is brought against the Board, the individual Board Defendants, Superintendent Peek and Defendant Coaches; Count 4, a *Monell* claim that the Court construes as a due process violation pursuant to the Fourteenth Amendment, which is brought against the Board; Count 5, a violation of Ala. Code § 16-1-23, which is brought against Defendant Coaches; Count 6, assault and battery, which is brought against Defendant Coaches; Count 7, false imprisonment, which is brought against Defendant Coaches; Count 8, intentional infliction of emotional distress, which is brought against Defendant Coaches; Count 9, negligence, which is brought against Principal Copeland and Defendant Coaches; Count 10, negligence per se, which is brought against Principal Copeland and Defendant Coaches; and Count 11, violation of Ala. Code § 16-1-24.1, which is brought against Principal Copeland and Defendant Coaches.

## STATEMENT OF FACTS

Pursuant to Court Order Doc 125, Plaintiffs incorporate by reference the facts set forth in Plaintiffs' Statement of Material Fact filed concurrently. Plaintiffs are former students of Davidson High School and their parents.  PSMF 38, 68, 88, and 96.  Each student was physically hazed or assaulted by members of the football team coached by

Defendant Coaches (Defendants Riley, Pope, Eubanks and Miller). While each Plaintiff suffered a different assault, each assault was the product of a history of willful, intentional, and conscious, deliberate disregard for the health, safety and constitutional rights of the students. For years, before the assaults suffered by the student Plaintiffs, Davidson football players were subjected to ritualistic abuse at the hands of their older teammates. PSMF 22 -30.

This abuse would have been discovered and stopped had Defendant Peek, the Defendant Board and Board members required mandatory anti-hazing training as they required training on bullying, suicide prevention and mandatory reporting. PSMF 150-155. Despite Ala. Code § 16-1-23[1] which prohibits hazing in all forms, Defendant Peek, the Defendant Board and the Board Members failed to provide any training to teachers or administrators on the anti-hazing law. PSMF 150-158. As a result, Defendant Peek, teachers, coaches, counselors and administrators failed to implement any policies or procedures to ensure that students were not the victims of hazing and were unable to recognize hazing when it was right under their collective noses. PSMF 132-148. Moreover, the failure to create policies and procedures to prevent hazing, allowed the Defendant Coaches to create an environment that rewarded hazing and violence. PSMF 15-32.

Furthermore, prior to the assaults suffered by the student Plaintiffs the Defendant Peek and the Board were on notice of Coach Riley's abusive conduct. PSMF 166-174.

---

[1] Plaintiffs are aware that the Court's Order on the Board and Board Defendants Motion to Dismiss, dismissed Plaintiffs' causes of action based on Ala. Code § 16-1-23 and § 16-1-24.1. Plaintiff does not seek to resurrect those arguments, rather they seek to establish that the Boards failure was more than mere acquiescence.

In or around November 2016, prior to the hazing incident that caused injury to R.K. Jr. Valerie Powe and her husband attempted to contact Martha Peek, and ended up speaking with School Commissioner Mr. Battle about immoral and unsportsmanlike harassment by Coach Riley directed at their son, ZSAJUAN POWE, after their son decided to transfer out of Davidson. PSMF 166. The Powes' written complaint about Coach Riley, directed at the district office, provided notice that Coach Riley was harassing the family and his former student athlete. PSMF 167. The Powes also spoke directly to Defendant Crenshaw and Defendant Battles about the harassment by Defendant Riley. PSMF 168.

Superintendent Peek, the Board and the Board members took no action to investigate the allegations against Defendant Riley. PSMF 169. An investigation into Coach Riley based on complaints brought by the Powes would have uncovered the facts that Coach Riley routinely failed to pass along to his players letters from interested college football programs.  Former player Zsajuan Powe, while retrieving a laptop for Ken Daigle, found a letter from Nebraska University that was addressed to him, Zsajuan Powe. After he found a letter with his name on it, he found 30-40 other letters that Coach Riley had not passed along to players. PSMF 170.

