# EXHIBIT 140

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

```
                              )
                              )
RODNEY K., SR., MARY K.,      )
MARY K., GUARDIAN AD          )
LITEM FOR R.K., JR.,          )
MINOR; STACEY S.T. AND        )    CIVIL ACTION NO.
G.T.B., MINOR, BY HIS         )    1:18-cv-343-TFM-N
GUARDIAN AD LITEM STACEY      )
S.T.; KENNESHA Q. AND         )
COLBY Q. AND J.C., MINOR,     )
BY HIS GUARDIAN AD LITEM      )
KENNESHA Q.,                  )
                              )
                              )
          Plaintiffs,         )
                              )
VS.                           )
                              )
                              )
MOBILE COUNTY BOARD OF        )
EDUCATION, et al.,            )
                              )
                              )
          Defendants.         )
```

*********************************************
VIDEO CONFERENCE DEPOSITION OF:
NORMAN J. POLLARD

*********************************************
MARCH 4TH, 2021
MOBILE BAY REPORTING
110 DAUPHIN STREET
MOBILE, AL.  36602
9:00 A.M.

Page 71

1      it?

2   A.   Well, working on a college campus where

3        there's that same behavior of sharing the

4        information that -- for example, we have

5        staff that monitors Facebook, Twitter,

6        Snapchat, the different ways that students

7        communicate, that they look and they also

8        ask.

9   Q.   You have staff that monitors students'

10       Facebook, Twitter and Snapchat; is that what

11       you're saying?

12  A.   Not specific students individually for that,

13       but trying to have a pulse of the campus is

14       really important.

15  Q.   Okay.  Anyway, it doesn't appear at this

16       point to be part of your opinion.  I was just

17       more curious.  So you talked about Jeremiah

18       Chatman and then some kids in the locker room

19       and Rodney Kim being on social media?

20  A.   Correct.

21  Q.   All right.  And obviously you say unbeknownst

22       to school officials; so you would agree that

23       the school officials were not aware of these

Page 72

1        incidences that were on what you term social

2        media?

3    A.  Well, more importantly, it seemed as though

4        that they're unaware that it was occurring on

5        school grounds.

6    Q.  Okay.  But you agree that they were unaware

7        that it was occurring on school grounds?

8    A.  Correct.

9    Q.  All right.  And --

10   A.  Well, there were incidents where coaches

11       walked in when different concerning behavior

12       was being exhibited.  I don't know if it

13       necessarily was being recorded, but they

14       observed it and seemingly walked away from

15       them.

16   Q.  Okay.  And you're, I guess, referencing to

17       what some of the students said in their

18       interviews; is that correct?

19   A.  That's correct, yes.

20   Q.  But at least as far as the Rodney Kim and the

21       Jeremiah Chatman and the incident in the

22       locker room, you would agree that school

23       officials were not aware of those activities?

Norman Pollard

Page 73

1    A.    Well, there was an earlier incident with

2          Rodney where my understanding it had to do

3          with the shaving cream and being slapped and

4          beaten with belts, and Coach Eubanks observed

5          it and said knock it off.  So there was some

6          awareness of that, if I remember correctly

7          from Rodney's deposition.

8    Q.    Again, you know, I'm just taking your words

9          and I'm trying to find out what you're

10         saying.  But you said unbeknownst to school

11         officials, so by saying that, I guess are you

12         taking that back that you're now saying that

13         they were known to school officials?

14   A.    No, I'm sorry.  I didn't mean to cause

15         confusion.

16   Q.    Okay.  All right.

17   A.    That they're unbeknownst to it being on

18         social media.

19   Q.    Okay. And this is probably as good a time as

20         any to ask you this.  I represent the school

21         board.  Do you have any evidence, knowledge,

22         or opinion as to whether any individual

23         school board member had actual knowledge of

Norman Pollard

Page 74

1      what was going on at Davidson?

2      A.   My recollection from their depositions is

3           that they had -- none of the board members

4           had any idea.

5      Q.   Okay.  Fair enough.  And you don't have

6           anything that would dispute that; is that

7           fair?

8      A.   Well, other than -- is it Lyman Collins, that

9           his mom mentioned to Dr. Cleveland a

10          complaint about some of the behavior.

11     Q.   About some type of behavior of Coach Riley,

12          correct?

13     A.   That's correct.

14     Q.   All right.  And I don't represent Dr.

15          Cleveland, so I can't speak for her.  But as

16          far as you know, you have no evidence to

17          dispute the fact that the board members,

18          individually and collectively, had no actual

19          knowledge of what was allegedly going on in

20          the Davidson locker room?

21     A.   Correct.

22     Q.   Okay.  If you'll go to the next page, second

23          to the last paragraph; you say that, "The

Norman Pollard

Page 75

1          coaches and administrators had significant

2          control, power and influence over the

3          students and the Davidson High School

4          community."  And I'm assuming that you are

5          saying that in a general term in that all

6          coaches, teachers and administrators in a

7          high school have certain control over their

8          students; is that a fair statement?

9     A.   I think it reflects, you know, the concept of

10         "local printing," that they are charged with

11         the oversight of the students.

12    Q.   Right.  So when you reference Davidson High

13         School community, it could be any high school

14         community that this statement would apply to;

15         is that a fair --

16    A.   Correct.

17    Q.   Correct?

18    A.   Yes, that's fair.

19    Q.   Now, the next paragraph you say, "Usually

20         neither a new member nor their parents has

21         context or knowledge of the inner-workings of

22         high school athletics."  And that's in a

23         general term; is that correct?

Norman Pollard

Page 78

1    Q.   Okay.  And so you've studied that particular

2         section, correct?

3    A.   I've reviewed it, yes.

4    Q.   And have you got a copy of that in front of

5         you?  Did you do the entire code section in

6         your report?  I'm talking about 16-1-23, the

7         hazing.  I'm sorry.  Yes, that's it.  That's

8         the one I'm talking about, the hazing.  All

9         right.

10             Section D, which I guess is on the next

11        page, says, "Any person who shall commit the

12        offense of hazing shall be guilty of a Class

13        C misdemeanor as defined by Title 13A; is

14        that correct?

15   A.   Yes.

16   Q.   Do you know whether or not any of the coaches

17        were ever charged with hazing?

18   A.   It's my understanding that the -- that there

19        were no criminal charges brought against the

20        coaches.

21   Q.   Or the administrators at Davidson High

22        School?

23   A.   That's my understanding.

Page 79

1    Q.    Okay.  And you understand that encouraging or

2          assisting in hazing is also considered an

3          offense, correct?

4    A.    Yes.

5    Q.    Then section E says, "That any organization

6          associated with a school, college or other

7          educational which knowingly permits hazing to

8          be conducted shall forfeit any entitlement to

9          public funds, scholarships, awards which are

10         enjoyed by him or by it and shall be deprived

11         of any sanction or approval granted by the

12         school, college, university or other

13         educational institution."

14              Do you know or you would agree that

15         Davidson, Davidson football program, Coach

16         Riley, nobody forfeited any entitlement to

17         public funds or any awards or anything like

18         that; is that a fair statement?

19   A.    My understanding is that they did not.

20   Q.    All right.  Now, if you go to I guess Alabama

21         Code of Education, Section 16-1-24.1, which

22         is just below that, this has to do with safe

23         and drug-free policies; is that correct?

Norman Pollard

Page 86

1           to another person who has a hard time

2           defending himself or herself."

3       Q.  Okay.  With regards to Mr. Chatman, would the

4           activity that you saw on that video, would

5           that fall under bullying?

6       A.  Why I hesitated previously is that the

7           difference between the school's definition

8           and the Federal Guidelines at Bullying

9           website has to do with behaviors repeated or

10          has a potential to be repeated over time.

11          And what I don't know from the information

12          that was provided, if there were previous

13          incidents where he was targeted, bullied and

14          so forth and the potential for that, and if

15          there, in fact, were incidents after this one

16          that was recorded.

17      Q.  So you don't know whether -- well, you would

18          agree that it doesn't fall under the Davidson

19          High School definition unless you have

20          additional information, correct?

21      A.  That's correct.

22      Q.  But under the bullying standards where you

23          say that bullying is defined as unwanted

Norman Pollard

Page 87

1    aggressive behavior among school-age children

2    that involves a real or perceived power

3    imbalance, under that definition what

4    happened to Rodney Kim, Jr. would fall under

5    bullying, that definition, correct?

6  A.    Well, Rodney was joining the team.  It was

7    part of an initiation of new freshmen players

8    coming onto the varsity team, so there was an

9    initiation component to that.

10 Q.    Okay.  But as far as the definition of

11    bullying, under this federal guideline that

12    you provided, the actions directed toward

13    Rodney Kim, Jr. were unwanted, correct?

14 A.    That's correct.

15 Q.    Aggressive behavior, correct?

16 A.    Correct.

17 Q.    Among school-age children, correct?

18 A.    Correct.

19 Q.    And that involved a real or perceived power

20    imbalance, correct?

21 A.    Correct.

22 Q.    And the behavior is repeated, we all know, or

23    has the potential to be repeated; that could

Norman Pollard

Page 88

1        have happened to Rodney again, correct?

2   A.   Correct.  And the challenge oftentimes

3        between educating about the differentiation

4        between bullying and hazing takes some

5        purposeful dialogue, because some people

6        mistakenly think that that is bullying, but

7        the component of having that behavior

8        directed towards an individual who's trying

9        to join a team done by his teammates in order

10       to simply join, you know, the squad is

11       different than being picked on by a random

12       person walking down the hallway that may

13       inflict the same type of pain, trauma and

14       impact.

15  Q.   So are you saying bullying has to be with a

16       random person?

17  A.   No, no.  But you're not doing it as a factor

18       of joining a team or a club or organization.

19  Q.   So the actions are the same but the intention

20       is different; is that what you're saying?

21  A.   Yes, the context is different.

22  Q.   Okay.  So if you're just looking at

23       something, you can't tell whether it's

Norman Pollard

Page 90

1    Q.   All right.  Because they were, I think, taken

2         after you did your report.  Do you intend on

3         reading those depositions?

4    A.   If it's provided, I will.

5    Q.   Okay.  Are you aware that the Mobile County

6         Public School System has an anti-bullying

7         program that they have implemented in

8         conjunction with the Mobile County District

9         Attorney's office?

10   A.   I'm not aware of that.

11   Q.   So you're not aware of the extensive training

12        and support given by the Mobile County

13        District Attorney's office to the school

14        system with regards to anti-bullying,

15        correct?

16   A.   Did you say it was the District Attorney's

17        office that's doing the training on bullying?

18   Q.   There is a program between the Mobile County

19        School Board and the Mobile County District

20        Attorney's office whereby, yes, the district

21        attorney provides information, provides

22        reports, provides a hotline and things of

23        that nature directed at anti-bullying.  Are

Norman Pollard

Page 91

1        you aware of that?

2   A.   And this was implemented before these

3        incidents occurred?

4   Q.   Years ago.

5   A.   And have they evaluated the efficacy of those

6        programs?

7   Q.   I believe we've supplied reports in our

8        discovery, but I'm not sure how you define

9        the efficacy.  They do list a number of, you

10       know, complaints they get, the number of

11       calls they get, the number of investigations

12       they do, the number of people they arrest,

13       that sort of stuff.

14  A.   Well, it will be interesting to see how they

15       responded and reviewed after these incidents

16       that occurred to the students.

17  Q.   Well, certainly, you're aware that with the

18       Rodney Kim there was a complete police

19       investigation, and a number of the

20       perpetrators were arrested and charged and

21       either convicted or pled guilty, but of

22       course they were juveniles, so a lot of that

23       is undisclosed.  You are aware of that,

Norman Pollard

Page 92

1       right?

2    A.    I am aware, but I also didn't see where there

3          was any systemic change within the school as

4          a result of any of these incidents other than

5          increasing the supervision in the locker

6          room.

7    Q.    And you don't think that that is important,

8          to increase the supervision?

9    A.    It's not that it's not important, it's not

10         comprehensive.