In an investigation, the board would have learned that Coach Riley created an animalistic culture that tolerated routine fighting in the locker room, within sight of the coaches' offices and with the coaches watching the fighting.  PSMF 171. The Board would have learned that Coach Riley created a culture where fights between seniors and freshmen left Zsajuan with a busted bloody mouth, to which, Defendant Riley sated, "they got you pretty good" and then started laughing. The Board would have learned that there

was rampant hazing in the Davidson locker room because upperclassmen could get away with it.  PSMF 173.  The Board would have learned that Coach Riley would be present and watch players fighting each other. PSMF 174. Had the Board discharged its mandatory duty under Alabama Education Law, instead of active deliberate indifference to Alabama Education Law, the U.S. Constitutional Rights of the students and parents, the Board would have discovered and stopped Coach Riley's "fight club".

Neither the Board as a whole nor any individual Board members took any steps to investigate hazing or even discuss whether it was occurring. PSMF 176- 184. They took no steps to have a policy prohibiting hazing or to require any training for teachers, staff, students or coaches. *Id.* Perhaps most conscience shocking about the Board as a whole and the individual board member is that after witnessing video after video of students getting hazed and assaulted, each board member testified they planned to do nothing and took no affirmative corrective action to protect students from hazing, and end the fight club. PSMF 193 (Foster); 254 (Harwell); 246 (Battles); 251 (Stringfellow); 236 (Crenshaw).

## Actual and Constructive Knowledge

*1. Hazing Victims*

Superintendent Peek had active and constructive knowledge of hazing and violence in Mobile County School System. In addition to the four (4) student Plaintiff victims of hazing and violence, Resource Officer Eric Terry randomly interviewed approximately twenty (20) of Coach Riley's football players. Virtually every player confirmed hazing was a "tradition", a routine occurrence during football season, sometimes happening "once a week". "You get beat up to varsity".

Resource Officer Eric Terry interviews in May 2018 of Coach Riley's football players confirms hazing dating back to 2014: (Bonner Dec. 133. Eric Terry Depo.)

### **REPORTED HAZING INCIDENTS AMONG FOOTBALL PLAYERS**

EXHBIIT 18-Mchael Ashe-Hazing Once a Week, Tradition, Saw Student put in trash can, got beat up a couple days ago.

EXHIBIT 22-Reginald Davis-Hazing Two or Three Times That I Know of, Tradition, It's something We see an initiation to be on varsity. It's kind of like what happens to you when you join a locker room. You get beat up, welcome to varsity level, to locker room, you know.

EXHIBIT 25-Lyman Collins-Put in Trashcan.

EXHIBIT 26-Sumar Lewis-Got Beat Up in Locker Room.

EXHIBIT 27-Noah Lewis-Hazing Once or Twice a Week.

EXHIBIT 29-Josh Howard-Saw Another Kid Get Thrown to Ground and Piled On

EXHIBIT 30-George Morris-Hazing Every Couple of Days-Thrown to Ground, Piled on, Face Scratched.

EXHIIT 32 KOBE BLUNT "When you said this had occurred before, so how many years have you been on the team? "This will be my fourth year." "So it's been happening since you've been here, right? "Yes, sir" [BACK TO 2014]

EXHIBIT 33-Andre Morrison-Hazing Every Walk-On Season-When Freshmen Are Moving Up to The Varsity, Like December or January, When Lower Classmen Are Moving Up to The Varsity or JV, Randomly During the Spring.

EXHIBIT 35-Johnson-Witnessed Player Get Piled on And Face Scratched.