11   Q.    Okay.  And as far as incidents of hazing, are

12         you aware of any incidents of hazing at

13         Davidson High School that occurred after the

14         Rodney Kim, Jr. incident?

15   A.    Well, my recollection is that the -- that his

16         occurred in spring of 2018, and then much of

17         the information came out.  So, no, I'm not

18         aware of additional.

19   Q.    Okay.  Hazing incidents, correct?

20   A.    That's correct.

21   Q.    All right.  Or for that matter, aware of any

22         hazing incidences that occurred at any Mobile

23         County Public High School subsequent to the

Norman Pollard

Page 95

1      high school personnel."  As far as the
2      general recommendations, I guess you provided
3      them in your seminars; is that correct?
4  A.  Yes, also in --
5  Q.  I'm sorry.  But as far as actual schools or
6      school systems, we've talked about the one up
7      in New York and the one in Tennessee,
8      correct?
9  A.  We've talked about those, but I don't know
10     what you're asking.
11 Q.  Well, I'm trying to find out how you provided
12     general recommendations for high school
13     personnel.
14 A.  In the book that was referenced, The Coaches
15     Guide to Hazing Prevention, in there it's the
16     actions that schools should take are
17     articulated --
18 Q.  Do you know whether that -- I'm sorry.
19 A.  I was going to say also through
20     hazingprevention.org, we provided information
21     through that venue and the National
22     Federation of High Schools also has provided
23     lots of information.  In fact, two of the

Norman Pollard

Page 96

1      coaches, Eubanks and Pope, took the online

2      course and had a lot of those recommendations

3      presented to them.

4   Q.   Okay.  And I don't represent either one of

5      those coaches.  But as far as providing

6      recommendations to high school personnel, you

7      have never, at least to your knowledge,

8      provided any recommendations to the board

9      members or the superintendent of Mobile

10      County Public School Systems with regards to

11      hazing prevention?

12   A.   I have not personally, no.

13   Q.   Okay.  And then going, I guess, a little

14      further down, you say, talk about "Bullying

15      as part of the School Culture."  And state

16      that in 2015, "School Crime Supplement for

17      National Center for Education indicates that,

18      nationwide, about 21 percent of students ages

19      12 to 18 experienced bullying," correct?

20   A.   Yes.

21   Q.   And you included this because you think what

22      happened to Mr. Chatman could have been

23      bullying?

Norman Pollard

Page 97

1    A.    Yes, it could have been.  And so I wanted to
2          include the industry standard of the
3          prevalence of bullying in public schools.
4    Q.    Right.  And also, as we discussed, what
5          happened to Rodney Kim could fall under the
6          federal definition of bullying, correct?
7    A.    Yes.  A lot of these behaviors could fit both
8          definitions by specific behaviors, but the
9          context of why and how it happened and who
10         was involved, then it could also be included
11         in hazing, even with Mr. Chatman.
12   Q.    Right.
13   A.    If part of the initiation or the expectation
14         of the football players was to randomly jump
15         one of a non-football player and assault them
16         as part of their initiation, then it could be
17         considered hazing as well, so that's why
18         further investigations is really critical
19         into the motivation and in the context of
20         these other incidents.
21   Q.    But you have no evidence or information that
22         what occurred to Mr. Chatman was part of a
23         initiation into something or other; is that a

Norman Pollard

Page 98

1          fair statement?  You're just speculating?

2    A.    I don't believe that they did an

3          investigation into understanding the motive

4          for that behavior.

5    Q.    Well, you do realize that your attorneys

6          represent Mr. Chatman, don't you?

7    A.    I do.

8    Q.    Okay.  So you have no information in front of

9          you as to whether or not what happened to

10         Mr. Chatman was part of some type of

11         initiation, correct?

12   A.    I don't know that.

13   Q.    All right.  And so that's a yes, I don't have

14         any information, correct?

15   A.    That's correct.

16   Q.    All right.  And likewise, with regards to

17         Mr. Kim, we've agreed that what happened to

18         him easily fits the definition of bullying

19         based on the national standard, correct? I

20         mean, we went through it.  I don't want to

21         have to go through it again.

22   A.    Okay.  But I wouldn't have included the word

23         easily.  I think it does but...

Norman Pollard

Page 100

1     what percentage falls somewhere in between,

2     you're just lumping everything in the

3     21 percent, correct?

4  A.  I'm quoting their statistics, yes.

5  Q.  Okay.  I see where you have actually cited

6     the Alabama code on harassment.  So I guess

7     you did review that code section, correct?

8  A.  That's right.  I'm sorry.  I see that I did

9     include this in the report.

10  Q.  Do you know whether or not you reviewed the

11     Alabama statute on bullying?

12  A.  I believe I had that included in here.  No,

13     I'm sorry, I just have Davidson.

14  Q.  Okay.

15  A.  So no, I don't know that.

16  Q.  But, clearly, you reviewed the Alabama

17     statute on harassment, correct?

18  A.  Yes.

19  Q.  Okay.  Then you go on the following page:

20     "Hazing Vs. Bullying Vs. Harassment."  And

21     again, I think you said the context but also

22     the intention.  Would you agree that the

23     intention of the people who are carrying out

Norman Pollard

Page 101

1          the acts have a lot to do with whether it's a

2          harassment situation, a bullying situation or

3          a hazing situation, correct?

4     A.   I haven't seen that research to be able to

5          say that that's true.

6     Q.   Well, you say that the difference between the

7          three is subtle, right?

8     A.   Correct.

9     Q.   And they can often be mistakenly used

10         interchangeably, correct?

11    A.   That's true.

12    Q.   All right.  And is that because if you're

13         just looking at the incident, you can't tell

14         whether it's bullying, harassment, or hazing?

15    A.   True.

16    Q.   And it says that a "Significant difference is

17         harassment usually involves singling out an

18         individual and subjecting that person to

19         these acts."  And I guess hazing is part of

20         joining the group, right?

21    A.   Yes.  Typically, a harasser or someone who's

22         doing the bullying has no desire of a

23         continued relationship or interaction, where

Norman Pollard

Page 102

1        this is done to one of your teammates, that's

2        someone that will be on the squad and with

3        you.

4    Q.   So, again, getting back to my original

5        question; a lot depends on the intention of

6        the person or persons that are performing the

7        acts to determine whether it's bullying,

8        harassment or hazing, correct?

9    A.   Correct.

10   Q.   Now, under your "Toxic Culture of Davidson

11       Football Team," you state that "The case

12       materials documented a cultural of

13       harassment, bullying and hostility."  Is that

14       right?

15   A.   Yes.

16   Q.   And I guess you're using that all

17       interchangeably, harassment, bullying and

18       hostility?

19   A.   Yes.

20   Q.   All right.  And is that based on, I guess,

21       the Plaintiffs' testimony and the reports of

22       the interviews of the players who were on the

23       Davidson football team at the time of

Norman Pollard

Page 103

1      Rodney's incident?

2   A.   Yes.

3   Q.   Okay.   When did this toxic culture start?

4   A.   Well, in some of the material I reviewed, it

5        seemed to be prevalent 10 years ago or so,

6        that there were reports of it being in, I

7        think, it was 2015, 2016 for that.   And so I

8        don't have a definitive date of when it

9        began.   I do know that, you know, with Tre,

10       he was in school in 2016 when the dog pile

11       incident occurred.

12  Q.   And you do know that the incident involving

13       Rodney Kim, Jr. occurred in 2018, correct?

14  A.   Yes, April is my understanding.

15  Q.   So, in '16, would be two years before, '17

16       would be one year before, correct?

17  A.   Yeah.

18  Q.   All right.   So you originally said 10 years.

19       So I'm trying to find out where you got the

20       idea that this alleged toxic culture had been

21       going on for 10 years?

22  A.   In the material that was in the interviews by

23       the resource officers, it's my recollection

Norman Pollard

Page 104

1          that they were talking about incidents that

2          happened between 2014, 2018.

3     Q.   That's your recollection?

4     A.   I believe so.  This was at least in some of

5          the materials I read.  I thought it was with

6          the resource officer interviews.

7     Q.   Okay.  Who interviewed students, correct?

8     A.   Yes.

9     Q.   All right.  And some of them said that this

10         had been going on for a year or two, correct?

11    A.   Yes.

12    Q.   And some of them said that it -- they had

13         never experienced it; is that a fair

14         statement?

15    A.   Yes.

16    Q.   So I guess the oldest folks that they would

17         have talked to or students they would have

18         talked to would have been seniors, so maybe

19         four years; is that a fair statement?

20    A.   It could be but for some reason I have this

21         recollection of it occurring earlier, and I

22         thought it was as a result of information

23         provided in those interviews with the

Norman Pollard

Page 106

1              And, again, that's based on the

2         materials that were supplied to you, correct?

3    A.   Yes.

4    Q.   Okay.  And then it says that according to

5         the, I guess, investigation by "Resource

6         Officer Eric Terry, the toxic culture of the

7         football team was well known and in place for

8         a significant period of time."

9              Now, we already discussed the period of

10        time, at least according to the reports, was

11        from 2000 -- could possibly be from 2014 to

12        2018, correct?

13   A.   Yes.

14   Q.   And you say was well known, and by that, you

15        mean it was well known among the student

16        athletes?

17   A.   Yes.  What I attempted to describe there

18        through their statements was to show how well

19        known it was through the interview responses

20        to Officer Terry.

21   Q.   Right.  But when you say it was well known,

22        you mean it was well known among the student

23        athletes, correct?

Norman Pollard

Page 107

1    A.   Yes.

2    Q.   All right.  You're not trying to say it was

3         well known among the school board members; is

4         that a fair statement?

5    A.   That's true.

6    Q.   And then you go ahead and list incidences

7         which you say created a toxic environment,

8         and these were all incidences that you got

9         from either the depositions or the resource

10        officer's report or material provided by the

11        Plaintiff's counsel, correct?

12   A.   Correct.

13   Q.   And as far as these list of incidences,

14        you're just assuming that they all occurred,

15        correct?

16   A.   As opposed to --

17   Q.   As opposed to being made up?

18   A.   My basis was that the individuals

19        interviewing were forthcoming and truthful.

20   Q.   That was your basis.  Were they under oath?

21   A.   I don't know if they -- in many

22        investigations, there's a signatory line

23        where they talk about it being perjury of

Norman Pollard

Page 108

1        <u>giving a false statement to a police officer,</u>

2        <u>so I don't know if that was included in that,</u>

3        <u>but they were not under oath.</u>

4    Q.   Okay.  And as an example, the first one,

5         "Remarked Lyman's being diagnosed with an

6         elbow fracture as "sissy-itis."  That's based

7         on a statement by Lyman Collins, correct?

8    A.   Yes.

9    Q.   And you're assuming, for the basis of your

10        opinion, that his statement was truthful and

11        accurate, correct?

12   A.   Correct.

13   Q.   And you say, "Identified injured players as

14        the "cripple crew," and directed them to

15        collect trash and move tires and cones during

16        practice."  Again, this is based on a

17        statement by a student, correct?

18   A.   Yes, it is from the statements in the

19        depositions.

20   Q.   Right.  And you're, again, assuming that that

21        statement was truthful and accurate, correct?

22   A.   Yes.

23   Q.   Okay.  And in fact, all of these are based on

Norman Pollard

Page 111

1              saying?

2        A.    Could you rephrase your question?

3        Q.    Sure.  You, apparently, are giving full

4              credibility to the students who said this

5              kind of activity occurred, and you are

6              discounting the students who said it didn't

7              occur because you believe they didn't

8              recognize that they were being hazed?

9        A.    I wouldn't use the term, you know, full

10             credibility and totally, you know,

11             disregarding the others.  I think it's you

12             look at group statements where there's some

13             continuity and some consistency to try to get

14             an understanding of what is occurring.  It's

15             a way of examining the culture in which the

16             students are experiencing their team

17             participation, and it gives you the

18             opportunity to say, well, then there are some

19             who are saying this happened or this

20             occurred, and trying to get a better

21             understanding of what that is about.