2. *Chart of Hazing/Violence/Harassment*

**Mobile County Annual School Incident Report**
2016-2017-2018

| BONNER DEC. EX 2 | | | |
|---|---|---|---|
| INCIDENTS | PARTICIPANTS/STUDENTS | WP DAVIDSON HIGH SCHOOL INCIDENTS | WP DAVIDSON HIGH SCHOOL PARTICIPANTS |
| FIGHTING-8,102 | 8,938 | 155 | 261 |
| KNIFE USE-265 | 259 | 6 | 6 |
| ASSAULT-145 | 148 | 12 | 12 |
| HARRASSMENT-599 | 615 | 7 | 9 |
| TOTALS-     9,111 | 9,960 | 180 | 288 |

3. *Lawsuit regarding Hazing*

Superintendent Peek knew, or should have known, of a Federal Lawsuit filed in this Court for a student victim of "Hazing" at Semmes Middle School. Some of the Hazing incident were videotaped and published the news, including television reports. [2]

---

[2] Case 1:19-Cv-00052-N Document 1 Filed 02/07/19 Page 1 Of 55 Pageid #: 1
United States Federal District Court
Southern District of Alabama
Amber C. And Joseph C., Parents And
Guardians of G.C., A Minor, And G.C., A Minor Plaintiffs Vs.
Mobile County Board of Education; Douglas Harwell, Jr. In His Official And Individual Capacity- District I,
Don Stringfellow, In His Official And Individual Capacity-District Ii;
Reginald Crenshaw, In His Official And Individual Capacity- District Iii; Robert Battles,
In His Official And Individual Capacity-District Iv; William Foster, In His Official And Individual Capacity-
District V; Former- Superintendent, Martha Peek, In Her Official And Individual Chresal D. Threadgill,
Superintendent Of The Mobile County Public School System, et al. Complaint For Damages
**State Claims**
1. **Violation Of Al. Code §16-1-23 And §16-1-24.1**
2. **"Anti-Hazing Law"**
71."It is August 26, 2016, during the school day at Semmes Middle School. the classes change and g.c. is alone. although called for, there was no paraprofessional with g.c. no one is supervising g.c. and no one

4. *Harwell actual knowledge of Two (2) acts of Violence*

PSMF 264 Harwell was aware of a second bullying incident at "Semmes Middle School" where boy was chased down school by several students.

### SUPERINTENDENT MARTHA PEEK LIABILITY

SUPERINTENDENT MARTHA PEEK'S following testimony, including her actual knowledge and constructive knowledge of at least two (2) "mob" attacks of students at Semmes Middle School, proves by a preponderance of evidence her omissions, inaction and deliberate indifference to the clear and present danger of hazing and violence to the students in Coach Riley's football team and in the Mobile County School System: Peek was the Board of School Commissioners chief executive officer." "safety and security" were part of her duties. Peek had the authority to developed policies and did developed policies: "Policies could be designed and developed under my auspices. The policies were approved by the Board of school commissioners, so they would be the policy makers." Peek asserts "Safety is the goal." PSMF 5

**Peek Failed To Develop Policies, Practices And Procedures Preventing Hazing**.

Despite the obvious need for hazing related policies and procedures, neither the board nor Ms. Peek took any action to implement any procedures to keep students safe

---

is supervising the other students. a water hose is turned on g.c. and he is publicly humiliated and soaked with water by another student. g.c. is afraid: he fears going into the locker room, he even fears going into the school building. g.c. has been physically attacked and verbally abused before by students in unsupervised situations. but there has been no reaction by defendants, no intervention by defendants and no action to prevent future harm to g.c. on the part of the defendants in this case.

**72**. There have been numerous other attacks at Semmes Middle School involving videotaping of assaults on other students by large groups (mobs) of students acting without supervision and complete inaction of staff and employees of Semmes Middle School to intervene on behalf of the student being attacked."

in a locker room. PSMF 6. Neither Defendant Peek nor the board provided any direction regarding how to ensure student safety. PSMF 9. After R.K. JR was hazed, Ms. Peek suggested having an adult in the locker. Ms Peek states: "I did not institute anything to address that [hazing] at Davidson High School." During Ms. Peek's six-year tenure as Superintendent of Mobile County School from 2012 until 2018 there was no practice of always having an adult in the dressing room where young athletes were. PSMF 17. The district and Superintendent Peek had access to the Collins' complaints because Defendant Peek contacted Mrs. Collins after the R.K. Jr. video surfaced and indicated that she, Superintendent Peek, was aware of the stuff going on at Davidson and was going to get to the bottom of it. PSMF 86. Threadgill states no discussion with PEEK regarding training of Coaches.  Does not recall Board discussing Hazing.