22       Q.    And so where some students said this was

23             horseplay and just kidding around that got

Norman Pollard

Page 112

1    out of hand, you interpreted that as being

2    they were hazed, but they thought it was fun?

3  A.  Yes, I think that that's fair to think that

4      there was not only students, but the coaches

5      and I believe the board members that were

6      conceptualizing the behavior as horseplay.  I

7      think that was a common phrase that many used

8      where, in fact, I did see that as hazing.

9  Q.  Okay.  You saw that as hazing, you've been, I

10     guess, studying hazing for 20 years.  But

11     haven't you found in your studies that most

12     people don't recognize hazing as hazing?

13 A.  That's what the research has shown and which

14     is why the necessity for education and being

15     proactive is so critical.

16 Q.  Okay.  And so if people see young men horsing

17     around or engaged in what they believe as

18     horseplay, you, as the expert and the

19     specialist, see that as a possible hazing,

20     correct?

21 A.  As possible, yes.  It depends on the context.

22 Q.  Certainly.  All right.  Now, going to the

23     next page, you go on to say that, "Even

Norman Pollard

Page 113

1        though these incidents were reported by Ms.

2        Kim, Ms. Collins, and Lyman Collins;" they

3        were not reported until after the video of

4        Rodney Kim, Jr. surfaced, correct?

5    A.   Yes.

6    Q.   All right.  So all of the reporting that was

7        done, including that by Ms. Collins and Lyman

8        Collins, was done after, after the incident

9        involving Rodney Kim, Jr. became public

10        knowledge, correct?

11    A.   Correct.

12    Q.   And you say that Resource Officer Terry did

13        not include any questioning about their

14        specific complaints.  You do realize that

15        Mr. Terry tried to talk to Ms. Kim, but she

16        wouldn't talk with him, you do realize that,

17        right?

18    A.   I do.

19    Q.   Okay.  And then you go through a list of

20        students, reports, not all of them but some

21        of them, and you say also Mr. Terry

22        interviewed the assistant principal. Do you

23        know what Mr. Terry's purpose or directive

Norman Pollard

Page 114

1       was with regards to his investigation?

2   A.  My understanding is that he was looking at

3       specifically at just the one incident.

4   Q.  Okay.  Fair enough.  All right.  Now, at the

5       very bottom you used this term "alarmingly."

6       Were you alarmed by what Mr. Terry did?

7   A.  That's the word I used, yes.

8   Q.  Okay.  I just wanted to make sure.  That he

9       expressed no concern about retaliation

10      towards the victims and offered no resources.

11      Retaliation would seem to indicate that

12      people would know what these students said,

13      correct?

14  A.  Yes.

15  Q.  Do you believe that Mr. Terry made public his

16      findings?

17  A.  I don't know.  It was concerning because on

18      most schools, when there's an investigation

19      that is going on, the rumor mill spreads like

20      wild fire and people make assumptions.  And

21      just as a precautionary measure, when you are

22      investigating any incident, you always want

23      to be aware that how could this impact the

Norman Pollard

Page 115

1        individuals, the victims.

2   Q.   So you're speculating, you don't know what

3        happened with this report, correct?

4   A.   No, I don't.

5   Q.   All right.  Or whether or not kids knew what

6        was going on or whether they spoke or other,

7        correct?

8   A.   Correct.

9   Q.   And do you realize that some of these reports

10        and interviews were done when officers were

11        present, police officers, law enforcement

12        officers?

13   A.   Oh, yes.

14   Q.   Okay.  And do you know whether or not police

15        officers, when they're investigating criminal

16        activity and they're interviewing witnesses,

17        whether or not they express concern about

18        retaliation?

19   A.   I know that part of my responsibilities is

20        getting students to oversee our public safety

21        office and as part of their investigatory

22        process, that is included.  And it's also

23        included in the report that they -- how they

Norman Pollard

Page 116

1        express concern about retaliation, making

2        sure that the individuals are safe since they

3        came forward.

4    Q.   How do they express concern about

5        retaliation?

6    A.   One of the things that we look at is their

7        environment, do they feel safe where they're

8        living or in classes or their campus work

9        study positions, that we try to make sure

10       that those individuals who are brave enough

11       to come forward, are protected.  And that we

12       give options then in saying, you know, do you

13       need to relocate where you're living, do you

14       need an escort, or is it simply just having a

15       phone number that you can call immediately.

16   Q.   So you think Officer Terry should have told

17       these students he was interviewing that he

18       would help them relocate if they needed to be

19       relocated; is that what you're saying?

20   A.   I think he should -- what I'm saying is in

21       his report he should have listed if he was

22       expressing concern and gave options for that

23       concern.

Norman Pollard

Page 117

1    Q.   So you have criticisms with Officer Terry's

2         reporting, correct?

3    A.   Well, the content in the report.   And, you

4         know, I appreciate that he was asking those

5         individuals and received multiple statements

6         of their perceptions, but as I said, I wish

7         he would have done more.

8    Q.   Okay.   So you have criticism of how Mr. Terry

9         conducted his interviews and/or his

10        reporting, correct?

11   A.   Yes.

12   Q.   All right.   Let's get to your opinions.   And

13        you didn't number them, so I'm just going to

14        have to kind of go down the list here.   The

15        first one, it's your opinion, "That if

16        Coach Riley and assistant coaches, Eubanks,

17        Miller and Pope had implemented proper

18        industry standard locker room supervision and

19        the common hazing prevention practices found

20        in many high schools and teams, the hazing

21        and subsequent injuries would have been

22        averted."   Correct?

23   A.   Correct.

Norman Pollard

Page 118

1   Q.   All right.  What are the industry standard

2        locker room supervision and common hazing

3        prevention practices?

4   A.   Sure.  If you go to the National Federation

5        of High Schools, they provide the industry

6        standards for supervision and for chaperoning

7        and for supervision.

8   Q.   So you believe that the recommendations of

9        the National High School Federation

10       Association provide industry standards; is

11       that what you're saying?

12  A.   Yes.

13  Q.   Okay.  And you say that these standards are

14       found in many high schools and teams.  Do you

15       know how many high schools and teams?

16  A.   Not quantitative, no.

17  Q.   And you're saying that what happened to

18       Mr. Kim would not have happened if these

19       standards had been in place; is that correct?

20  A.   I think that the likelihood of them having

21       taken place would have been greatly

22       diminished.

23  Q.   Okay.  Are there policies involving use of

Page 121

1       first opinion, that you're not really saying

2       that Rodney Kim, Jr.'s hazing or alleged

3       hazing or assault would have been prevented,

4       but that the likelihood of that occurring

5       would have been diminished?

6    A.   Well, I think it would have been averted and

7       because of the expectation of supervision in

8       locker rooms, the way it's stated, for

9       example, on the National Federation's website

10      of having that adults supervising.  Because,

11      hopefully, typically, students are not acting

12      out in that way in the vision of an adult.

13   Q.   So if there's supervision, is it possible

14      that the hazing activity would then be moved

15      off campus?

16   A.   There possibly could be.  I'm not saying it's

17      impossible, but as I said previously, the

18      overall majority of hazing that occurs on

19      high school is either on campus, in the buses

20      or at away matches.

21   Q.   Okay.  So where there's less supervision; is

22      that a fair statement?

23   A.   Yes.

Norman Pollard

Page 122

1    Q.   But still in places where there is

2         supervision, because you said on the bus

3         there's typically a bus driver; away games

4         they're typically coaches and at the school

5         campus there's typically coaches?

6    A.   Yes, unless there is a lack of supervision

7         with that --

8    Q.   But you don't know whether there is a lack of

9         supervision or not?

10   A.   Well, in this case there is, and that's why

11        I'm saying that if they had industry

12        standards and supervision as they attempted

13        to put in place after this incident, it would

14        have been averted.

15   Q.   Now, what are the industry standards that the

16        National Federation of High Schools have?

17   A.   If you go to their website, it's listed

18        there.  You know, it has to do with the ratio

19        of supervisees to students, to locations,

20        looking at hotspots.

21   Q.   But you don't know what they are?

22   A.   Well, I know that they're there.

23   Q.   You just know that there's something on the

Norman Pollard

Page 123

1          National Federation of High School Athletics

2          website that relates to hazing?

3     A.   Yes, well, and to supervision.

4     Q.   Relates to supervision of student athletes,

5          correct?

6     A.   Correct.

7     Q.   And you use that as a basis of your opinion,

8          correct?

9     A.   And just having worked in this field for, you

10         know, let's just say 20 years, understanding

11         the necessity of appropriate supervision.

12    Q.   Okay.  So, but you don't have a copy of this?

13    A.   I could look through my files and find it for

14         you.

15    Q.   The file, the Kim files?

16    A.   No, no.  In just -- I keep information about

17         hazing and different aspects of hazing and

18         I'm sure I, at one point, downloaded what the

19         recommendations were.

20    Q.   Okay.  Can you send those to me whenever you

21         get a chance?

22    A.   Sure, happy to, let me just make a note.

23    Q.   Okay.  That would be the industry standard of

Norman Pollard

Page 124

1          care as far as supervision as set forth by

2          the National Federation of High Schools?

3    A.    Yes, that I believe that they had, if I

4          recall correctly, is that they have had an

5          expert in the field write an article with

6          those recommendations and expectations.

7    Q.    So is this an industry standard or is this a

8          person's recommendations?

9    A.    Well, because it's on the National

10         Federation's website, which would be the

11         industry, it would be the industry standard,

12         you know, that they're endorsing it by having

13         it on their website.

14   Q.    So it's your opinion that any article that

15         the National Federation of High Schools has

16         on their website, de facto becomes their

17         industry standard?

18   A.    I think that that's -- in general, I think

19         that's probably a true statement.

20   Q.    You don't think they have any policies or

21         procedures or standards that they have passed

22         by their board that is their official policy?

23   A.    I'm not -- I can't say for sure because,

Norman Pollard

Page 125

1    typically, the associations do not make

2    policies as opposed to guidelines and

3    recommendations and standards for that.  That

4    if there's policies similar to the NCAA,

5    except in extreme circumstances, they leave

6    it up to the individual schools or the

7    associations for them.

8    Q.   Okay.  So this article may have been a

9         guideline, a recommendation, or a standard;

10        is that correct?

11   A.   I would phrase it as an industry standard.

12   Q.   Why wouldn't you phrase it as a

13        recommendation?

14   A.   Well, I think it can be both.

15   Q.   Why wouldn't you phrase it as a guideline?

16   A.   It could be that as well except that I think

17        standard has a higher level of expectation,

18        you know, here's the baseline of expectation.

19        Guidelines oftentimes, at least in my

20        definition, are something that you may want

21        to be aware of, but not with the same level

22        of expectation.

23   Q.   And you're going to send this article -- do

Norman Pollard

Page 126

1          you know who wrote this article that you're

2          referencing?

3     A.   No, not off the top of my head.

4     Q.   Okay.  But you're going to send me a copy of

5          that, correct?

6     A.   I certainly will.

7     Q.   All right.  Thank you.  And I'm going to wrap

8          up this particular opinion.  It's your

9          opinion that had there been an adult actually

10         in the locker area, that this incident

11         wouldn't have occurred and I guess because

12         the adult would have been there, but that had

13         there been adults in the locker room, that

14         these same students would not have done some

15         hazing activity off campus, correct?

16    A.   Well, just to qualify it, it's not only

17         having adult there, but as the sentence also

18         says, common hazing prevention practices,

19         which is more than just having, you know, a

20         physical body in that space for that.  There

21         has to be, you know, training and different

22         supports of the individual is competent as a

23         supervisor in that way.

Norman Pollard

Page 128

1    Q.    And then again, we get into the supervising

2          adults.  I guess your position that there

3          should have been an adult inside the locker

4          room at the time, correct?

5    A.    At minimum, yes.

6    Q.    At minimum.  And that if there had been

7          adults there, then the older members would

8          not have attempted to do their hazing off

9          campus or in some location that was out of

10         sight of adult supervision, correct?