Peek failed to implement procedures and practices to prevent hazing after R.K.JR. hazing and admitting that according to Ms. Peek's investigation, during the time that Rodney Kim was beaten, who were the three coaches that were present Coach Philon, Coach Boltman, and Coach Reeves there in the locker room. PSMF 285. This is impermissible deliberate indifference that shocks the conscience in the constitutional sense.

**Peek Failed To Provide Training To Prevent Hazing And Violence**

Peek has not participated in any training about developing procedures for implementing any type for hazing. She has not attended any training on developing procedures to prevent hazing. Peek has no knowledge that Board members received any training re hazing. Peek did not make any recommendation to the Board about any type

of training for any coach in the Mobile County Public School System, and specifically not for Coach Riley. PSMF 153. BOARD did not provide Peek with training to prevent hazing PSMF 154. Neither Peek nor Board Members talk with Riley about hazing, bullying, violence or whether videos of beatings were part of initiation into football team. Defendants failed to investigate hazing before Martha Peek PSMF 155. Ms. Peek showed deliberate indifferent to impact on mental and emotional health of R.K. JR EX. PSMF 156. Coach Rieves received no training from Davidson High School before becoming a volunteer coach. Principal Copeland never provided him any training on student safety or told him to take any training on student safety. Martha Peek never directed him to take any training on bullying, harassment or hazing. None of the Board Members ever directed him to do any training on hazing, bullying or harassment. PSMF 170.

When asked, Copeland admits he knows what hazing is and it involves initiation and admits to knowing there is a law in Alabama to prevent it. He admits that it's a crime to commit hazing and also to allow it. He goes on further to admit "No, we've never implemented a procedure just to specifically prevent that -- prevent hazing. No." He also admits that to his knowledge the School Board and Martha Peek have done nothing to prevent hazing by way of policies and procedures. PSMF 172.

Defendant Peek failed to avail herself of training on hazing offered by various Professional Association/Alliances, including National Federation of High Schools, which offered training course on hazing entitled "bullying, hazing and inappropriate behaviors". Defendants failed to avail themselves of training on hazing was also available from the "Alabama Athletic Association, including the School Superintendents of Alabama, The American Association of School Superintendents; The Alabama Association of School

Boards, National Association of Secondary School Administrators; Council for Leaders in Schools in Alabama. "PSMF 283.

## Parents Powe Complained To Peek's Office And Board Members About Son's Abuse

In or around November 2016, prior to the hazing incident that caused injury to R.K. Jr., Valerie Powe and her husband attempted to contacted Martha Peek, and ended up speaking with School Commissioner Mr. Battle about immoral and unsportsmanlike harassment by Coach Riley directed at their son, ZSAJUAN POWE, after their son decided to transfer out of Davidson. PSMF 174. The Powes decided to move Zsajuan to a new school to escape from Coach Riley after talking to another family, Zane English, who had complained about Coach Riley directly to Martha Peek. PSMF 175.  The Powes written complaint about Coach Riley, directed at the district office, provided notice that Coach Riley was harassing the family and his former student athlete. PSMF 176. The Powes also spoke directly to Defendant Crenshaw and Defendant Battles and contacted Peek's office about the harassment by Defendant Riley but received no response. PSMF 177. Threadgill states no discussion with PEEK regarding training of Coaches. PSMF 189. Dr. Foster that Martha Peek may have told him about the incident at Semmes Middle School that occurred between 2016 and 2017. Id. at 107:2-5. PSMF 216. Harwell was aware of a second bullying incident at "Semmes Middle School" where boy was chased down school by several students "Yes, sir; there was a -- just the same as the -- the Davidson case where some kids had had a video with a phone." And he watched the video of this Incident. "I saw it on the news as well. Yes, sir". Board member Harwell failed to recommend to the board procedure following this incident at Semmes Middle School

to protect and ensure the safety of students in the Mobile County School System. After the two incidents in middle school, Harwell did not recommend to Board that to implement procedures to ensure safety of Students.83:9-17; After the "MOB" attacked at Semmes Middle School, Ms. Peek did not recommend new producers. Harwell received reports of violence. PSMF 264.