11   A.    Well, again, the likelihood of that would

12         have been diminished.

13   Q.    Diminished.

14   A.    I can't say with a hundred percent certainty

15         it would have not occurred, but the

16         likelihood of it occurring would have been

17         diminished.

18   Q.    Okay.  The next one, the third one, it's your

19         "Professional opinion that any assertion that

20         because players could have reported the

21         hazing at any point and that it was therefore

22         viewed as consensual or condoned, is false

23         and contrary to the accepted definitions of

Norman Pollard

Page 129

1      hazing."

2            Isn't one of the definitions of hazing

3      -- or requirement to hazing that it be

4      consensual?  I mean, it is consensual, right?

5  A.   No.  One cannot consent to an illegal act for

6      that.

7  Q.   We're not talking about an illegal act, we're

8      talking about hazing.  And I think you said

9      that almost 70 percent of hazing activities

10     are not illegal?

11 A.   That the activity that was involved in their

12     hazing is also some sort of illegal act like

13     the consumption of alcohol, so --

14 Q.   Yes.  But you said that only 29 percent or

15     the survey said 29 percent of hazing activity

16     is illegal.  To me, that means that, you

17     know, 71 percent isn't illegal, correct?

18 A.   No.  You're misinterpreting it.

19 Q.   Oh, okay.

20 A.   It's that the activity that they were

21     involved in could -- like stealing a sign or

22     beating someone up, is an illegal act while

23     they're hazing, which is also illegal.  My

Norman Pollard

Page 130

1          point is --

2     Q.   The hazing is illegal.

3     A.   Hazing is illegal.

4     Q.   Gotcha.  Okay.

5     A.   And my point is with consent, even though

6          using your alcohol scenario, even though the

7          19-year old wants to drink, likes to drink,

8          enjoys drinking and feels it's fun to drink

9          doesn't mean that it's okay just because they

10         view it as being fun, enjoyable.

11    Q.   No, I didn't say it was okay.  I said it was

12         consensual.  You understand what consensual

13         means, right?

14    A.   Well, if you could explain the

15         differentiation between consensual and okay.

16    Q.   Consensual is something you agree to

17         participate in.

18    A.   And the difference with it being okay?

19    Q.   No. You said that because the players could

20         have reported the hazing at any point and it

21         was therefore viewed as consensual or

22         condoned is false and contrary to the

23         acceptant definition of hazing.

Norman Pollard

Page 131

1   A.   Right.

2   Q.   So I mean, it is consensual, we agree, right,

3        it was consensual?

4   A.   Not always.

5   Q.   Well, in the case of Rodney Kim, we agree

6        that it was consensual, correct?

7   A.   I'm not making that assertion.

8   Q.   Well, Rodney Kim said he knew it was coming.

9        His parents said they knew it was coming and,

10       yet, they still went forward without

11       reporting it; so is that not consensual?

12  A.   No, I don't believe that.  There are many

13       circumstances where an individual knows that

14       this is going to occur in the future and as

15       he described.  His fear is trepidation, he's

16       trying not to enter that locker room, waiting

17       for them to leave before he'd go in and get

18       the football that he could use for practice

19       only to be grabbed from behind and taken into

20       the locker room and them pummeled.

21  Q.   Okay.

22  A.   I don't believe that that was consensual at

23       all.

Norman Pollard

Page 132

1    Q.    Okay.  So even though he knew it was coming,

2          even though his parents knew it was coming,

3          it wasn't consensual.  And even though he was

4          there and knowing it was going to happen, it

5          wasn't consensual because at the last moment

6          he decided not to go in the locker room?

7    A.    Well, not only that but the -- I believe in

8          order to give consent, you'd have to fully

9          understand what it is you're consenting to.

10         So he doesn't know that the duration, the

11         intensity, the consequence of that act.  I

12         don't think he knew he was going to get a

13         broken arm out of it.  I don't think he

14         consented to get a broken arm.  I don't

15         believe that he consented to have the

16         physical effects and the psychological

17         effects as a result of that.  That's not what

18         he knew.  He wasn't knowingly acquiescent to

19         that.

20   Q.    No, I don't think he knowingly agreed to get

21         his arm broken either.  Okay.  Going to the

22         next one, what I've numbered 4, the fourth

23         paragraph down, sort of the last sentence;

Norman Pollard

Page 134

1    A.   Not specifically.

2    Q.   All right.  Do you know whether Commissioner

3         Harwell, ,or do you have any evidence that

4         Commissioner Harwell knew that bullying,

5         hazing or harassing was going to occur in the

6         locker room?

7    A.   Not specifically.

8    Q.   All right.  And do you know or have any

9         evidence that Commissioner Stringfellow knew

10        that bullying, hazing or harassing behavior

11        was going to happen in the locker room?

12   A.   Not specifically.

13   Q.   Okay.  Now, with regards to should have

14        generally known that the locker room was a

15        location of potential bullying, hazing or

16        harassing, let's, again, break that down.

17             Do you have any evidence that

18        Commissioner Battles should have known that

19        bullying could occur in the locker room?

20   A.   That's my point is that they should have

21        known, that all the commissioners as well as

22        the superintendent and principal should have

23        known and they seemingly did not know.

Norman Pollard

Page 135

1    Q.    And I believe you said that the parents

2          didn't know, correct?  In some other point

3          you said the parents didn't know?

4    A.    I don't recall saying that.

5    Q.    Okay.  Well, we'll get to that.  On what

6          basis should they have known?

7    A.    Well, as educators and individuals who are

8          board members to be aware about the health

9          and safety and risk to the students that

10         they're in charge to keep safe.

11   Q.    Okay.  So, in general terms, you think that

12         they should know that students need to be

13         safe?

14   A.    Yes.

15   Q.    Okay.  Fair enough.  And in general terms,

16         that students may be bullied, correct?

17   A.    Yes.

18   Q.    Whether in the locker room, in the hall room,

19         in the kitchen, in the cafeteria, out in the

20         parking lot, students can be bullied,

21         correct?

22   A.    Correct.

23   Q.    And they should know that, correct?

Norman Pollard

Page 136

1    A.   Yes.

2    Q.   All right.  Now, the same thing with

3         harassing, they should know that, correct?

4    A.   Correct.

5    Q.   Now, hazing, hazing is a little different.

6         Hazing, specifically, I believe I've read in

7         all of these reports is that most people

8         don't even realize that hazing is occurring,

9         correct?

10   A.   Correct.

11   Q.   The people who are actually being hazed,

12        according to your definition, don't realize

13        they're being hazed, correct?

14   A.   You're correct, but that's not the term and

15        the definition that they would use.

16   Q.   Okay.  And most of the students and/or their

17        parents don't report incidents of hazing,

18        correct?

19   A.   Correct, which is why these individuals had a

20        responsibility to provide that information.

21   Q.   Okay.  How would they know if the people who

22        were actually involved in it didn't know?

23   A.   Because they're educators, and their primary

Norman Pollard

Page 137

1       responsibility is to look at the issues that

2       are affecting the children in their care and

3       providing response for them.

4   Q.  Response to a problem that most people don't

5       even know exist; is that what you're saying?

6   A.  Yes.  There are many problems that students

7       face in school that may not be visible, that

8       may not be noticed, that doesn't make any of

9       the responsibility of this school to try to

10      prevent those from occurring --

11  Q.  All right.  Did you -- I'm sorry.  Go ahead.

12  A.  Whether it be substance abuse, whether it be

13      sexual assault or whether it be hazing,

14      whether it be hunger.  There's a lot of

15      social issues that kids are struggling with,

16      and school districts is the primary source of

17      response for many of those students.

18  Q.  And it's your position that they should have

19      known, correct?

20  A.  Correct.

21  Q.  Okay.  Number 5 says that it's your

22      professional opinion that, "It is unrealistic

23      for school to require victims of

Norman Pollard

Page 138

1          bullying/hazing/harassment to officially

2          report incidents using a form prior to any

3          investigation started by a school

4          administrator."

5                On what basis do you believe that they

6          have to report it in writing before an

7          investigation is initiated?

8     A.   From the materials that I read, it seemed to

9          suggest that the resource officer stated that

10         he needed to have a report of any incident in

11         order to investigate.  My understanding from

12         the materials from the assistant principal

13         and principal seem to suggest that someone

14         needed to come in and submit that form in

15         order for them to take action.

16    Q.   Okay.  Can you point me to that,

17         specifically?

18    A.   Not in front of me, that's my recollection.

19    Q.   That's your recollection; so you're making an

20         opinion based on recollection?

21    A.   Well, I'm giving my statement now based upon

22         recollection.

23    Q.   Okay.

Norman Pollard

Page 139

1   A.   I didn't -- I didn't notate the specific part

2        of whose deposition stated that.

3   Q.   So it's your recollection that a written

4        report is required before any investigation

5        is done, correct?

6   A.   Well, that's my recollection.

7   Q.   Okay.  So if an administrator witnesses an

8        incident occurring and verbally reports that,

9        nothing's going to be done; is that your

10       recollection?

11  A.   I can't say with absolute certainty, but it

12       seemed as though what was described,

13       especially by the assistant coaches, is that

14       they were given discretion when they noticed

15       it turned negative, when they saw incidents,

16       and there wasn't the expectation that they

17       come forward and report that.

18            The other, you know, challenge is that

19       you're talking about if an administrator, a

20       teacher, an employee, that has other

21       responsibilities to report different types of

22       abuse that they witnessed, may be mandated to

23       come forward and verbally give that.

Norman Pollard

Page 140

1          But I was referencing if a student is

2       experiencing that, that there's this form

3       that they fill out and seemingly no other

4       vehicle that they could report an incident

5       that either they experienced or witnessed

6       that would prompt an investigation.

7    Q.   So it's your recollection that if a student

8       came to a teacher and said they were being

9       harassed or bullied, that nothing could be

10      done about it until they filled out a written

11      formal report?

12   A.   That's my understanding.

13   Q.   Okay.  And is it your understanding that all

14      harassment, bullying incidences require an

15      investigation by a school resource officer?

16   A.   No, no.  I think that the protocol that they

17      had was that the assistant principals were

18      assigned to investigate except for -- I think

19      it was Dr. Cleveland that didn't have that

20      responsibility, but the other assistant

21      principals would do the initial

22      investigation.  And if it met a certain

23      criteria, then it would go to the resource

Norman Pollard

Page 141

1          officer.

2      Q.   Okay.  And that first initial investigation

3          had to be formal and in writing before the

4          administrator could conduct an investigation;

5          is that your recollection?

6      A.   As I said, that's my recollection and

7          understanding.

8      Q.   And so it's your recollection that if a

9          parent called in and said my student is being

10         bullied, that they would be required to fill

11         out a formal written complaint before any

12         action could be taken?

13     A.   Based upon the information provided in the

14         depositions, it seemed as though when parents

15         came forward and disclosed that, that it

16         wasn't default of an investigation.

17     Q.   You mean the parents who came forward after

18         the lawsuit was filed?

19     A.   No.  I think that in -- was it Lyman Collins,

20         that his mom complained to Dr. Cleveland

21         about it.  I think that's correct.

22     Q.   Okay.

23     A.   When he was interacting -- about how he was

Norman Pollard

Page 142

1          interacting with Coach Riley.

2     Q.   And that's not regarding hazing incidents

3          involving --

4     A.   No.  That was, as I said, the coach's

5          incident of bullying and the toxic culture of

6          harassment.

7     Q.   Okay.  Fair enough.  Okay.  Your next one,

8          number 6 says that, in your opinion,

9          "Davidson High School administrators and

10         resource officers responded to the reports

11         regarding the assaults of Kim, Betts,

12         Chatman, they failed to address the

13         underlying dysfunctional culture of

14         bullying/hazing and harassment."  On what do

15         you base that on?

16    A.   I couldn't see any documentation that there

17         was any attempt by the school to rectify the

18         culture, the environment.  You know, here

19         were these reports of incidents, videotapes.

20         And in the interview or deposition -- excuse

21         me -- of the new superintendent, it didn't

22         sound like there was any action that was

23         taken to respond to correct that.