Copeland is only aware of one time that Martha Peek ever made a recommendation and that was after the R.K.JR. incident. That was to put adults in the lock room to monitor students all the time. PSMF 268. Before R.K. JR. was hazed, Ms. Peek did not present any procedure to the Board to prevent hazing. Martha Peek: After R.K. Jr was hazed, Ms. Peek suggested having an adult in the locker. Peek states: "I did not institute anything to address that [hazing] at Davidson High School." During Peek's six-year tenure from 2012 until 2018 there was no practice of having an adult at all times in the dressing room where young athletes were. PSMF 281. Ms. Peek failed to include a procedure in the Student Code of Conduct or Handbook preventing hazing and she was involved in the Student Code of Conduct, revamped during her tenure but she did not include Hazing. Student Handbook does not include Hazing PSMF 282.

Credibility at Issue with Ms. Peek: Ms. Peek incredulously claims she has no knowledge of widely published via newspaper and television Jury Verdict for $128,573.39 in back pay and damages against her in 2020: "Jury finds former Mobile superintendent blocked promotion for Black school administrator." "Q. But you heard the jury verdict in that case; isn't that true?  A No, sir. I was simply a witness in that case. I was not present for the jury verdict. Or I have had no follow up or any correspondence on it since then." PSMF 284.

Peek did not give Tony Wilson in writing any procedures to prevent hazing, bullying, or harassment. PSMF 287 Tony Wilson admits that there are no teachers, coaches, administrators present in video of R.K., JR. Beating. PSMF 288.

## Action Peek Should Have Taken To Prevent Hazing And Violence

PSMF 317.   Complaints and criticisms of Martha Peek. Ex. 140 Depo of Dr. Pollard: 277:21-23; 278:1-16; 279:6-17

21 Q. Now, what complaints or criticisms do you
22 have of Ms. Peek?
23 A. Well, as being the CEO of the school
1 organization, the leader of that, I would
2 have expected that there would have been
3 compliance with the hazing statute, that she
4 would have made recommendations that be
5 included in the student handbook as well as
6 in the student code of conduct.
7 I think to have set up where in her
8 testimony she talked about the response to
9 hazing was a policy, the response was simply
10 the expectation that if it was a policy, it
11 was going to change the behavior. And so as
12 a leader of the organization, she could have
13 done -- provided the resources for the staff
14 to be trained, for the individuals to have
15 had a policy about that and for it to be
16 re-enforced.
6 Q. You've got the report in front of you. If
7 you will, I need to know now, what criticisms
8 or complaints do you have with respect to
9 Ms. Peek?
10 A. As what is listed in my report and as I said,
11 previously with those other criticisms. You
12 know, concern that she did not have an
13 anti-hazing policy with that.
14 Q. Anything else?
15 A. That the superintendent did not have an
16 adequate knowledge base to develop policies
17 specific to hazing.

14

**LEGAL STANDARD**

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. Id. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.,* 831 F.2d 1013, 1016 (11th Cir. 1987)

**LEGAL ARGUMENT:**

**Count Two: FOURTH AMENDMENT**

To obtain relief under § 1983, a plaintiff must demonstrate that he was deprived of a federal right by a person acting under color of state law. Patrick v. Floyd Med. Center, 201 F.3d 1313, 1315 (11th Cir. 2000). It has long been recognized that § 1983 is not a source of substantive federal rights. Whiting v. Traylor, 85 F.3d 581, 583 (11th Cir. 1996).

Instead, to maintain a § 1983 action, a plaintiff must point to a violation of a specific federal right. Id. Here, Plaintiff asserts that the Defendants violated his Fourth Amendment rights.

Generally, the "under color of state law" requirement excludes from § 1983's reach merely private conduct, no matter how wrongful. Am. Manufacturers Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999). For Plaintiff to bring this § 1983 action against the Defendants, who are private citizens, he must demonstrate that the conduct allegedly causing the deprivation of his Fourth Amendment rights is fairly attributable to the state. Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982).