Norman Pollard

Page 143

1    Q.   Is that what you said, it didn't sound like

2         there was any action taken?

3    A.   Well, based upon her deposition --

4    Q.   Well, stop.  You said the current

5         superintendent, Mr. Threadgill?

6    A.   The one who replaced Dr. Peek.

7    Q.   Mrs. Peek, yes.

8    A.   I'm sorry, Mrs. Peek.

9    Q.   So it didn't sound like it, anything.  But,

10        again, going back, you have no evidence or

11        any information that this so-called toxic

12        culture continued after the Rodney Kim, Jr.

13        incident; is that correct?

14   A.   She did not disclose that in her deposition,

15        no.

16   Q.   Well, again, and I know you like to play

17        around with your words, but you have no

18        information, no evidence that any of this

19        so-called toxic culture continued after the

20        incident involving Rodney Kim, Jr., correct?

21   A.   I don't have any of that information as

22        provided.

23   Q.   All right.  So you have no information or

Norman Pollard

Page 144

1      evidence that this alleged dysfunctional

2      culture on the football team continued after

3      the incident involving Rodney Kim, Jr.,

4      correct?

5    A.  I can find no evidence that anything was done

6      other than the rest of the individuals that

7      were charged and the retirement of Coach

8      Riley.

9    Q.  Okay.  Well, again, listen to my question and

10      this will go a lot quicker.  You have no

11      evidence or information that this alleged

12      culture of bullying continued after the

13      incident involving Rodney Kim, Jr.; is that

14      correct?

15   A.  Correct, yes.

16   Q.  All right.  Number 7 says that, "Upon review

17      of Davidson High School's own publication,

18      it's my opinion they failed to recognize the

19      topic of hazing as a problem," correct?

20   A.  Correct.

21   Q.  And is that because they had no specific

22      section involving hazing?

23   A.  There was no policy.  There was no education.

Norman Pollard

Page 145

1      There were descriptions.  Even the word

2      hazing wasn't included in their code of

3      conduct and student handbook.

4   Q.  Okay.  And then you go on to say, "As

5      required by Alabama state statute;" is that

6      correct?

7   A.  Correct.

8   Q.  All right.  And I don't want to go over it

9      because I think we went over the statute, but

10     just so that it's clear, there's no direct

11     provision that says that a school system or a

12     school must develop and adopt a policy

13     against hazing, correct?

14  A.  Correct.

15  Q.  Okay.  Now, you say that because there was a

16     state statute that the board should have

17     known of the prevalence and severity of

18     hazing amongst high school athletic teams; is

19     that correct?

20  A.  That's correct.

21  Q.  All right.  And that's just based on your own

22     opinion, right?

23  A.  It's an assumption that -- that may not be

Norman Pollard

Page 146

1          accurate, but my assumption was that there

2          was someone within the school district that

3          was in charge of compliance with state

4          regulations, that would have had the

5          responsibility to identify those statutes

6          that are applicable to schools and would have

7          ensured that they were in compliance.

8     Q.   And I think we already agreed that as far as

9          the State Board of Education goes, there is

10         no State Board of Education recommended

11         policy on hazing?

12    A.   Correct.

13    Q.   On the next page, second to the last

14         paragraph you state that, in your opinion,

15         "Those with ultimate responsibility for

16         developing and implementing policies within

17         the Mobile County School System were

18         negligent."  Is that what you said?

19    A.   Yes.

20    Q.   Negligent in -- do you know what negligent

21         means?

22    A.   I don't want to give a legal definition, but

23         it's just a layman's-type definition.

Norman Pollard

Page 147

1   Q.   And what's your layman's definition?

2   A.   That there were expectations of behavior,

3        action, that they didn't fulfill.

4   Q.   Expectations from who?

5   A.   Well, in this case, it was that the safety of

6        the students was a primary charge, that the

7        superintendent being the CEO of the school

8        district had -- and the board in conjunction,

9        had to ensure that measures in place to keep

10       students safe.

11           And based upon all these incidents in

12       the videos, this was not a safe environment,

13       And I think it was unsafe because of the lack

14       of action on their part.

15  Q.   And you're saying that the environment at

16       Davidson High School's football team was

17       unsafe?

18  A.   I think that the football team contributed to

19       the unsafe environment, yes.

20  Q.   Okay.  And basically, you're just talking

21       about Davidson High School, correct?

22  A.   Correct.

23  Q.   And then you state, in conclusion that, "The

Norman Pollard

Page 162

1    Q.   Because it seems like you got 43 percent and

2         then 23 percent and then 22 percent, so

3         that's why I'm wondering.  So I'm not a great

4         mathematician, but that seems to add up to a

5         hundred percent?

6    A.   Well, 43, 23, and 22 does not.

7    Q.   Yes.  So I'm not sure.  Okay.  So you don't

8         recall whether somebody -- you could put

9         people in various groups or whatever.  All

10        right.  If you'll drop down to Dangerous

11        Hazing.  And we've talked about illegal

12        activities and people in doing things.  And

13        you include harassing others, vandalizing

14        property, that's an illegal activity,

15        correct?

16   A.   Correct.

17   Q.   Steal, cheat or commit a crime, that's

18        obviously an illegal activity, correct?

19   A.   Yes.

20   Q.   Beat up others or pick a fight with someone,

21        that's an illegal activity, correct?

22   A.   Yes.

23   Q.   And then some of the other stuff.  But

Norman Pollard

Page 163

1    anyway, we get down to being physically

2    abused or beaten, and that's what happened to

3    Rodney Kim, Jr., correct?

4    A.   Yes.

5    Q.   And apparently what Mr. Collins alleges

6         happened to him, correct?

7    A.   Yes.

8    Q.   Mr. Betts doesn't allege that, does he, that

9         he was physically abused or beaten by other

10        students?

11   A.   No.   I think you're incorrect.   In the dog

12        pile in the locker room, I think he

13        acknowledges that he was beaten.   That's when

14        Coach Riley walked in and said, "You dumb

15        asses, break it up."

16   Q.   And I had it confused.   Mr. Collins is saying

17        that Coach Riley was abusive, but he's not

18        saying that he was involved in the dog pile;

19        is that correct?

20   A.   Not in the dog pile.   My recollection with

21        Mr. Collins was that he was placed in a trash

22        can receptacle.

23   Q.   And Mr. Chatman, I think we've already agreed

Norman Pollard

Page 164

1    was the subject of possible bullying but not

2    hazing, correct?

3    A.   It's challenging because the information,

4         there was the incident in the locker room

5         that he was, I think, punched there, and I

6         don't know the sequence of events by him

7         going into the locker room, was then that

8         initiation of anyone that went to the weight

9         room or locker room.  But at least for now

10        with the information I have, I'm considering

11        it more of a bullying assault.

12   Q.   Correct.  Okay.  So if we look at it in your

13        survey of these high school students,

14        physically abused or beaten by other folks is

15        8 percent, correct?

16   A.   Yes.

17   Q.   So he falls into an 8 percent of hazing

18        activity, correct?

19   A.   Correct.

20   Q.   And just so that I'm clear, is it your

21        opinion that the school board should have had

22        a policy against all forms of hazing whether

23        it was silly or not?

Norman Pollard

Page 165

1    A.    Yes.

2    Q.    Okay.   So even if it wasn't an illegal

3          activity or an activity that was necessarily

4          a violation of the student code of conduct,

5          it should have still been prevented, correct?

6    A.    Well, I would hope they would have been

7          included in the student code of conduct.

8    Q.    Right.   Okay.   And that's what I'm saying,

9          if it wasn't included in the current student

10         code of conduct, it should have been as a

11         separate offense?

12   A.    Yes.   Similar to bullying where there's a

13         wide range of behaviors that fall under that

14         umbrella.

15   Q.    So it's your opinion that in the student code

16         of conduct there should have been a section

17         that designated hazing as an offense and then

18         I guess depending upon what type of hazing

19         activity occurred, the severity of the

20         offense, whether it was an A, B, C, D or E,

21         correct?

22   A.    Yes.

23   Q.    So you could have a relatively minor offense

Norman Pollard

Page 166

1      that was termed hazing and then a more

2      serious offense that was also termed hazing,

3      correct?

4  A.  Yes.

5  Q.  And it's your opinion that the Mobile County

6      School Board should have included a hazing

7      section in their student code of conduct?

8  A.  Yes.  My understanding is that they give

9      their approval for the code of conduct.

10 Q.  Okay.

11     MR. CARBO:  And if you'll go to what's

12     page 10 on this document, Jennifer.  Yes,

13     okay.

14 Q.  And this is I think where you said -- I was

15     asking you what percentage of hazing is with

16     sports teams, and you said 24 percent of the

17     students hazed were to get into a sports

18     team, correct?

19 A.  Could you repeat that?

20 Q.  Sure.  We talked when we first started

21     talking about this, I was asking of the

22     groups how many students were hazed in trying

23     to get into a sports group or athletic team

Norman Pollard

Page 169

1    many venues, but at that time when we're

2    trying to figure that out, we learn as we go

3    along.

4    Q.   So dropping down to the percentage of

5    students hazed to join a specific

6    organization, you have extrapolated, I guess,

7    from your numbers that 35 percent of athletic

8    students or students who join athletic teams

9    are hazed; is that correct?

10   A.   Yes.

11   Q.   And that's based on the fact that 24 percent

12   of the students you surveyed said that they

13   engaged in hazing activity, or I guess to be

14   more accurate, said they engaged in activity

15   which you've defined as hazing.  And so

16   that's how you determine that 35 percent of

17   members have been hazed; is that correct?

18   A.   Yes.

19       MR. CARBO:  If you can go to page 17,

20   Jennifer.

21   Q.   "How Do We Stop Hazing."  And your first

22   sentence is, "Most students believe that

23   adults needed to intervene to stop it.

Norman Pollard

Page 170

1          Students rated strong, disciplinary measures

2          for known hazing incidents and police

3          investigation and prosecution of hazing cases

4          as the best prevention strategies;" is that

5          correct?

6    A.    That these were the students responses to how

7          they thought the best practices.

8    Q.    Right.  And do you agree with them?

9    A.    I think that the challenge is trying to go

10         from an individual's opinion to having a

11         research base to what is actually effective

12         for that.  But I actually agree that having,

13         you know, a policy with known disciplinary

14         consequences is really important.

15   Q.    All right.  So you think it's really

16         important to have strong disciplinary

17         measures including and up to police

18         investigations and prosecution of hazing

19         cases, correct?

20   A.    Yes.

21   Q.    All right.  And you would agree that there

22         was strong discipline issued to the

23         perpetrators of the assault on Rodney Kim,

Norman Pollard

Page 171

1        Jr., correct?

2    A.  I specify --

3    Q.  I mean, they were suspended and/or expelled,

4        so that's about as strong as you can get for

5        a school, right?

6    A.  The only caveat would be if they were, in

7        fact, charged with hazing; that consequence

8        would have been more in favor of.

9    Q.  Okay.  But you would agree that they suffered

10       about as hard a discipline or as strong a

11       discipline action as a school administrator,

12       correct?

13   A.  Correct.

14   Q.  And that a police investigation was

15       initiated, correct?

16   A.  Yes.

17   Q.  And that there were prosecutions, correct?

18   A.  Yes, for some.

19   Q.  For some of the perpetrators, correct?

20   A.  Yes.

21   Q.  And you do understand that as far as what the

22       perpetrators are charged with, that's not up

23       to the school, that's up to the District

Page 172

1          Attorney, correct?  I mean, do you know that?

2     A.   For the criminal side, yes.  My understanding

3          their suspension expulsion is up to the

4          school district that fits the code of

5          conduct.

6     Q.   Certainly.

7               MR. CARBO:  Can you pull up the next

8          exhibit, Jennifer?  I think it's 63.

9               (DEFENDANT'S EXHIBIT 63 MARKED

10        FOR IDENTIFICATION)

11    Q.   Are you familiar with this particular study

12         and report in the Journal of Adolescent

13         Health by Dr. Gershel, Katz-Sidlow, Small,

14         and Zandieh?