The Eleventh circuit has set forth the three primary tests the Supreme Court has used to determine whether deprivation of constitutional rights are attributable to the state and thereby constitutes state action. State action exists: (1) the public function test; (2) the state compulsion test; and (3) the nexus/joint action test. The public function test limits state action to instances where private actors are performing functions "traditionally the exclusive prerogative of the state." The state compulsion test limits state action to instances where the government "has coerced or at least significantly encouraged the action alleged to violate the Constitution." The nexus/joint action test applies where "the state has so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." Courts must determine on a case-by-case basis whether sufficient state action is present from a non-state actor [ ] to sustain a section 1983 claim. Nat'l Broad. Co., Inc. v. Commc'ns Workers of Am., AFL-CIO, 860 F.2d 1022, 1026-27 (11th Cir. 1988).

In *Blum v. Yaretsky*, 457 U.S. 991, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982) . . . the Supreme Court applied a standard analogous to [the Eleventh Circuit's] nexus/joint action test. In outlining a mode for determining the propriety of holding the state liable for private conduct, the Court said: "the complaining party must . . . show that 'there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.'" Id. at 1004, 102 S. Ct. at 2786. The court continued: "The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains. The importance of this assurance is evident when, as in this case, the complaining party seeks to hold the State liable for the actions of private parties." Id. The Court further held that "although the factual setting of each case will be significant, our precedents indicate that a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives . . ." Id. at 1004-05, 102 S. Ct. at 2786(emphasis added).

The Fourth Amendment provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ." U.S. Const. amend. IV. The facts set forth above establish that Defendant Peek approved, allowed and "significantly encouraged, either overtly or covertly" the assaults on Plaintiffs to persist by students. The failure to take any action to implement any comprehensive anti-hazing and anti-violence polices or procedures

allowed the hazing and violence to become the culture within the football team.  PSMF 18-35.

**Count Three: FOURTEENTH AMENDMENT**

The due process clause of the Fourteenth Amendment prohibits states from "depriving any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV § 1. The due process clause "was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998). The substantive component of the due process clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992).

Only in certain limited circumstances does the Constitution impose affirmative duties of care on the states. *Doe v. Braddy*, 673 F.3d 1313, 1318 (11th Cir. 2012). The "stated-created danger" doctrine exists where conduct by a government actor rises to the level of a substantive due process when the actor's conduct can be characterized as arbitrary or conscience shocking in a constitutional sense." *Id; Dacosta v. Nwachukwa*, 304 F.3d 1045, 1048 (11th Cir. 2002) (only the most egregious official conduct can be said to be arbitrary in the constitutional sense). To rise to a "conscience-shocking" level, the offending conduct of a state actor most likely must be intentionally injurious and unsupported by any government interest. *Davis v. Carter*, 555 F.3d 979, 982 (2009). Determinations of what is egregious conduct must not be made in the glow of hindsight; decisions made by a government actor must be egregious – that is, shock the conscience – at the time the government actor made the decisions. *See Rodriguez v. Farrell*, 280

F.3d 1341, 1352-53 (11th Cir. 2002) (concluding that hindsight could not be used to judge police officer's act of handcuffing suspect, but rather it was necessary to consider what the police officer knew or reasonably should have known at the time of the act). Thus, whether a state actor's conduct shocks the conscience depends on the particular factual circumstances, and cannot be determined by reference to an inflexible standard. *County of Sacramento,* 523 U.S. at 850.

However, in a non-custodial setting, a substantive due process violation would, at the very least, require a showing of deliberate indifference to an extremely great risk of serious injury to someone in Plaintiffs' position. *Waddell v. Hemerson*, 329 F.3d 1300, 1305 (11th Cir. 2003). In *L.S. ex rel. Hernandez v. Peterson,* 982 F.3d 1323, 2020 WL 7296744 (11th Cir. Dec. 11, 2020), the Eleventh Circuit held that acting with "deliberate indifference" means acting with knowledge and disregard of an excessive — i.e. extremely great — risk to the victim's health or safety. In *L.S. ex rel. Hernandez*, a case involving a school shooting, the court held that because the students did not stand in custodial relationship with the state, to succeed on a theory of deliberate indifference, plaintiffs were required to "allege both that the officials acted with deliberate indifference and that their indifference was "arbitrary" or "conscience shocking." *Id.* at *4. To be deliberately indifferent, a defendant must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind." *Farmer v. Brennan* 511 U.S. 825, 834-38, 114 S.Ct. 1970, 128 L.Ed.2d 811(1994); *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference).