15    A.   It looks familiar, but I can't recall the

16         consequence or the conclusions that they came

17         up with.

18    Q.   Okay.  You say it looked familiar, correct?

19    A.   What caught my eye is that it's all written

20         by physicians which is noteworthy.

21    Q.   Yes.  If you'll look at the abstract, which

22         is the first paragraph, it states, "Little is

23         known about the prevalence of hazing

Norman Pollard

Page 176

1  Q.  That's the second paragraph, first line,
2      School administrators --
3  A.  Yes.  I think that, you know, including
4      parents would be an appropriate conclusion of
5      that as well, but certainly school
6      administrators are critically important.
7  Q.  And it states that, "When students become
8      disruptive or exhibit inappropriate behaviors
9      that interfere with teaching and learning,
10     administrators must respond promptly,
11     consistently, and in a manner that is
12     proportional to the seriousness of the
13     disruption."  Would you agree with that
14     statement?
15 A.  Yes.
16 Q.  And you would agree that what happened to
17     Rodney Kim, Jr. was inappropriate behavior,
18     correct?
19 A.  Certainly, yes.
20 Q.  And that it was disruptive and interfered
21     with teaching and learning, correct?
22 A.  Yes.
23 Q.  And would you also agree that once it became

Norman Pollard

Page 177

1    known that administrators responded promptly,

2    consistently and in a manner that was

3    proportional to the seriousness of the

4    disruption?

5    A.    I don't believe that the response was

6          comprehensive to that.  I think that they did

7          respond to the initial complaint or awareness

8          of that.

9    Q.    You believe that, though, it should have

10         kicked off a more comprehensive

11         investigation; is that your opinion?

12   A.    Not only an investigation but also having a

13         more robust and comprehensive response to the

14         issues of hazing.

15   Q.    But in regard to the actual incident

16         involving Rodney Kim, Jr., they did an

17         investigation, they interviewed a number of

18         students and administrators, they suspended

19         or expelled the main perpetrators, and they

20         assisted in the prosecution of those

21         perpetrators, correct?

22   A.    Correct.  And as I said, they looked at it as

23         an individual incident instead of systemic or

Page 178

1          a cultural issue.

2    Q.    And you would agree that as soon as, I guess,

3          they found out about it, those steps were

4          taken, correct?

5    A.    Yes.

6    Q.    The third paragraph says, "The following

7          pages detail the school's response to

8          inappropriate behaviors.  The sections are

9          divided from minor disciplinary infractions

10         to major disciplinary infractions."

11             And then it goes on to say that, "Before

12         each level of infractions, a description of

13         the school level response is provided.  And

14         you don't disagree with, I guess, making

15         different levels of offenses and prescribing

16         what an administrator can and cannot do as

17         far as each of those offenses, correct?

18   A.    In principle, no.  The only question or

19         concern I had was when coaches were seemingly

20         saying that they had discretion in how they

21         personally handled it instead of referring it

22         to the assistant principals or the principal

23         to determine what type of offense it was and

Norman Pollard

Page 179

1      the consequences for it.

2   Q.  Okay.  And then it goes to list some other

3       factors.  But if you'll turn to the next

4       page, which is page 15 of the student code of

5       conduct, and these are Group B offenses.

6       "Behaviors which upset the orderly classroom

7       and all areas," you see that?

8   A.  Yes.

9   Q.  And it goes over what the responses,

10      classroom interventions and responses may be;

11      contacting parents, apologies, changing

12      seats, things of that nature.  And then it

13      goes through, you know, if there's a second

14      and there's a subsequent offense, you see

15      that?

16  A.  Yes.

17  Q.  And you would agree that it has to be

18      observed or reported before disciplinary

19      action can be taken, correct?

20  A.  There has to be some knowledge, yes.

21          MR. CARBO:  If you'd go to the next

22      page, Jennifer, page 16.

23  Q.  All right.  If you'll see the second item is

Norman Pollard

Page 180

1          "Acts of physical aggression," you see that?

2    A.    I do.

3    Q.    And you would agree that what occurred to

4          Rodney Kim, Jr. was an act of physical

5          aggression, correct?

6    A.    Absolutely.

7    Q.    And what occurred to Jeremiah Chatman was an

8          act of physical aggression, correct?

9    A.    Yes.

10   Q.    And what allegedly occurred to Mr. Collins

11         and Mr. Betts, even though we don't have

12         video of it, based on their description of

13         the actions or at least some of those

14         actions, that would be acts of physical

15         aggression, correct?

16   A.    Yes.

17   Q.    And if you go down to number 9, "Using

18         aggressive obscene/profane language-whether

19         spoken, written, or by gestures.  Including

20         verbal confrontation."  And again, the

21         actions of the perpetrators who assaulted

22         Rodney Kim, Jr., who assaulted Jeremiah

23         Chatman and who allegedly assaulted Mr. Betts

Norman Pollard

Page 181

1          and Mr. Collins, that would be a violation,

2          correct?

3     A.   Yes.

4     Q.   And then there are, I guess, listed

5          subsequent offenses, second offenses, first

6          offenses.  Almost all of them require

7          suspensions of a certain length, correct?

8     A.   Yes.

9          MR. CARBO:  And if you'll turn to the

10         next page, Jennifer.

11    Q.   Number 12, "Bullying, cyber bullying,

12         harassing behavior which threatens the health

13         and welfare of any person (on campus/off

14         campus.)"

15         And you would agree that what happened

16         to Mr. Chatman could possibly qualify as

17         bullying, what happened to Rodney Kim could

18         possibly qualify as bullying, and the same

19         thing with Mr. Collins and Mr. Betts; the

20         actions against them would be a violation of

21         the student code, correct?

22    A.   Yes.

23         MR. CARBO:  If you'd go to the next

Norman Pollard

Page 182

1     page, Jennifer, 18.

2     Q.   You'll see this is Group C.  And this is more

3          serious offenses and requiring, I guess,

4          stronger actions.

5               MR. CARBO:  Jennifer, if you would go to

6          page 19.

7     Q.   And if you would look at 8 through 14, it

8          includes Assault First, Second, and Third

9          Degree, Menacing, Reckless endangerment,

10         Harassment, including threats and Disorderly

11         Conduct.

12              And you would agree, especially with

13         regards to the assault on Rodney Kim, Jr.,

14         that it was an assault, it certainly was

15         menacing and it certainly recklessly

16         endangered him, correct?

17    A.   Correct.

18    Q.   And so all of the actions taken against

19         Rodney Kim, Jr. were violations of the

20         student code of conduct, correct?

21    A.   Yes.  I believe that those students were

22         adjudicated through the student code of

23         conduct.

Norman Pollard

Page 183

1    Q.   Okay.  And that the actions that were taken

2         against them were violations, correct?

3    A.   Yes.

4    Q.   All right.  Give me a second to check my

5         notes.  I may have about covered everything I

6         need to cover.  You want to take a

7         five-minute break?

8    A.   That would be appreciated.  Thank you.

9    Q.   Okay.

10             MS. ENGLISH:  We're off the record at

11        3:15 p.m.

12                  (BRIEF RECESS)

13   Q.   I'm just about done.  Dr. Pollard, were you

14        able to find the National Federation of High

15        Schools standard?

16   A.   Yes, I printed it out and set it down.

17   Q.   Can you go ahead and e-mail that to us?

18   A.   I'll have to scan it and then e-mail it to

19        you.  Do you want me to do that now?

20   Q.   Yes, if you don't mind and e-mail it to

21        jennifer@mobilebayreporting.com, and I'll

22        give you a minute to do that.

23                  (OFF THE RECORD)

Norman Pollard

Page 228

1          contracting with me, they're not hiring me.

2          I volunteer to do it as a way of giving back

3          to the community.

4     Q.   Well, just give me a judgment then as to how

5          many of these consultations you've had with

6          high schools?

7     A.   The best guess I could give would say about a

8          dozen different high schools.

9     Q.   Just 12?

10    A.   Yes.

11    Q.   Okay.  And when was the last time you went to

12         a high school and had a session as a

13         consultant?

14    A.   It may be 10 years.

15    Q.   Ten years ago?  So we're now, what, 2021, so

16         what that's, 2000 --

17    A.   2010, 2011, 2012. But I think that I -- I

18         believe, again, I think it's on my CV of when

19         I went to Tennessee and that may have been

20         around that same time.

21    Q.   So it's going to be the CV which you produced

22         in this case?

23    A.   That I have, yes.

Norman Pollard

Page 232

1    what information I provide to you is accurate

2    and complete.

3    Q.   Let me ask you about this 13th page of your

4         report; have you got that report there in

5         front of you, sir?

6    A.   I do.

7    Q.   Can I see a list of incidents where Coach

8         Riley created a toxic environment?

9    A.   Yes.

10   Q.   Is that a complete list, sir?

11   A.   This was complete as it related to the Kim

12        complaint, but there was additional behavior

13        on his part that I don't see in that list

14        that was also concerning or problematic.

15        With Kim, obviously, the stomach bumping

16        event was concerning.  There was also, with

17        Tre Betts, when he walked in and saw the dog

18        pile calling them dumb asses and to break it

19        up.

20            With Lyman Collins there was the times

21        when he was interacting with that, you know,

22        using the term "sissy-itis" for that.  With

23        Jeremiah, when he was in the locker room and

Norman Pollard

Page 233

1    was being punched, I believe it was that he

2    remarked that the coach came in and looked at

3    them, smiled, and I think took a lick of his

4    ice cream cone or something.

5         But what I tried to do in the list of

6    the toxic environment wasn't only the

7    specific behaviors the coach displayed

8    towards individuals there, but just the

9    general environment of conduct and behavior.

10   Q.   So you have now given me a complete list of

11        the incidents where Coach Riley created a

12        toxic environment?

13   A.   To the best of my understanding, yes, I have.

14   Q.   Well, again, I just want to make sure because

15        you've told me now that was a thorough

16        report, and I just want to make sure that

17        we've got everything that you're going to say

18        with respect to the incidents where Coach

19        Riley created a toxic environment?

20   A.   I believe I have, yes.

21   Q.   All right.   So you're representing to me I'm

22        not going to be surprised at trial if you

23        come up with something new?

Norman Pollard

Page 234

1    A.   Unless it's provided in information after

2         today's deposition.  This is what I plan on

3         presenting at the trial.

4    Q.   And we have an understanding that you're

5         going to alert your lawyers if there's any

6         additional information that you add or change

7         with respect to this list of incidents where

8         Coach Riley created a toxic environment?

9    A.   Yes.

10   Q.   All right, sir.  And I know you appreciate

11       the fact that we just don't want to be

12       surprised at the time of trial?

13   A.   No.  No.  Why I'm hesitant is that my

14       understanding was that Coach Riley hasn't

15       been deposed yet.  So I don't know what he

16       will say, and I don't know if that will

17       influence my opinion.  So that's the only

18       hesitancy I have is that I don't want to be

19       surprised either when more information comes

20       out that's presented to me that might change

21       my opinion in a document that I've already

22       produced.  But my intention is to testify to

23       the facts that I've listed here and if they

Norman Pollard

Page 235

1          changed, to absolutely let you know.

2     Q.   Now, what about Coach Pope?

3     A.   Well, with Coach Pope I didn't -- it was more

4          being part of the coaching staff, and having

5          children under his care and not providing the

6          supervision and the oversight needed for them

7          with that.

8     Q.   I'm sorry.  I don't understand.  What do you

9          mean by supervision?

10    A.   Well, I view teachers, coaches as having the

11         responsibility -- I don't want to misuse a

12         legal term, but In Loco Parentis, that they

13         have the students in their charge.  And so

14         part of when you're in an athletic program,

15         all the coaches have that responsibility to

16         ensure that there's adequate supervision of

17         the students that are participating in that

18         sport during that time.

19    Q.   Do you have any other contention or claim

20         that Coach Pope defaulted in these incidents?