The Eleventh Circuit has additionally held that within the context of an educational setting, deliberate indifference and conscience shocking is apparent where there exists intentional corporal punishment, physically contact with a student or otherwise a willful and/or malicious intent to injure the student. *Davis v. Carter*, 555 F.3d 979, 984 (11th Cir. 2009); *Neal ex rel. Neal v. Fulton County Board of Education*, 229 F.3d 1069 (11th Cir. 2000). Thus, intentionally injurious conduct unsupported by any government interest is the sort of conduct most likely to rise to the conscience-shocking level. *County of Sacramento,* 523 U.S. at 848-49.

When evaluating whether corporal punishment rises to a level of excessive, courts look at both an "objective and a subjective component." Neal ex rel., 229 F.3d at 1075, n. 3. The court held that "the punishment must objectively be obviously excessive and the teacher must subjectively intend to use that obviously excessive amount of force in circumstances where it was foreseeable that serious bodily injury could result." *Id.* In *Neal*, the Eleventh Circuit set forth an analysis to assist in determining if a person's constitutional rights were violated for excessive corporal punishment. 229 F.3d at 1075. It explained: "we hold that, at a minimum, the plaintiff must allege facts demonstrating that (1) a school official intentionally used an amount of force that was obviously excessive under the circumstances, and (2) the force used presented a reasonably foreseeable risk of serious bodily injury. In determining whether the amount of force used is obviously excessive, we consider the totality of the circumstances. In particular, we examine: (1) the need for the application of corporal punishment, (2) the relationship between the need and amount of punishment administered, and (3) the extent of the injury inflicted." *Id.*

Here, the failure of the Defendant Peek to take any action to implement anti-hazing policies and procedures or to investigate Coach Riley after the Powe's complaints, amounts to deliberate indifference. Given the extended period of time that hazing was occurring and Davidson and the prevalence within the football team, the Defendant Peek was obligated to take steps to investigate whether hazing was occurring and to create education and policies to ensure that hazing is stopped. This is exactly what the board requires for bullying, suicide prevention, and mandatory reporting despite the fact that there is little to know observable bullying and no known suicides.  PSMF 157-166.

**Count Four: MUNICIPAL LIABILITY**

Municipalities may not be held liable for constitutional deprivations on the theory of respondeat superior. *Denno v. Sch. Bd. of Volusia Cty.*, Fla., 218 F.3d 1267, 1276 (11th Cir. 2000). Instead, "municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80, 106 S. Ct. 1292, 1298, 89 L. Ed. 2d 452 (1986). Therefore, a municipality may be held liable "only if such constitutional torts result from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." Denno, 218 F.3d at 1276. In addition to identifying conduct attributable to the municipality, a plaintiff alleging municipal liability under § 1983 must show that the "municipal action was taken with requisite degree of culpability, i.e., that the municipal action was taken with deliberate indifference to its known or obvious consequences." *Davis*, 233 F.3d at 1375-76.