21    A.   Well, the only additional observation is

22         that, you know, Coach Pope did take the

23         online course of the National Federation of

Norman Pollard

Page 236

1       High Schools, and he took it before these

2       incidents occurred.  And I don't know what he

3       learned from that.  But, seemingly, what he

4       talked about in his deposition is that it

5       didn't change the culture, the actions, the

6       prevention steps necessary.  So that is an

7       area for both he and Coach Eubanks haven't

8       taken a course that is recommended and

9       seemingly not to understand the basic

10      definition of hazing, the actions that they

11      could take proactively and the prevention

12      recommendations that were included in that

13      course.

14   Q.  And what were the provision of matters that

15      we should have taken?

16   A.  Yes.  I think that there certainly -- even if

17      there was not a school prohibition against

18      hazing included in their code of conduct, at

19      least the athletic department could have --

20      there is no hazing within the department or,

21      you know, if there's found it will be

22      investigated, could affect play, status on

23      the team, so forth.

Norman Pollard

Page 237

1          That ideally all the coaches could have

2      done presentations and programs on what is

3      hazing, how to identify hazing, how to report

4      hazing, you know, different aspects of hazing

5      prevention that they themselves as a coaching

6      staff could have included.

7   Q.  Anything else that Coach Pope should have

8      done?

9   A.  That's the primary area was just an

10     observation of the understanding of hazing,

11     seemed to be very, very limited for someone

12     involved in the care and custody of children.

13  Q.  So that I'm clear then, that's the only

14     criticism you have with respect to Coach

15     Pope?

16  A.  Correct.  I don't recall him being involved

17     in any of the complaints that came forward

18     from before from before.

19  Q.  Again, I just want to make sure we've got all

20     of your opinions now with respect to Coach

21     Pope?

22  A.  Correct, yes.

23  Q.  How about Coach Eubanks, what, if any,

Norman Pollard

Page 238

1     criticisms or complaints do you have with

2     respect to Coach Eubanks?

3  A.  Well, you know, I think Coach Eubanks with

4     Rodney Kim when he observed some of that

5     troubling behavior, and I think that it was

6     when there was the shaving cream and using

7     the belts and being slapped.  You know, his

8     only response was to knock it off, you know,

9     as opposed to having that as an opportunity

10    to do something of more affirmative action on

11    his part.

12        I think also, you know, he again talked

13    about his own discretion of how to handle

14    these types of incidents with that.  And, you

15    know, that was concerning as opposed to even

16    following the policy and procedures of the

17    code of conduct, about how it's reported

18    through an Incident Report about, you know,

19    in responding to the culture for that.

20        The other part with Rodney, too, that he

21    had him doing these bear crawls in response

22    to an allegation I think that he was

23    smooching with his girlfriend or something or

Norman Pollard

Page  239

1       acting disrespectful or something and, again,

2       not using the defined code of conduct policy

3       procedure to deal with students' problematic

4       behavior, having them do bear crawls, which

5       is not that I found, I didn't find that in

6       the code of conduct as a list of consequences

7       for problematic behaviors.

8    Q.   What problematic behavior was it?

9    A.   Well, I'm trying to recall if he was being

10       disrespectful to a teacher or if he was

11       caught kissing his girlfriend, but it was

12       something that he was engaging in with

13       someone considered as being problematic

14       behavior.

15   Q.   I'm sorry.  Who was kissing his girlfriend?

16   A.   Well, I think that Rodney was kissing his own

17       girlfriend, I think that's the recollection.

18   Q.   Again, I just need for you to tell me so that

19       we won't be surprised at trial.

20   A.   Well, let me make it more -- regardless of

21       what Rodney was doing, someone complained to

22       Coach saying this student is behaving in this

23       way that's concerning.  And Coach Eubanks

Norman Pollard

Page 240

1          took it upon himself to discipline Rodney for

2          some type infraction that had absolutely

3          nothing to do with football or athletics

4          seemingly by having him do bear crawls that's

5          not listed in the student code of conduct as

6          a prescribed consequence for any action that

7          I could find.  And so --

8     Q.   What should he have done?  I'm sorry I

9          interrupted you.

10    A.   What did you ask?

11    Q.   What should he have done?

12    A.   Well, it seemed as though that they had a

13         number of assistant principals that were in

14         place primarily to help redirect students'

15         behavior in a positive direction, ideally.

16         So if there's concerning behaviors that is

17         outside of, you know, something that happened

18         right in front of him as part of the football

19         program, to have reported that.

20    Q.   Reported --

21    A.   To the assistant principal.

22    Q.   All right.  So it's your testimony, in your

23         opinion, that Coach Eubanks should have

Norman Pollard

Page 241

1        reported what to the assistant principal?

2    A.   Whatever that initial complaint was about

3        Rodney.  Again, I'm trying to recall if it

4        was that a different teacher saw Rodney

5        kissing his girlfriend or if it was Rodney

6        was disrespectful to a teacher.  But

7        regardless, it was something other than what

8        Coach Eubanks necessarily witnessed or being

9        involved with and certainly didn't have

10       anything to do with football.

11   Q.   So you've now told me about all the

12       complaints or problems you see with Coach

13       Eubanks?

14   A.   I believe so.  And again, you know, just the

15       only other thing was that, you know, he had

16       gone through the online course, even though

17       it was, you know, I think it was in early

18       2019 that he actually completed it after

19       these incidents.  But even having the most

20       recent, going through that, didn't seem to

21       recall the content of that course and wasn't

22       able to give I think an accurate

23       understanding of what hazing was and why it

Norman Pollard

Page 242

1     was an important issue.

2   Q.   And what was the content of that program that

3        you --

4   A.   The National Federation of High School has an

5        online course.  As I referenced earlier, the

6        Alabama Athletic Association encourages

7        students and coaches to take this on

8        bullying, hazing, and I don't know if it's

9        problematic behavior or concerning behavior,

10       and it's an online course with those topics.

11  Q.   And what was is it that he didn't comply with

12       respect to the online program?

13  A.   Well, one of the -- when the beginning

14       pieces, especially in the hazing, is it gives

15       a definition and examples, and so the coaches

16       and students have an understanding of what it

17       means.  Because as I talked about at length,

18       that there can be a misunderstanding or a

19       different perception of the behavior and not

20       appreciating the possible severity.

21            And Coach Eubanks didn't seem to really

22       understand that and didn't seem to be able to

23       identify the problematic behavior as anything

Norman Pollard

Page 243

1        other than, I think, he even used the term

2        horseplay.

3    Q.    What problematic behavior was it?

4    A.    That when he was shown the videos that were

5          produced in evidence, that he was describing

6          that as, like, horseplay and, you know,

7          rough-housing and just students, boys will be

8          boys, is the attitude that seemed to be

9          suggestive.

10   Q.    What videos are you talking about, sir?

11   A.    That was provided, an incident, it was the

12         video of Rodney Kim.  I think he was shown

13         the video of the earlier or another incident

14         where it seemed like a fight club that was in

15         the locker room as well.  I can't recall if

16         he was shown Jeremiah's, but certainly the

17         two that were in the locker room.

18   Q.    And how did he describe those, sir?

19   A.    Well, the best of my recollection, he was

20         calling them rough-housing, you know, boys

21         will be boys, not to a level of severity that

22         would -- especially that, you know, that

23         warranted those students to be separated from

Norman Pollard

Page 244

1        the school and arrested.  So you would think

2        that he would describe them in more accurate

3        terms than just rough-housing or horseplay.

4    Q.  I'm sorry.  Which students should have been

5        suspended?

6    A.  The students that assaulted -- the students

7        that assaulted Rodney but also assaulted

8        Jeremiah.

9    Q.  Any other students that should have been

10        suspended or separated from the school?

11    A.  Well, those that were identified.  I know

12        that they went through a process of

13        interviewing the coaches to try to get a

14        definitive list of that.  And so I don't know

15        if they had a complete list or not.

16    Q.  So you've now told me about all the

17        criticisms you have of Coach Eubanks?

18    A.  Yes, I believe I have.

19    Q.  What's the other coach?

20    A.  With Coach Miller?

21    Q.  Please.  What criticisms or issues do you

22        have with Coach Miller?

23    A.  Again, it's similar to Coach Pope except he

Norman Pollard

Page 245

1      did not take the voluntary course for that.

2      So I can't criticize him about not learning

3      that, but his definition of what hazing is

4      and any actions or inaction they could have

5      taken.

6   Q.   What could he have done?

7   A.   Well, you know, the environment I think was

8        pretty known.  I don't have the specifics

9        where Coach Miller was personally aware of

10       that, but how he described the behaviors that

11       he saw, again, he was categorizing those as

12       rough-housing, as horseplay and just

13       diminishing the severity, the savageness of

14       those beatings.  You know, as a teacher you

15       see a child engaged in that type of physical

16       assault, I would have expected a different

17       response.

18   Q.   And what was it that Coach Miller observed

19       that should have created more of a response?

20   A.   Yes.  I'm referencing again when he was shown

21       the videos during deposition.

22   Q.   Is there any evidence that he saw any of

23       those incidents?

Norman Pollard

Page 246

1   A.   Not that I was able to get from the
2        deposition or reports, no.
3   Q.   Is there any evidence that any of the coaches
4        ever saw any of these incidents?
5   A.   Well, yes, with, as I said, Coach Eubanks
6        walked in when Tre Betts was -- being
7        dog piled and was being beaten.  And Coach
8        Riley told them to, you know, break it up,
9        you dumb asses.
10  Q.   I'm sorry, you said Coach Eubanks --
11  A.   Oh, I'm sorry.  That was Coach --
12  Q.   Are you confused?
13  A.   I thought you wanted a complete list of all
14       the coaches.  I'm sorry.  With Coach Eubanks?
15  Q.   I'm sorry, please do.
16  A.   So Coach Eubanks was when Rodney Kim was
17       being -- with the shaving cream and the belts
18       and being slapped, Coach Eubanks' response to
19       that was to knock it off.  That's the --
20       other than Coach Riley, that's my
21       recollection of any of the coaches that
22       observed that behavior.
23  Q.   So based upon your study and review of all

Norman Pollard

Page 247

1          the evidence in this case, the only issue you

2          have is Coach Eubanks saw somebody and said

3          knock it off, one of these incidents, said

4          knock it off?

5     A.   Well, and again, when I said that he should

6          have not disciplined Rodney Kim by having him

7          do bear crawls, he should have referred him

8          to the assistant principals for disciplinary

9          action if needed.

10    Q.   What kind of disciplinary action would you,

11         as an intervenor, have prescribed for Rodney

12         Kim for being involved in those -- is it two

13         incidents you say?

14    A.   For the life of me, I can't recall if it was

15         being disrespectful to a teacher or kissing.

16         And I would have to look in the student code

17         of conduct which in many areas is complete

18         with a graduated list of consequences

19         depending on the frequency and the severity

20         for that.

21    Q.   If you've reviewed the code of conduct, what

22         should have been done with respect to these

23         two incidents that were observed?

Norman Pollard

Page 248

1    A.    Again, depending on the context, I think that

2          the variability of that.  Again, the report

3          was without great detail of what all was

4          involved, it was a short sentence, and so not

5          having the completeness to know the severity

6          of those infractions.  But certainly even the

7          conversation with an assistant principal can

8          be beneficial about deportment and respect

9          and communication.

10   Q.    So that I'm clear then, it's your opinion

11         that this matter should have been handled by

12         the assistant principals and not by

13         Coach Eubanks; is that your opinion?

14   A.    That's correct.

15   Q.    And you've now told me about Coach Eubanks

16         is the one person who observed one of these

17         incidents for which this lawsuit has been

18         filed?  Any other coach make any observations

19         that you are critical of in that report?

20   A.    Other than Coach Riley.

21   Q.    Tell me what Coach Riley observed.

22   A.    Well, with Lyman Collins, there was behavior

23         that he actually imparted on him that's

Norman Pollard

Page 249

1      concerning.   With Tre Betts --

2   Q.   What was that?

3   A.   That Coach Riley with the stomach bumps, with

4        the humiliation, you know, about the

5        "sissy-itis," about the cripple crew, about

6        those types of interactions that he had with

7        Lyman.

8   Q.   All right.   That's what I need for you to

9        tell me what those interactions were so we've

10       got a clear record?