A plaintiff can establish municipal liability in three ways: (1) identify an official policy; (2) identify an unofficial custom or practice that is "so permanent and well settled

as to constitute a custom and usage with the force of law"; or (3) identify a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights. *See Cuesta v. Sch. Bd. of Miami-Dade Cty., Fla.*, 285 F.3d 962, 966, 968 (11th Cir. 2002). Given that a municipality will rarely have an officially adopted policy that permits a particular constitutional violation, municipalities may be sued for "constitutional deprivations visited pursuant to governmental 'custom' even though such custom has not received formal approval through the [municipality's] official decision-making channels." *See Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Custom consists of "persistent and widespread . . . practices" or "deeply embedded traditional ways of carrying out . . . policy" that, although unwritten, are "so permanent and well settled as to [have] . . . the force of law." *See id.* at 691 & n.56. In cases alleging municipal "inaction," a custom arises where a municipality fails to correct "the constitutionally offensive actions of its employees" and instead "tacitly authorizes" or "displays deliberate indifference towards the misconduct." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001). Importantly, the municipality must have actual or constructive knowledge of the widespread unconstitutional practice to form a custom of indifference, and "random acts or isolated incidents are insufficient." *See Depew v. City of St. Marys, Georgia*, 787 F.2d 1496, 1499 (11th Cir. 1986).

A School Board's liability under § 1983 may also exist for its failure to train and supervise its employees and is similarly limited to circumstances where the failure to train or supervise amounts to deliberate indifference and is based on an official policy or custom. *See City of Canton v. Harris*, 489 U.S. 378, 387, 109 S. Ct. 1197, 103 L. Ed. 2d

412 (1989). To state and prove such a theory of liability, a plaintiff must show: (1) the employees were inadequately trained or supervised, (2) this failure to adequately train or supervise is the policy or custom of the government entity, and (3) the policy or custom caused the employees to violate a citizen's constitutional rights. Id. at 389-91; *see also Gold v. City of Miami*, 151 F.3d 1346, 1350(11th Cir. 1998). Because "a municipality will rarely have an express written or oral policy of inadequately training or supervising its employees," a policy or custom may be shown where the failure to train or supervise evidenced "deliberate indifference" to constitutional rights in the face of a "history of widespread prior abuse" or where a pattern of prior similar incidents put the municipality on notice of a need to train or supervise." *Gold*, 151 F.3d at 1350-51. Thus, in order to assert such a claim, a plaintiff must "present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Id.* at 1350. Here, the evidence of the Powe family establish such knowledge. PSMF 166-174.

A municipality may also be liable "on the basis of ratification when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority." *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016). In this context, the "final policymaker, however, must ratify not only the decision itself, but also the unconstitutional basis for it." *Matthews v. Columbia Cty.*, 294 F.3d 1294, 1297 (11th Cir. 2002). As implicated in this case, the Eleventh Circuit has also suggested that a City's "persistent failure to take disciplinary action against an employee can give rise to the inference that a municipality ratified

conduct, thereby establishing a 'custom' within the meaning of Monell." *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985).

Here the rampant history of hazing and violence and the total failure of the Defendant Peek to take any action to control the Coach Riley, even after learning about Riley's treatment of the Powe family, amounts to a Constitutional violation. Defendant Peek was a policy maker, submitting policies for approval by the Board. Defendant Peek implemented a policy of inaction and omission, ratified and adopted by the Board. The bottom line to this case is the Defendant Peek, the CEO and leader of the Mobile County School System was the lead state actor, like the lead bird in a gaggle of geese, and all the other Defendants descended into inaction, omission and compliancy in the wake of her inaction. Defendants are all liable for the pain, injuries a lifelong agony Defendants parachuted upon these vulnerable, unsuspecting parents and students. Defendants failed to discharge their mandatory duty to provide **loco parentis**, "in the place of a parents for the safety and care of our children.

## CONCLUSION

For the forgoing reason, supported by material facts, law and equity, Plaintiffs' Motion for Summary Adjudication must be granted.

Dated:  April 29, 2021                    **LAW OFFICES OF BONNER & BONNER**


                                           */s/ CHARLES A. BONNER*
                                           CHARLES A. BONNER, ESQ.
                                           Attorney for Plaintiffs
                                           Rodney K, et al.
                                           Law Offices of Bonner & Bonner
                                           475 Gate Five Road, Suite 212
                                           Sausalito, CA 94965

Telephone: (415) 331-3070
Facsimile: (415) 331-2738

## **CERTIFICATE OF SERVICE**

I hereby certify that on Thursday, April 29, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.


*/s/ Charles A. Bonner*
CHARLES A. BONNER