11  A.   Yes, as I just said, the best of my

12       recollection, had to do with the stomach

13       bumps that he had as he was being

14       aggressively interacting with him, the

15       interaction they had with calling him a sissy

16       or "sissy-itis," that.   They talked

17       about those that were on the cripple crew,

18       those that were injured.

19          There was also the seemingly disparaging

20       about needing extra tutoring going a third

21       day out of the week instead of two and

22       questioning how he was going to -- why that

23       was necessary.   But I've listed those on page

Norman Pollard

Page 250

1      13, those are --

2   Q.   That's a complete list?

3   A.   Those are a list that I have, yes.

4   Q.   So at trial these are the only items that

5      you're going to bring up on page 13?

6   A.   For Lyman Collins it is.  I think I also said

7      that, with Jeremiah, Coach Riley observed him

8      getting punched in the ribs in the locker

9      room and that his -- Coach Riley's response

10      was to look at him, smile, take a lick at his

11      ice cream cone and walk out for that.  And

12      again, with Tre Betts, when he was being dog

13      piled how coach, you know, called him --

14      called the students dumb asses and telling

15      them to break it up.

16   Q.   Anything else?

17   A.   No, I believe that that's it.  The only other

18      is with the resource officer took statements

19      from different players that seemed to

20      substantiate that type of behavior by a coach

21      but not specific incidents.

22   Q.   Did any of the players who were interviewed

23      indicate that any of the coaches that

Norman Pollard

Page 251

1      observed any other incidents?

2   A.   That involved Jeremiah and Tre?

3   Q.   Any incident?

4   A.   I would -- I can't -- not that I can recall.

5   Q.   And if you recall, you're going to let your

6        lawyer know?

7   A.   Or it's in the report for that.

8   Q.   What report?

9   A.   The report that I provided to you that I

10       believe that if there were incidents where he

11       was observed by others that was engaged in

12       that behavior, I believe I would have listed

13       it in the report.  At this stage in the

14       afternoon, I just can't recall if I included

15       or had incidents to that or not.

16  Q.   Well, do we need to take a break because I do

17       need a complete record so that I'm not

18       surprised?  Do you want to take a break

19       because we are going to ask that you review

20       your deposition and tell us if there are any

21       changes?  So, in fairness to you, would you

22       like to take a break now?

23  A.   Not at this time.

Norman Pollard

Page 252

1    Q.   All right.  So you're capable mentally and

2         physically to go on with the deposition?

3    A.   I believe so, yes.

4    Q.   All right, sir.  Because I guess what I hear

5         you saying is you don't know of any evidence

6         that any of the coaches observed any other

7         incidents for which this lawsuit has been

8         filed?

9    A.   Other than the victims that experienced it

10        themselves and through their depositions

11        reported that this was the behavior, that

12        this was what was witnessed by either

13        Coach Eubanks in the one case or by

14        Coach Riley.

15   Q.   Which you've told me about?

16   A.   That I have told you about.

17   Q.   All right.  Did any of the players who were

18        interviewed by Resource Officer Eric Terry

19        indicate that any of the coaches had observed

20        any of the incidents?

21   A.   I don't believe so because I have the report

22        in front of me and --

23   Q.   Well, now, take your time because we do need

Norman Pollard

Page 253

1          an accurate record.

2     A.   I appreciate that, thank you.  No, I don't

3          believe that there are any of the individuals

4          that were interviewed by the resource

5          officer, Terry, made that statement.

6     Q.   Made what statement?

7     A.   That it was observed by a specific coach.

8     Q.   Or any coach?

9     A.   By any coach.

10    Q.   Now, we were talking about Coach Miller and I

11         asked you what, if any, criticisms or

12         complaints you had with respect to Coach

13         Miller?

14    A.   And I think I gave you a complete response is

15         that, you know, it seemed to be just

16         generally that he was not protecting the

17         students that were in his care that were

18         engaged in this type behavior and by not

19         providing that supervision to ensure that

20         they were safe.

21    Q.   I'm sorry.  I thought you just said what he

22         observed or none of the coaches observed any

23         of these incidents?

Norman Pollard

Page 254

1   A.   That's what I mean is that you asked if there

2        was a criticism.  My criticism is that they

3        were not observant.  They were not

4        supervising.  They were not in the spaces

5        where their students who they had a

6        responsibility for were gathering and then

7        involved in this type of activity.

8   Q.   What evidence do you have with respect to

9        Coach Miller?

10  A.   That he was not there when these incidents

11       occurred in the locker room and --

12  Q.   I'm sorry.

13  A.   And that he and/or the other coaches should

14       have been in that space.

15  Q.   I guess I'm puzzled.  As I understand it, you

16       don't have any evidence that any of the

17       coaches were present or observed any of these

18       -- what did you say -- I guess, maybe I just

19       don't understand your reasoning for having a

20       complaint against Coach Miller?

21  A.   As I attempted to provide, industry standards

22       that are listed, you know, from a recent

23       article by National Federation of High School

Norman Pollard

Page 255

1          talks about supervision, especially

2          supervision of locker rooms.  And from what

3          was provided to me, it was inadequate

4          supervision by the coaches who had the

5          responsibility for the student athletes that

6          are in their care during that set period of

7          time.

8     Q.   All right.  And what recent article are you

9          talking about, sir?

10    A.   It was one that I had just sent the court

11         reporter, to Jennifer.

12    Q.   What do you mean recent?

13    A.   It was published in -- it was on the website

14         for the National Federation of High Schools,

15         I believe, last month.

16    Q.   I'm sorry.  Let's see, it's, what, February

17         of 2021, you say it was published in January

18         of 2021?

19    A.   Well, the one article that I saw there was

20         from that date, that was the one I was

21         referencing.  But the issue of supervision of

22         locker rooms is documented well before then.

23         That was the article that caught my eye that

Norman Pollard

Page 275

1          produce your material to support your

2          opinion.

3     A.   Not to your satisfaction, obviously.

4     Q.   Well, I guess it's going to be up to the

5          courts whether they feel like it's

6          satisfactory.

7     A.   Okay.

8     Q.   You had a Subpoena Duces Tecum two weeks

9          before your deposition was taken.  So you've

10         now told me about all of the criticisms you

11         have for the four coaches who have been sued

12         in this case?

13    A.   Correct.

14    Q.   What criticisms, if any, do you have of

15         Mr. Copeland, the principal?

16    A.   Well, again, it has to do with the code of

17         conduct of while the principal may not

18         develop policy, he certainly is a key player

19         that could have made recommendations to the

20         superintendent and to the board about this

21         topic.  So similar to what I mentioned with

22         the coaches is the lack of overarching,

23         prevention and notice and acknowledgment that

Norman Pollard

Page 276

1      hazing is an issue and ways to effectively

2      respond to that.

3   Q.   How would he have done that, sir?

4   A.   Well, one of the things that he, by

5      leadership, is to have publicly talked about

6      how hazing is not allowed that may reference

7      code of conduct, could have brought in

8      outside speakers, could have done surveys of

9      the students, former students, could have

10     interviewed those who have quit the team or

11     activities to inquire why.

12         He could have set up anonymous reporting

13     systems in order to gather more data that

14     could have been discreet instead of asking

15     victims to come forward to see if friends of

16     those who have been impacted.  There are a

17     variety of different ways.

18         He could have sent his staff to

19     different workshops.  He could have had an

20     expectation that the staff took the online

21     course and created an opportunity of

22     discussion.  He could have had the students

23     take the online course as well.  That's just

Norman Pollard

Page 277

1          some of the ideas.

2     Q.   Anything else?  Yes, sir.  I need to get a

3          complete list so that we know what you're

4          going to testify to at trial with respect to

5          Principal Copeland.  Anything else?

6     A.   No, I believe that would be comprehensive.

7     Q.   All right.  Are we going to hear anything

8          else at trial?

9     A.   It's not my intention unless there's more

10         material that comes forward.

11    Q.   Have you asked for any additional material

12         from your lawyers?

13    A.   I did inquire when Coach Riley was going to

14         be deposed.

15    Q.   Have you asked for any additional material?

16    A.   No.

17    Q.   So you've now told me all of your complaints

18         and criticisms of Principal Copeland; is that

19         correct, sir?

20    A.   Yes.

21    Q.   Now, what complaints or criticisms do you

22         have of Ms. Peek?

23    A.   Well, as being the CEO of the school

Norman Pollard

Page 278

1    organization, the leader of that, I would

2    have expected that there would have been

3    compliance with the hazing statute, that she

4    would have made recommendations that be

5    included in the student handbook as well as

6    in the student code of conduct.

7         I think to have set up where in her

8    testimony she talked about the response to

9    hazing was a policy, the response was simply

10   the expectation that if it was a policy, it

11   was going to change the behavior.  And so as

12   a leader of the organization, she could have

13   done -- provided the resources for the staff

14   to be trained, for the individuals to have

15   had a policy about that and for it to be

16   re-enforced.

17   Q.   Anything else, sir?

18   A.   I believe that's comprehensive.

19   Q.   Well, is that going to be your testimony at

20        trial?

21   A.   Yes.

22   Q.   Anything else that's going to be mentioned by

23        you with respect to Ms. Peek?

Norman Pollard

Page 279

1   A.   Other than if there's something else that is

2        in the report that I've given you, but I

3        believe I have covered that all.

4   Q.   Well, that's why I'm asking you the question.

5   A.   Well, then --

6   Q.   You've got the report in front of you.  If

7        you will, I need to know now, what criticisms

8        or complaints do you have with respect to

9        Ms. Peek?

10  A.   As what is listed in my report and as I said,

11       previously with those other criticisms.  You

12       know, concern that she did not have an

13       anti-hazing policy with that.

14  Q.   Anything else?

15  A.   That the superintendent did not have an

16       adequate knowledge base to develop policies

17       specific to hazing.

18  Q.   Anything else?

19  A.   That is it.

20  Q.   All right, sir.  So you've now told me about

21       all the criticisms you have with respect to

22       Ms. Peek, Mr. Copeland, and the four coaches

23       who have been sued in this case; is that

Norman Pollard

Page 281

1    Q.   And what staff development programs have you

2         developed?

3    A.   Part of my responsibility as Dean of Students

4         was ensuring that we were compliant with

5         various state and federal law.  So there was

6         staff training specifically for substance

7         abuse for Title 9 issues with various forms

8         of sexual harassment, sexual assault, and

9         sexual misconduct.  I did specific staff

10        training for athletics with both Title 9 and

11        for hazing.  I also chaired our behavioral

12        assessment team.  So I would train faculty on

13        how to identify the danger -- the dangerous,

14        disruptive and disturbing student and how to

15        intervene and refer.

16             I also chaired our division emergency

17        response system so we'd have to do training

18        for staff on how to differentiate and respond

19        to a variety of different emergencies that

20        would occur on a college campus.  Those are

21        the ones that come to mind that I provided.

22   Q.   Now, your job as a counselor and

23        administrator was to ensure and maintain

Norman Pollard

Page 282

1    student safety at Alfred University; is that

2    correct?

3    A.   Yes.

4    Q.   And because of your job was student safety

5         with Alfred University necessary for you to

6         develop all the policies to ensure student

7         safety?

8    A.   Yes.  The Dean of Students has the

9         responsibility to have the student handbook

10        and the code of conduct, making sure we're

11        compliant and up to date.

12   Q.   And can we agree that Alfred University also

13        developed all necessary procedures to

14        implement the safety policies at Alfred

15        University?

16   A.   To the best of our ability, yes.

17   Q.   And can we agree that based upon your

18        expertise and student safety with the

19        policies and procedures developed at Alfred

20        University were complete and comprehensive?

21   A.   Complete is a challenging concept because,

22        for example, with COVID, even though while I

23        was working at the University, we had