## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| RODNEY K. SR., *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | CIVIL ACTION NO. 1:18-cv-343-TFM-N |
| | : | |
| MOBILE COUNTY BOARD | : | |
| OF EDUCATION, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## **MEMORANDUM OPINION AND ORDER**

Pending before the Court are (1) *Defendant Kelly Eubanks' Motion for Summary Judgment* and brief in support (Docs. 144, 145, both filed April 29, 2021); (2) *Defendant Robert Miller's Motion for Summary Judgment* and brief in support (Docs. 146, 147, both filed April 29, 2021); (3) *Defendant Fred Riley's Motion for Summary Judgment* and brief in support (Docs. 148, 149, both filed April 29, 2021); (4) and *Defendant Bobby Pope's Motion for Summary Judgment* and brief in support (Docs. 150, 151, both filed April 29, 2021).  Each of these defendants move the Court to enter summary judgment in their favor and against the plaintiffs on the Counts that are brought against them. Docs. 144 at 1, 146 at 1, 148 at 1, 150 at 1.  Having considered the motions, the responses, the replies, relevant law, and the arguments that were presented at oral argument, the Court finds as follows:

(1)     Defendant Kelly Eubanks' Motion for Summary Judgment (Doc. 144) is due to be **GRANTED**;

(2)     Defendant Robert Miller's Motion for Summary Judgment (Doc. 146) is due to be **GRANTED**;

(3)     Defendant Fred Riley's Motion for Summary Judgment (Doc. 148) is due to be **GRANTED**; and

(4)     Defendant Bobby Pope's Motion for Summary Judgment motion (Doc. 150) is due to be **GRANTED**.

Also pending before the Court is *Plaintiffs' Notice of Motion for Summary Adjudication of Issues on Claim Against Principal Lewis Copeland, Coach Fred Riley, Coach Bobby J. Pope, Coach Robert Miller, Coach Kelly Eubanks* (Doc. 152, filed April 29, 2021) as it relates to Defendants Coach Fred Riley, Coach Bobby J. Pope, Coach Robert Miller, and Coach Kelly Eubanks.   Plaintiffs move the Court to enter summary judgment in their favor and against Defendants Coach Fred Riley, Coach Bobby J. Pope, Coach Robert Miller, and Coach Kelly Eubanks on Counts 2 and 10 that Plaintiffs bring against them.  Doc. 152 at 1.  Having considered the motions, the responses, the replies, the relevant law, and the arguments that were presented at oral argument, the Court finds Plaintiffs' Notice of Motion for Summary Adjudication of Issues on Claim Against Principal Lewis Copeland, Coach Fred Riley, Coach Bobby J. Pope, Coach Robert Miller, and Coach Kelly Eubanks (Doc. 152) is due to be **DENIED** as to Coach Fred Riley, Coach Bobby J. Pope, Coach Robert Miller, and Coach Kelly Eubanks.

## I.      PARTIES, JURISDICTION, AND VENUE

In this Memorandum Opinion and Order, Plaintiffs Rodney K., Sr.; Mary K.; R. K., Jr.; Garrian Tre Betts; Stacy Stanton Terry; Kennesha Quinnie; Colby Quinnie; Jeremiah Chatman; Lyman Collins, Sr.; Tiffanie Collins; and Lyman Collins, Jr., will be referred to collectively as "Plaintiffs;" Defendant Superintendent Martha L. Peek will be referred to as "Superintendent Peek;" Defendant Principal Lewis Copeland will be referred to as "Principal Copeland;" Defendant Board of School Commissioners of Mobile County will be referred to as the "Board;"

Defendants Douglas Harwell, Jr., Don Stringfellow, Reginald Crenshaw, Robert Battles, and William Foster will be collectively referred to as the "individual Board Defendants;" and Defendants Coach Fred Riley, Coach Bobby J. Pope, Coach Miller, and Coach Eubanks will be collectively referred to as the "Defendant Coaches."

No party contests jurisdiction or venue, and the Court finds adequate support for both. The district court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights), and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

The district court has personal jurisdiction over the claims in this action because the events that gave rise to this action occurred within this district, and the Board is a local government agency and the individuals Board Defendants are members of that local government agency. *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291-92 (11th Cir. 2000) ("Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint. . . . General personal jurisdiction, on the other hand, arises from a defendant's contacts with the forum that are unrelated to the cause of action being litigated. The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction, and require a showing of continuous and systematic general business contacts between the defendant and the forum state.").

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     FACTUAL BACKGROUND

#### 1.     Defendants[1]

The Board is comprised of five (5) members: Robert Battles, Dr. Reginald Crenshaw, Dr. William Foster, Douglas Harwell, and Don Stringfellow.  Doc. 129-5 at 5.

Superintendent Peek was hired by the Mobile County Public School System ("the MCPSS") as a teacher in 1973 and selected as the Superintendent in 2012, a position that she held until she retired in 2018.  Doc. 128-1 at 2, Doc. 128-2 at 3.

Principal Copeland was hired by the MCPSS as a teacher in 1967, and he was selected as the Principal at Davidson High School ("Davidson") in 1982, a position that he held until he retired in 2018.  Doc. 128-3 at 2, Doc. 128-4 at 3-4.

Coach Riley was selected as the Head Football Coach at Davidson in 2004 and retired as a teacher and football coach at Davidson on November 30, 2018.  Doc. 128-5 at 20, 24.

Coach Pope was hired by the MCPSS in 1994 and began teaching at Davidson in 2002 and was a coach for the varsity football team.  Doc. 128-6 at 3-4.  Coach Pope then transferred to other high schools to advance his football coaching career then returned to Davidson as a teacher and assistant football coach, positions he held until he retired on January 1, 2019.  *Id.* at 4-7.

Coach Miller began his positions as a teacher and football coach at Davidson in June 2017.  Doc. 128-7 at 5-6.

Coach Eubanks was hired as a teacher and assistant football coach at Davidson in June

---

[1] The Court previously issued its memorandum opinion and order in which it granted the motions for summary judgment that were filed by the Board, the individual Board Defendants, Superintendent Peek, and Principal Copeland, dismissed with prejudice Plaintiffs' claims against those defendants, and denied Plaintiffs' cross-motions for summary as to those defendants.  Doc. 231.  The Court lists here the dismissed defendants for description purposes only.

2017.  Doc. 128-8 at 5-6.

> ### 2.      MCPSS Student Code of Conduct

The  Board  approved  and  issued  a  "Mobile  County  Public  Schools  Student  Code  of Conduct"  for  the  terms  of  July  2015  to  July  2017  and  2017  to  2019  (collectively,  the  "Code  of Conduct").  Docs. 128-9, 128-10.  Every student is provided a copy of the Code of Conduct at the beginning of the school year.  Doc. 128-11 at 3.  Both versions of the Code of Conduct state, "Your signature  on  the  Online  Student  Enrollment  Information  indicates  that  you  have  received  this Student Code of Conduct and you will read and discuss it with your son/daughter," and the Code of Conduct policies "apply to all students and parents/guardians in the [MCPSS] at all school campuses, school buses, and school-related activities and events."  Doc. 128-9 at 8, Doc. 128-10 at 9.

The Code of Conduct includes a section for "Student Misconduct," which is divided into different groups of misconduct and prescribes courses of action for each successive occurrence of misconduct.  Doc. 128-9 at 17-34, Doc. 128-10 at 23-37.  The Code of Conduct also includes instructions for "Reporting, Investigation, and Complaint Resolution Procedures For Bullying and Harassment," which state:

> Complaints alleging violations of this policy must be made on Board approved complaint forms available at the principal and/or counselor's office in each school. The  complaint  must  be  signed  by  the  student  alleging  the  violation  or  by  the student's parent or legal guardian and delivered to the principal or the principal's representative  either  by  mail  or  personal  delivery.    At  the  request  of  the complaining  student  or  the  student's  parent  or  legal  guardian,  incidental  or  minor violations of the policy may be presented and resolved informally.

Doc. 128-9 at 32, Doc. 128-10 at 39.  Included in the Code of Conduct is a "Harassment Complaint Form."  Doc. 128-9 at 33, Doc. 128-10 at 40.

3. **Allegations of Student Misconduct by the Student Plaintiffs**

   a. **Garrian Tre Betts**

Garrian began his freshman year at Davidson in Fall 2016 and continued to attend until the end of the 2018 school year. Doc. 128-12 at 3. Garrian states he was a member of the Davidson football team and was listed on the junior varsity and freshman team rosters, but never participated in a game and participated only in workouts. *Id.* at 8-12. Garrian states it was his understanding Coach Pope and Coach Riley were "over the entire football program." *Id.* at 8-9. Coach Riley states Garrian "never was on the football team once we got going. But he was involved initially." Doc. 128-5 at 3-4. Garrian's academic record indicates he was enrolled in "9th FBall" in "Term 1 - 2017" and "Term 2 – 2017," but was not enrolled in that course in either "Term 3 – 2017" or "Term 4 – 2017." Doc. 128-12 at 3.

Garrian states he was hazed at the end of his freshman year, Spring 2017, at Davidson, when he says his collarbone was injured. Doc. 128-13 at 3. Garrian states he was in the fieldhouse so he could change and was threatened by football players, who said they were going to "jump" him if he went to the bathroom to change. *Id.* at 17-19. Garrian states he then decided to change at the "side of a locker" . *Id.* at 19. Garrian states some football team members came up behind him, pushed him into a locker, then began to "beat [him] up" because he was not on the football team and did not belong in the fieldhouse. *Id.* at 21-22. Garrian states there were "at least six plus" assailants. *Id.* at 24. Garrian states he was hit, kicked, pushed into a locker, slammed on the floor, stepped on, and hit with multiple small weights. *Id.* at 22-24. Garrian states he does not remember the names of his assailants, but one later identified himself after a football game as Gabe and another was nicknamed "Unc." *Id.* at 22. Garrian states during the event, he saw Coach Riley in the doorway and he told the assailants, "Knock it off, dumb asses," but they only paused then

continued.  *Id.* at 24-25.

Coach Riley states he never saw anyone "inappropriately put a hand on Garrian ever." Doc. 128-5 at 22.[2]

Garrian states during the "middle of [his] 9th grade year" and the "beginning of [his] 10th grade year" he told Principal Copeland "football players were either fighting or destroying . . . our property." Doc. 128-13 at 14.  Garrian also told Principal Copeland about what happened to R.K., Jr., "a week or so after" it happened.  *Id.* at 15.  Garrian states, during Hell Week, he saw hazing "every single day," but states, "I didn't specifically see anybody get jumped.  I usually removed myself before I could see it happening or try to leave because it's just something I don't like to see."  *Id.* at 27.  Garrian states he remembers "an O lineman in the freshman locker room, he was jumped by almost the whole team," but he could only hear it.  *Id.*

Garrian also states an offensive lineman named George was hazed by freshmen football players.  *Id.* at 29.  Garrian states he did not "tell anybody specifically" about "Burpo" and "Ry-Ry," who were "beating kids up" in the locker room, but he told Principal Copeland "that the incidents were happening a little too frequently" but he "pushed it off and nothing ever happened," and "Coach Riley was told about it."  *Id.*  Garrian states he also told Principal Copeland about what happened to R.K., Jr., "the week or so" after the assault.  *Id.* at 15.

Coach Riley states the incident with George Morris occurred when the freshman football players were in the fieldhouse and were preparing to play a game, and when Coach Riley and Coach Pope were at a podium, the players began to excitedly jump up and down then fell in a pile.

---

[2] Normally, the Court would only list facts from one side's perspective, the non-moving party's; however, since there are cross-motions for summary judgment in this case, the Court must list facts from both sides.  *See Chavez v. Mercantil CommerceBank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012) (stating on cross-motions for summary judgment "the facts are viewed in the light most favorable to the non-moving party on each motion" (citation omitted)).

Doc. 128-5 at 10-12.  Coach Riley states George Morris told him he was at the bottom of the pile and his glasses were broken.  *Id.* at 12.  Coach Riley states, the next day, the players were directed to run as punishment for their "silliness."  *Id.* at 12-13.  Coach Pope states he remembered the incident with George Morris and described the players "got up and wound up falling all over each other and playing."  Doc. 128-6 at 18-19.  Coach Pope states he punished the players the next day by "running them, and running them a lot."  *Id.* at 19.

Garrian states "[e]very fight or hazing is recorded" but either Coach Riley or Coach Pope "confiscates phones from people that's around."  Doc. 156-44 at 19.  Garrian could not identify who had their phone confiscated by either Coach Riley, Coach Pope, or any of the football coaches. *Id.*  However, Garrian states Coach Riley and Coach Pope picked up his phone to look at his "camera roll," they looked in "many people's camera roll[s]," and "after any incident" they "look at it and if [they] find it," there is "some type of punishment . . . after it will be deleted."  *Id.* at 19-20.

Garrian states, when he was in the eighth grade, he and others were invited by high school coaches "to come be looked at to see if we would make a good fit" for the Davidson football team and that is when he witnessed a "hazing-related incident" in the Davidson locker room, but "was pulled away from it before [ ] it escalated" by Coach Riley.  *Id.* at 26-29.

Garrian states, during his freshman year, he saw "a white kid" being hazed and Coach Riley "said stop and everybody stopped, all the other players stopped."  Doc. 156-44 at 48.

Garrian states a guidance counselor told him he may not want to register for the weight training class because "people are getting beat up and there's fights happening a lot" and suggested he register for "P.E."  *Id.* at 40-41.

       **b.**       **Lyman Collins, Jr.**

Lyman Collins, Jr., began his freshman year at Davidson in 2016 and eventually transferred to Blount High School during the second semester of his sophomore year.  Doc. 128-19 at 12-13, 34.  Lyman Collins, Jr., states he does not remember the names of freshman football team members who were bullied in Fall 2016 nor does he remember who perpetrated the bullying.  *Id.* at 16.  Lyman Collins, Jr., states he cannot remember whether he told his parents or any of the coaches about what he saw occur in the locker room in Fall 2016.  *Id.* at 16-17.  Lyman Collins, Jr., states he does not remember "instances where people were getting punched or put in lockers or anything like that in the locker room" or any encounters with either Coach Eubanks, Coach Miller, Coach Pope, or Coach Riley in Spring 2017.  *Id.* at 18.

During Lyman Collins, Jr.'s, sophomore year, he broke the tip of his elbow, which he thought occurred at football practice, and after the injury was diagnosed, the doctor put Lyman Collins, Jr.'s, arm in a hard cast.  Doc. 156-49 at 11-12.  Prior to going to the doctor, Lyman Collins, Jr., was told by the trainers to stretch what they thought was a muscle injury and take pain medication, and this continued for two (2) or three (3) weeks before Lyman Collins, Jr.'s, injury was diagnosed by a doctor.  *Id.* at 34-35.  Lyman Collins, Jr., states Coach Riley did not call him a "faggot" or a "sissy," but did say Lyman Collins, Jr., had "sissyitis" when he returned with a cast for his elbow injury and on another occasion told Lyman Collins, Jr., if he "ever [had] to go to tutoring three times a week, you're a dummy."  Doc. 128-19 at 29-30, 36-37.

Lyman Collins, Jr.'s, mother, Tiffanie Collins, states in September 2017, she contacted a female assistant principal at Davidson and reported Coach Riley's comments about her son.  Doc. 156-49 at 22-23.  Tiffanie Collins states the assistant principal later called her and reported she "had either taken care of what [Tiffanie Collins called] about," and she spoke with Coach Riley

about the "sissy, dummy incident" and "she was going to give it over to [Principal Copeland.]" *Id.* at 22-24.  Tiffanie Collins states she called the same assistant principal again after Coach Riley "called [Lyman Collins, Jr.,] out" in a huddle for his mother calling the school about him.  *Id.* at 24-25.   Specifically, Tiffanie Collins states Lyman Collins, Jr., told her Coach Riley said "something along the lines of don't be telling your parents what happened in the locker room." *Id.* at 26.  The assistant principal who Tiffanie Collins spoke with was Dr. Lynn Cleveland, who states she did not investigate how Coach Riley conducted his football team and how he prevented fighting, hazing, or bullying.  Doc. 156-53 at 15.  Tiffanie Collins also states Lyman Collins, Jr., told her "the coaches were standing around and watch these kids being jumped on, they would even encourage it on the football field before they left from the field to go back to the locker room, that if they knew somebody messed up or did something wrong, he would tell them that the boys were going to take care of them in the locker room."  Doc. 156-49 at 10.

During one instance, Lyman Collins, Jr., states he told Coach Riley he was going to tutoring then Coach Riley looked at him and his face was "all balled up and it was red like he was aggressive," had his arms on his side, poked his stomach out, and "walked up" on him, to which Lyman Collins, Jr., put out his arm and asked Coach Riley what he was doing.  Doc. 128-19 at 35.  Lyman Collins, Jr., states Coach Riley did not respond to his question and Lyman Collins, Jr., exited the door and went to tutoring.  *Id.*  In another instance, Lyman Collins, Jr., states during the last football game of the regular season, Coach Riley "was putting everybody in the game, everybody ended up getting to play," but Coach Riley walked up to Lyman Collins, Jr., and told him, "I would have played you, but you put tutoring before practice."  Doc. 156-48 at 34-35.

### c.   Jeremiah Chatman

Jeremiah attended Davidson for his junior year.  Doc. 128-20 at 5.  Jeremiah states a video

was recorded that was posted on Facebook of an incident in which he was involved. *Id.* at 19-20. The recorded incident occurred in the fieldhouse, and Jeremiah states he does not know who recorded the incident or who posted it on Facebook. *Id.* at 20, 24-35. Jeremiah states the incident occurred after his third block class at "close to 4:00 o'clock." *Id.* at 22, 24-25.

Jeremiah states he was working out in the fieldhouse when Coach Riley came out of his office because a boy asked him about the weights, "cursed him out," and told him to get out of the fieldhouse. *Id.* at 26-27. Jeremiah states he then saw a classmate in the back of the locker room area and went to talk to him when a student named Coby Marks walked in front of Jeremiah and told him he could not go there then began to "cuss[ Jeremiah] out and push [him]." *Id.* at 26-28, 30, 32. Jeremiah states he responded, pushed Coby, told him to "get out my face," then collected his bags and walked towards the door. *Id.* at 28-29. While this occurred, Jeremiah states Coach Riley stood in front of his office. Doc. 156-45 at 9-10. Jeremiah states, as he proceeded to the door, Coach Riley was walking out as well then stood with a "smirk on his face eating ice cream," did not say or do anything, then said "hmmp" and walked out of the door and smiled. Doc. 128-20 at 29.

Jeremiah states he followed Coach Riley out of the door but was stopped by Coby, who began to push Jeremiah then grabbed Jeremiah from behind, picked him up, and "brought [him] out the door." *Id.* at 29-30. Jeremiah states he attempted to "get loose from [Coby]," who called to another student who grabbed Jeremiah's legs. *Id.* at 30. Jeremiah states the students pulled his shirt up and said, "Get his ribs, get his ribs," began to punch his ribs with closed fists, then Jeremiah's belt was removed and Coby said, "We're going to whip your ass like a slave." *Id.* at 30-34. Jeremiah states another student pulled off his belt, and both the student and Coby began to hit Jeremiah with the belts then Jeremiah was slammed into the bricks. *Id.* at 34-35. Jeremiah

identified Gabe Johnson and another student, "Coby or Jacoby," was involved in the incident and states there were four students in total who participated in the incident. *Id.* at 31.

Jeremiah states the incident occurred after R.K., Jr.'s, incident, did not occur as an "initiation or ritual," and had not heard the same individuals had done anything to anyone earlier in the school year. *Id.* at 35-37. Jeremiah states he did not see what happened to him happen to anyone else on campus and had not heard his assailants had done anything to anyone earlier in the school year. *Id.* at 36. Jeremiah states he did not tell either Superintendent Peek or Principal Copeland about his incident. *Id.* at 38-39. Jeremiah states he does not know Coach Eubanks, Coach Miller, or Coach Pope and did not see any of them on the day of his incident. *Id.* at 39-40. Jeremiah's mother states she did not learn about his incident until she was contacted by a detective with the Mobile Police Department. Doc. 154-59 at 6-10.

Coach Riley identified Jeremiah's assailants as Jukyle Hunter, Gabe Johnson, Jacoby Lott Funches, and Jerkoby Marks. Doc. 128-5 at 18. Coach Riley states he does not recall Jeremiah's incident and did not see it occur. *Id.* at 18-19; Doc. 156-74 at 49.

### d.    R.K., Jr.

R.K., Jr., began his freshman year at Davidson in Fall 2017. Doc. 128-21 at 3. R.K., Jr., played on the freshman football team. Doc. 131-1 at 3. In April 2018, the football team participated in a walk-through practice to learn how to practice. Doc. 128-22 at 4. At some point during the walk-through practice, the quarterbacks and centers were told to practice snapping the ball. *Id.* The centers stayed on the field, the rest of the team went to the locker room, and the quarterbacks went to retrieve their footballs. *Id.* Coach Miller and Coach Andrew Rieves[3] remained with the centers on the practice field. Doc. 128-5 at 15-16, Doc. 128-7 at 26.

---

[3] Coach Rieves is not a party in this matter.

R.K., Jr., was a quarterback, so he walked to the fieldhouse, and R.K., Jr., states, as he walked, another student, Jakaio Hunter, said, "Fruit-Fruit, we're going to get you too." Doc. 128-17 at 47. After Jakaio told R.K., Jr., this, R.K., Jr., states he decided to stay outside of the fieldhouse but attempted to find a way to enter to get his ball without being seen or noticed. *Id.* at 49.

R.K., Jr., states he talked to a girl named Janae then felt someone "scoop [him] up from behind," was carried into the fieldhouse, then thrown on the ground inside the locker room. *Id.* at 51-52. After R.K., Jr., was thrown on the ground, he states he was surrounded by football players and could not escape, so he dropped to the ground and tried to protect his face. *Id.* at 56. R.K., Jr., states he was punched in his left arm by Jakaio and LaQuinten Williams, felt it "start to bruise up," and "felt the blood rushing to it," so he turned the other way and his assailants began to "drill [his] right arm." *Id.* at 57. R.K., Jr., states Jalen Harris then grabbed his right arm and drug him, after which Jacoby Marks jumped and landed on him, followed by Jacoby Lott then Gabe Johnson. *Id.* R.K., Jr., states after Gabe Johnson landed on him, he felt a pop, and heard somebody say, "Y'all, chill out, chill out, chill out, chill out." *Id.* R.K., Jr., states everyone then began to walk away, and he threw his helmet visor at someone and told them, "You can go fuck yourselves." *Id.* at 57-58.

R.K., Jr., states, as he left the fieldhouse, he could not feel his right arm, and was stopped by Coach Rieves, who, after he saw R.K., Jr.'s, arm, told him to go to the trainer's office in the fieldhouse. *Id.* at 58-59. Coach Rieves states he took R.K., Jr., to the trainer's office, told the trainer, Ruth Hart, to inspect R.K., Jr.'s, arm, then returned to the practice field. Doc. 128-22 at 7-8. R.K., Jr., states Coach Riley came to Ruth Hart's office and asked him what happened and to name who perpetrated the attack. Doc. 128-17 at 64. R.K., Jr., states he told Coach Riley that

Jakaio Hunter, Gabe Johnson, and Eric Bell were the perpetrators, and Coach Riley took those individuals to the coaches' meeting room. *Id.* R.K., Jr., states he misidentified Eric Bell, who complained he had not participated. *Id.* at 65-66.

R.K., Jr., states Coach Riley brought him to his office, where Ruth Hart informed Coach Riley she thought R.K., Jr.'s, arm was broken through the growth plate. *Id.* at 68. R.K., Jr., states he and Coach Riley sat in Coach Riley's office for fifteen (15) minutes until one of R.K., Jr.'s, uncles arrived. *Id.*

Ruth Hart states she contacted R.K., Jr.'s, father and told him R.K., Jr., was injured in a fight and he needed to pick up R.K., Jr., and take him to the emergency room. Doc. 128-25 at 3-4. Ruth Hart states she did not tell R.K., Jr., his facture was close to, or in, the growth plate, and she would not have been able to know whether that occurred because it would have required an x-ray and her office was not equipped with such a machine. *Id.* at 8. Ruth Hart states R.K., Jr.'s, injury did not require an emergency call or transportation by an ambulance. *Id.* at 11-12. Ruth Hart states R.K., Jr.'s, arm was "iced, wrapped, and basically provided the appropriate care and treatment to get him to the [emergency room.]" *Id.* at 10. Ruth Hart states R.K., Jr., was picked up by his uncle, Brian K., and R.K., Jr.'s, sister, Gabrielle. *Id.*

Brian K. states he learned R.K., Jr., was injured when he received a call from R.K., Jr.'s, father, Brian K.'s brother, who told Brian K. he needed someone to go to Davidson as soon as possible because he was at work. Doc. 128-26 at 3-4. Brian K. said he drove to Davidson where a friend, Damien Miles, was present. *Id.* at 4-5. Gabrielle states when she learned about what happened to R.K. Jr., she drove to Davidson as well and pulled into the parking lot after Brian K. had arrived. *Id.* at 3-4. Gabrielle states Brian K. and she walked to the fieldhouse to talk to Ruth Hart, where Coach Riley was as well, and they saw R.K., Jr., sitting with a cast on his hand. *Id.* at

4.  Gabrielle states Brian K., R.K., Jr., and she left the fieldhouse and that was when her father arrived.  *Id.* at 5.  Gabrielle states her grandfather and Damien Miles were also present.  *Id.*  R.K., Jr., states his Aunt Taleah was also present in the parking lot.  Doc. 128-17 at 74.  R.K., Jr.'s, father then took R.K., Jr., to the hospital.  Doc. 128-26 at 7.

R.K., Jr., states Coach Riley knew of his impending assault because Coach Riley, after practice and during a huddle, told the team, "Don't touch the quarterback."  Doc. 128-17 at 95.

R.K., Jr., states he knows of six (6) hazing events or assaults at Davidson that occurred before his assault.  Doc. 128-17 at 87.  One such incident, R.K., Jr., states occurred during the spring semester of his freshman year, when Jakaio Hunter, Timothy Johnson, and Kobe Smith worked out with the freshmen.  *Id.* at 30.  R.K., Jr., states Coach Pope told them he would be back then left the fieldhouse.  *Id.* at 32.  R.K., Jr., states when the players were getting dressed, Jakaio Hunter began to punch then "slammed" a student named Zack because Jakaio thought somebody was talking about him, and Zack eventually "peed on" himself.  *Id.* at 33.  R.K., Jr., states Zack told Coach Riley about the incident the next day, based on rumors.  *Id.* at 34-35.

A second incident, R.K., Jr., states occurred one (1) or two (2) months before his assault and before spring football practice started, and involved a student named Rashard.  Doc. 131-1 at 16-17.  R.K., Jr., did not witness the incident but saw it on someone's phone.  *Id.* at 17.

A third incident that R.K., Jr., states occurred one (1) or two (2) weeks prior to his assault involved Devon Sylvester, Jakaio Hunter, Gabe Johnson, and another student named Eric who all were skipping class, when Devon Sylvester was swarmed and attacked by the others "like they usually do the freshmen."  Doc. 128-17 at 16-17.  R.K., Jr., states Devon Sylvester was pushed, kicked, and thrown to the ground.  *Id.* at 17.  R.K., Jr., states when the incident occurred, he was outside of the fieldhouse and Coach Riley had left the fieldhouse.  *Id.* at 17-18.  R.K., Jr., states

Devon Sylvester fought back and some teachers came and broke it up then Devon Sylvester, Jakaio Hunter, Gabe Johnson, and Eric went back into the fieldhouse. *Id.* at 18. R.K., Jr., states the teachers who broke up the fight called Mr. Blakely about the incident, but Coach Riley told Mr. Blakely he would "handle it." *Id.* at 19. Devon Sylvester, Jakaio Hunter, Gabe Johnson, and Eric were made to do "bear crawls and run" on the practice field. Doc. 131-1 at 9.

A fourth incident, R.K., Jr., states occurred one (1) week prior to his assault, when a student named Leon Payne, a freshman, was pushed to the ground, jumped on top of, and hit with belts by Jakaio Hunter, Gabe Johnson, Jacoby Marks, Jacoby Lott-Funches, LaQuinten Williams, and Alex Sullivan. Doc. 128-17 at 9-10, Doc. 131-1 at 4. R.K., Jr., states he was in the back, near the bathroom, in the fieldhouse when the incident occurred. Doc. 131-1 at 4. R.K., Jr., states the incident was videoed and he viewed it on Instagram. *Id.* at 4-5. R.K., Jr., states Coach Riley was in his office at the time of the incident because he saw Coach Riley walk in there when he walked into the fieldhouse but did not report the incident to Coach Riley. Doc. 128-17 at 12-13.

A fifth incident, R.K., Jr., states occurred during the spring semester, when Jakaio Hunter, Gabe Johnson, Eric Bell, and Jacoby Lott-Funches slapped him and some other students in the back of the head and neck with shaving cream, "gagged [them] up," and beat them with belts outside of the fieldhouse after school. *Id.* at 21-22. R.K., Jr., states the incident lasted approximately thirty (30) seconds, Coach Eubanks and two other adults witnessed the incident, and Coach Eubanks told them to "knock it off." *Id.* at 24-25, 27-28. R.K., Jr., states the incident was not in conjunction with a practice or event for football and did not tell anyone about it. *Id.* at 27-29.

R.K., Jr., states the day before his incident, during football practice, when he was made to retrieve his ball from the fieldhouse so he could practice snaps, a student named Reggie Davis, a

junior, was on the ground being hit with shoulder pads.  *Id.* at 87-88.  R.K., Jr., states Jakaio Hunter

and Gabe Johnson struck Reggie.  *Id.* at 88-89.  R.K., Jr., states he did not report the incident but

told his parents about it, and in response, his mother told him "not to have any part of it and keep

[his] distance, and if she found out [he] was taking any part of those activities, she would deal with

[him]."  *Id.* at 89-90.  R.K., Jr., states he did not report any of the other incidents that he describes,

except for Leon Payne's incident, about which he also told his mother.  *Id.* at 87.

### 4.      Miscellaneous Conduct by the Defendant Coaches

Coach Miller states he heard Coach Riley, in a video, tell the football team players "not to

go to the doctor unless you're bleeding out or you can't breathe;" however, Coach Miller states,

"That's not what he meant."  Doc. 156-63 at 40.  Coach Miller states he also "used different words"

but "mean[t] the same thing."  *Id.* at 41-42.  Coach Miller stated his understanding of hazing is it

"happens to everybody and everybody knows it's going to happen" and "everyone goes through it

in the exact same way."  Doc. 156-63 at 62.

Randall Powe, a nonparty to this action, complained to Robert Battle and Dr. Reginald

Crenshaw about Coach Riley in regard to his son, Z.P.  Doc. 156-67 at 20, 28.  Z.P. played football

for Coach Riley at Davidson during his sophomore year but Z.P. had issues because he was played

out of position and did not receive scholarship assistance, so the Powes decided to transfer their

son to another high school.  *Id.* at 5.  The Powes allege Coach Riley harassed them when he

complained they had not moved into a certain house for Z.P. to be eligible to play for his new high

school's football team, which led to an investigation of the matter.  *Id.* at 5-28.  Z.P. also states he

was once kicked in the mouth and his mouth was "busted open" and bleeding, and when he sat

down with Coach Riley, Coach Riley said, "They got you pretty good," laughed, and told him to

wash out his mouth.  Doc. 156-68 at 7.

### 5.    Events Subsequent to R.K., Jr.'s, Assault

Eric Terry, Davidson's School Resource Officer, prepared a memorandum that is dated May 29, 2018, with the subject "INVESTIGATION, ALLEGATION OF MISCONDUCT, INVOLVING MR. FRED RILEY, DAVIDSON HIGH SCHOOL TEACHER AND COACH, AND A MALE, NINTH GRADE, DAVIDSON HIGH SCHOOL STUDENT, IDENTIFIED AS [R.K., JR.]"  Doc. 129-1 at 7.  Eric Terry's memorandum states:

> On May 03, 2018, at approximately 02:36 P.M., Mr. Anthony Gatewood, Mobile County Public School System Director of Security, telephonically contacted this Resource Officer concerning a complaint involving a system employee.  Mr. Gatewood stated that Ms. Mary [K.], parent of a male, ninth grade, Davidson High School student, identified as [R.K., Jr.], alleged that Mr. Fred Riley, Davidson High School Teacher and Coach, failed to supervise student athletes in the football locker room and ignored hazing type behaviors initiated by upper classmen which was directed towards new and younger student athletes, i.e. football players.  Mr. Gatewood stated that Ms. [K.] also alleged that following a sustained injury, i.e. a broken arm, staff failed to provide medical treatment, failed to file a police report, and failed to remain with him, [R.K., Jr.], until such time as a parent or family member arrived to transport.  Mr. Gatewood stated that additionally, Ms. Tiffany Collins, parent, of a male, tenth grade, Blount High School Student, identified as Lyman Collins, alleged that Mr. Riley discouraged student athletes from attending tutoring and seeking off campus medical treatment during football season.  At that time, Mr. Gatewood directed this Resource Officer to initiate an investigation of the complaint allegations.

*Id.*

After an investigation by the Mobile Police Department, many of the assailants were arrested, charged, then given youthful offender status.  Doc. 129-3 at 3-13.  After an investigation by the MCPSS, many of the assailants were either suspended or placed in alternative schools.  Doc. 129-1 at 4-5, Doc. 129-4 at 3-4, Doc. 129-6 at 8-9.

### B.    PROCEDURAL BACKGROUND

On August 3, 2018, Plaintiffs originally filed their Complaint against the Board, the individual Board Defendants, Superintendent Peek, Principal Copeland, and the Defendant

Coaches.  Doc. 1 ¶¶ 19-36.  All of the individual Board Defendants were sued in their official and individual capacities.  *Id.* at 1.  Plaintiffs brought claims for violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681-88; violation of the Fourth Amendment; violation of the Fourteenth Amendment; a claim under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) [hereinafter *Monell*]; violation of Ala. Code § 16-1-23; assault and battery; false imprisonment; intentional infliction of emotional distress; negligence; negligence per se; premises liability; negligent training, hiring, retention, and supervision; and violation of Ala. Code § 16-1-24.1.  *Id.* ¶¶ 56-109.

On September 7, 2018, the Board, the individual Board Defendants, and Superintendent Chresal D. Threadgill, who is the current Superintendent of the MCPSS and was substituted for Superintendent Peek in her official capacity, filed their Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  Doc. 16.  Plaintiffs filed their response to the Motion to Dismiss as well as their Motion to File Plaintiffs' First Amended Complaint on September 28, 2018.  Docs. 27, 28.  The Court granted Plaintiffs' Motion to File Plaintiffs' First Amended Complaint, which rendered moot the original Motion to Dismiss, and Plaintiffs' filed their First Amended Complaint on November 28, 2018.  *See* Docs. 30, 33.  In the First Amended Complaint, Plaintiffs L. C., Sr.; Tiffanie Collins; and L. C., Jr., were added as parties and all of the claims from the original Complaint were brought except for premises liability and negligent training, hiring, retention, and supervision.  *Compare* Doc. 1 *with* Doc. 33.

On December 6, 2018, the Board and the individual Board Defendants filed their Motion to Dismiss in which they moved the Court to dismiss Plaintiffs' claims against them.  Doc. 37. Plaintiffs timely responded in opposition, to which the Board and the individual Board Defendants filed their reply.  Docs. 40, 42.

On January 10, 2019, Superintendent Peek, Principal Copeland, and the Defendant Coaches filed their Motion for More Definite Statement.  Doc. 43.  Plaintiffs filed their Memorandum of Points and Authorities in Opposition to Defendants' Motion for a More Definite Pursuant to Rule 12(e) in response.  Doc. 45.  On February 19, 2019, the Court entered an order in which it denied the Motion for More Definite Statement and ordered Superintendent Peek, Principal Copeland, and the Defendant Coaches to file their responsive pleadings to Plaintiffs' First Amended Complaint.  Doc. 47.  On March 13, 2019, Superintendent Peek, Principal Copeland, and the Defendant Coaches filed their Answer to Plaintiffs' First Amended Complaint. Doc. 48.

On July 25, 2019, the Court entered its memorandum opinion and order in which it granted the Motion to Dismiss as to Counts 1, 5, 9, 10, and 11 and denied the motion as to Counts 2, 3, and 4.  Doc. 50.  The Court's ruling in its July 25, 2020 memorandum opinion and order left the following claims pending from the First Amended Complaint:

- Count 2, violation of the Fourth Amendment, which is brought against all of the defendants;

- Count 3, violation of the Fourteenth Amendment, which is brought against the Board, the individual Board Defendants, Superintendent Peek in her individual capacity, and the Defendant Coaches;

- Count 4, a *Monell* claim that the Court construes as a due process violation pursuant to the Fourteenth Amendment, which is brought against the Board;

- Count 5, a violation of Ala. Code § 16-1-23, which is brought against Principal Copeland and the Defendant Coaches;

- Count 6, assault and battery, which is brought against the Defendant Coaches;

- Count 7, false imprisonment, which is brought against the Defendant Coaches;

- Count 8, intentional infliction of emotional distress, which is brought against the Defendant Coaches;

- Count 9, negligence, which is brought against Principal Copeland and the Defendant Coaches;

- Count 10, negligence per se, which is brought against Principal Copeland and the Defendant Coaches; and

- Count 11, violation of Ala. Code § 16-1-24.1, which is brought against Principal Copeland and the Defendant Coaches.  Docs. 50, 51.

On July 31, 2019, the Board and the individual Board Defendants filed their Answer to Plaintiffs' First Amended Complaint.  Doc. 52.

On April 29, 2021, the Board and the individual Board Defendants filed their motion for summary judgment, supporting brief, and exhibits in support.  Docs. 129, 133.  On the same date, Principal Copeland, the Defendant Coaches, and Superintendent Peek each filed a motion for summary judgment and brief in support as well as a combined narrative statement of undisputed facts and exhibits in support.  Docs. 128, 134, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151.  Again, on the same date, Plaintiffs filed their own motions for summary judgment against three (3) sets of defendants, Principal Copeland and the Defendant Coaches, the Board and the individual Board Defendants, and Superintendent Peek, as well as a statement of material facts in support of the motions for summary judgment and exhibits in support.  Docs. 152, 153, 154, 155, 156.  The Court entered submissions orders for each of the motions for summary judgment. Docs. 158, 159, 160.  On May 26, 2021, Principal Copeland and the Defendant Coaches filed their objections, pursuant to Fed. R. Civ. P. 56(c)(2), to Plaintiffs' statement of material facts in support

of the motions for summary judgment.  Doc. 162.  On June 7, 2021, the Board and the Individual

Board Defendants, and Principal Copeland and the Defendant Coaches, each filed a response to

Plaintiffs' statement of material facts in support of the motions for summary judgment.  Docs. 171,

174.  On June 8, 2021, Plaintiffs filed their opposition to Principal Copeland, the Defendant

Coaches, and Superintendent Peek's combined narrative statement of undisputed facts.  Doc. 179.

The parties each timely filed responses and replies to the relevant motions for summary judgment.

Docs. 172, 175, 176, 177, 178, 181, 182, 183, 184, 185, 186, 187.

On March 2, 2022, the Court entered its memorandum opinion and order in which it granted

the motions for summary judgment that were filed by the Board, the individual Board Defendants,

Superintendent Peek, and Principal Copeland, dismissed with prejudice Plaintiffs' claims against

those defendants, and denied Plaintiffs' cross-motions for summary as to those defendants.  Doc.

231.  The Court set the remaining motions for oral argument, which was held on March 15, 2022.

Doc. 232.  Therefore, the motions are fully briefed and ripe for adjudication.

Finally, the Court ordered Plaintiffs file a motion to substitute, pursuant to Fed. R. Civ. P.

25, for any of the minor plaintiffs who had reached the age of majority.  Doc. 234.  Plaintiffs filed

a motion to substitute certain parties who either had reached the age of majority or were referred

to by abbreviated names to protect the identities of their minor children.  Doc. 238.  The Court

granted Plaintiffs' motion to substitute and also ordered the substitutions.  Doc. 239.

## III.   STANDARD OF REVIEW

A party in a lawsuit may move a court to enter summary judgment before trial.  FED. R.

CIV. P. 56(a), (b).  Summary judgment is appropriate when the moving party establishes there is

no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter

of law.  FED. R. CIV. P. 56(a); *see also Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258,

1263 (11th Cir. 2007) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'").   "[T]he substantive law will identify which facts are material."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also Ritchey v. S. Nuclear Operating Co.,* 423 F. App'x 955 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510).[4]   At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."   *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.   Only disputes about the material facts will preclude the granting of summary judgment.   *Id.*

The movant bears the initial burden of proof.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).   A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."   FED. R. CIV. P. 56(c)(1).   The admissibility of evidence is subject to the same standards and rules that govern admissibility of evidence at trial. *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)).

---

[4] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority."   11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

Once the movant meets its burden under Fed. R. Civ. P. 56, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510).  The court must view the facts and draw all reasonable inferences in favor of the non-moving party.  *Id*. (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)); *Greenberg*, 498 F.3d at 1265 ("We view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion.").  On cross-motions for summary judgment, "the facts are viewed in the light most favorable to the non-moving party on each motion."  *Chavez v. Mercantil CommerceBank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012) (citing *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005)).  However, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586, 106 S. Ct. at 1356 (citations omitted).  Conclusory assertions, unsupported by specific facts, that are presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990).  "Speculation does not create a *genuine* issue of fact."  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted).  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.  *See Anderson*, 477 U.S. at 249-50, 106 S. Ct. at 2511 (emphasis in original) (citations omitted).  In short, summary judgment is proper after adequate time for discovery and upon motion against a party who fails to

make a showing that is sufficient to establish the existence of an element that is essential to that party's case.  *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

**IV.**     **DISCUSSION AND ANALYSIS**

Since there are cross-motions for summary judgment that, in sum, address all of the remaining Counts, the Court will address the Counts in order and combine, and address, the parties' arguments as to each.

**A.**     **Federal Claims**

**1.**     **Qualified Immunity**

The Defendant Coaches argue they are entitled to qualified immunity.  Doc. 145 at 9-12, 16; Doc. 147 at 9-12, 15-16; Doc. 149 at 9-12, 15-16; Doc. 151 at 9-12, 15-16.

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 122 S Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002)).  "Qualified immunity protect[s] from suit all but the plainly incompetent or one who is knowingly violating the federal law."  *Dalrymple*, 334 F.3d at 994 (citations and internal quotations marks omitted).

"In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."  *Carollo v. Boria*, 833 F.3d 1322, 1328 (11th Cir. 2016) (citations and internal quotation marks omitted).

"If, interpreting the evidence in the light most favorable to the plaintiff, the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff

to show that the defendant is *not* entitled to qualified immunity." *Harland*, 370 F.3d at 1264

(emphasis in original) (citing *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003)).

> To do that, the plaintiff must demonstrate (taking all the facts in the light most favorable to him) the following two things: (1) that the defendant violated his constitutional rights, and (2) that, at the time of the violation, those rights were "clearly established . . . in light of the specific context of the case, not as a broad general proposition[.]"

*Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (citation omitted).  These issues may

be decided in "either order, but, to survive a qualified-immunity defense, [Plaintiffs] must satisfy

both showings."  *Id.* (quoting *Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir. 2017)).

> [The Eleventh Circuit] has identified three different ways that a plaintiff can prove that a particular constitutional right is clearly established.  First, a plaintiff can show that a materially similar case has already been decided.  *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005).  This category consists of binding precedent tied to particularized facts in a materially similar case.  In determining whether a right is clearly established under this prong, only materially similar cases from the United States Supreme Court, this Circuit, and/or the highest court of the relevant state can clearly establish the law.  *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199, 1199 n.6 (11th Cir. 2007).  Second, a plaintiff can also show that a broader, clearly established principle should control the novel facts of a particular case.  *Mercado*, 407 F.3d at 1159.  "[T]he principle must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted."  *Loftus* [*v. Clark-Moore*], 590 F.3d [1200,] 1205 [(11th Cir. 2012)] (alteration in original).  Put another way, "in the light of pre-existing law, the unlawfulness must be apparent."  *Id.*  Third, a plaintiff could show that the case "fits within the exception of conduct which so obviously violated [the] Constitution that prior case law is unnecessary."  *Mercado*, 407 F.3d at 1159.  This third test is a narrow category encompassing those situations where "the official's conduct lies so very obviously at the very core of what the [relevant constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding lack of case law."  *Loftus*, 690 F.3d at 1205 (alteration in original) (quoting *Terrell v. Smith*, 668 F.3d 1244, 1257 (11th Cir. 2012)).

*Waldron v. Spicher*, 954 F.3d 1297, 1304-05 (11th Cir. 2020).

As to whether the Defendant Coaches acted within the scope of their discretionary

authority, each argues the supervision and discipline of students falls within their discretionary

authority.  Doc. 145 at 9-11, 16; Doc. 147 at 9-11, 15; Doc. 149 at 9-11, 15; Doc. 151 at 9-11, 15.

Plaintiffs do not contest the Defendant Coaches' assertion that they acted within their discretionary

authority.  *See* Doc. 178.  Again, Plaintiffs state in their First Amended Complaint, "At all times

relevant herein, each [defendant] was acting within the course and scope of his or her

employment."  Doc. 33 ¶ 41.  Therefore, the Court finds the Defendant Coaches acted within the

scope of their discretionary authority.

       Since the Court determined the Defendant Coaches was engaged in a discretionary

function, the burden shifts to Plaintiffs to show that they are *not* entitled to qualified immunity.

As to the Fourth Amendment, the Defendant Coaches each argue there is not clearly established

law that states a Fourth Amendment seizure occurs when a coach ratifies, endorses, or encourages

an alleged seizure by members of his football team.  Doc. 145 at 11-12, 16; Doc. 147 at 11-12, 15-

16; Doc. 149 at 11-12, 15-16; Doc. 151 at 11-12, 15-16.  Plaintiffs cite *Givens v. O'Quinn*, 121 F.

App'x 984 (4th Cir. 2005) (per curiam), and *Kesinger ex rel. Estate of Kesinger v. Herrington*,

381 F.3d 1243 (11th Cir. 2004), to support their argument that their constitutional right was clearly

established.  Doc. 178 at 21-22.  Plaintiffs also argue Ala. Code § 16-1-23 prohibits hazing and

requires such behavior be reported.  *Id.* at 22-23.

       *Givens* involved employees of the Virginia Department of Corrections, two co-workers

who assaulted another.  121 F. App'x at 985.  *Kesinger* involved a police officer who eventually

shot and killed a seemingly suicidal man, who the officer encountered standing in interstate traffic.

381 F.3d at 1246.  *Givens* is not a case that is from either the United States Supreme Court, this

Circuit, and/or the Alabama Supreme Court, and *Kesinger* is not materially similar to the facts in

this case.  Nor have Plaintiffs shown either a broader, clearly established principle that would put

the Defendant Coaches on notice that their conduct violated the Fourth Amendment or their

conduct obviously violated the Constitution such that prior case law is unnecessary.  As to Ala. Code, § 16-1-23, it is a state law the violation of which would not put the Defendant Coaches on notice that they would violate Plaintiffs' federal constitutional rights.

As to the Fourteenth Amendment, the Defendant Coaches each argue there is not clearly established law that recognizes a substantive due process claim in a non-custodial setting that is based on deliberate indifference.  Doc. 149 at 15-16.  Plaintiffs cite to *Waddell v. Hendry County Sheriff's Office*, 329 F.3d 1300 (11th Cir. 2003), and *Stewart v. Baldwin County Board of Education*, 908 F.2d 1499, 1503 (11th Cir. 1990), to support their argument that their constitutional right was clearly established.  Doc. 178 at 25-26.  Plaintiffs also argue Ala. Code § 16-1-23 prohibits hazing and requires such behavior be reported.  *Id.* at 26-27.

*Waddell* involved a confidential informant who, while performing duties as an informant, lost control of his car and ran into another vehicle.  329 F.3d at 1302-04.  *Stewart* involved a maintenance department employee who attended a mandatory meeting to hear comments from the superintendent then left while the meeting was in progress, which led to his termination.  908 F.2d at 1501-02.  Neither *Waddell* nor *Stewart* are materially similar to the facts in this case.  Nor have Plaintiffs shown either a broader, clearly established principle that would put the Defendant Coaches on notice that their conduct violated the Fourteenth Amendment or their conduct obviously violated the Constitution such that prior case law is unnecessary.  While Plaintiffs cite Ala. Code, § 16-1-23, to confer a duty on the Defendant Coaches to act, again, it is a state law the violation of which would not put the Defendant Coaches on notice that they would violate Plaintiffs' federal constitutional rights.  Further, Plaintiffs have not presented additional clearly established law that would have put the Defendant Coaches on notice their acquiescence in the hazing was a violation of Plaintiffs' constitutional rights.

Therefore, Plaintiffs have not discharged their burden to show their constitutional right was clearly established, and the Defendant Coaches are entitled to qualified immunity.

### 2.   Count 2 - Violation of the Fourth Amendment

Count 2 is brought against the Defendant Coaches for violation of the Fourth Amendment. Doc. 33 ¶¶ 72-74.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.  The Fourth Amendment has been made applicable to the states through the Fourteenth Amendment; thus, the Fourth Amendment applies to state officials. *Payton v. New York,* 445 U.S. 573, 576, 100 S. Ct. 1371, 1374, 63 L. Ed. 2d 639 (1980).

The Court assumes Plaintiffs bring Count 2 pursuant to 42 U.S.C. § 1983, as they must, for violation of the Fourth Amendment.[5]  "To state a claim for relief in an action brought under § 1983, [Plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law. . . . [T]he under-color-of-state-law-element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50, 119 S. Ct. 977, 985, 143 L. Ed. 2d 130 (1999) (citation and internal quotation marks omitted).

---

[5] The Defendant Coaches argue Plaintiffs failed to allege a violation of the Fourth Amendment because they do not reference 42 U.S.C. § 1983 in their First Amended Complaint.  Doc. 145 at 5-6; Doc. 147 at 5-6; Doc. 149 at 5; Doc. 151 at 5-6.  However, the Court rejects this argument since, while the First Amended Complaint might not be as clear as it should, it is obvious Plaintiffs bring their Fourth Amendment claim pursuant to 42 U.S.C. § 1983.

To prevail against an official in their individual capacity, a plaintiff is required to show the official "w[as] personally involved in acts or omissions that resulted in the constitutional deprivation." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995) (citing *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986)). "A § 1983 claim requires proof of an affirmative *causal connection* between the defendant's acts or omissions and the alleged constitutional deprivation." *Troupe v. Sarasota County,* 419 F.3d 1160, 1165 (11th Cir. 2005) (emphasis added) (citing *Zatler*, 802 F.2d at 401). A defendant must be the proximate cause of a plaintiff's injuries; that is, there must not be an intervening, independent cause for the injuries that breaks the chain of causation. *Id.*

Negligence is not a basis for liability in a § 1983 action. *Daniels v. Williams*, 474 U.S. 327, 328, 106 S. Ct. 662, 663, 88 L. Ed. 2d 662 (1986) (explaining the "negligent act of an official causing unintended loss of or injury to life, liberty, or property" is simply not implicated under the Constitution). Nor can *respondeat superior* serve as a basis for liability under § 1983. *Monell*, 436 U.S. at 691-92, 98 S Ct. at 2036 (explaining, in a § 1983 action, the city could not be held liable either vicariously or under the theory of *respondeat superior* for the acts of an employee).

> Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.

*Dolohite v. Maughon*, 74 F.3d 1027, 1052 (11th Cir. 1996) (citation and internal quotation marks omitted). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (quoting *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990)).

As to the under-color-of-state-law-element of a § 1983 claim, the Eleventh Circuit has

recognized three (3) tests to determine whether the actions of private actors are properly attributed

to the state:

> Previously, this circuit set forth the three primary tests the Supreme Court has used
> to determine whether state action exists: (1) the public function test; (2) the state
> compulsion test; and (3) the nexus/joint action test.  The public function test limits
> state action to instances where private actors are performing functions "traditionally
> the exclusive prerogative of the state."  The state compulsion test limits state action
> to instances where the government "has coerced or at least significantly encouraged
> the action alleged to violate the Constitution."  The nexus/joint action test applies
> where "the state has so far insinuated itself into a position of interdependence with
> the [private party] that it was a joint participant in the enterprise."  We must
> determine on a case-by-case basis whether sufficient state action is present from a
> non-state actor [ ] to sustain a section 1983 claim.

*Willis v. Univ. Health Servs., Inc.*, 993 F.2d 837, 840 (11th Cir. 1993) (quoting *Nat'l Broad. Co.,*

*Inc. ("NBC") v. Commc'ns Workers of Am., AFL-CIO*, 860 F.2d 1022, 1026-27 (11th Cir. 1988)).

> In *Blum v. Yaretsky*, 457 U.S. 991, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982) . . . the
> Supreme Court applied a standard analogous to [the Eleventh Circuit's] nexus/joint
> action test. . . .
>
> In outlining a mode for determining the propriety of holding the state liable for
> private conduct, the Court said: "the complaining party must . . . show that 'there
> is a sufficiently close nexus between the State and the challenged action of the
> regulated entity so that the action of the latter may be fairly treated as that of the
> State itself.'"  *Id*. at 1004, 102 S. Ct. at 2786 (quoting *Jackson v. Metro. Edison
> Co.*, 419 U.S. 345, 351, 95 S. Ct. 449, 453, 42 L. Ed. 2d 477 (1974)).  It continued:
> "The purpose of this requirement is to assure that constitutional standards are
> invoked only when it can be said that the State is responsible for the specific
> conduct of which the plaintiff complains.  The importance of this assurance is
> evident when, as in this case, the complaining party seeks to hold the State liable
> for the actions of private parties."  *Id.*  The Court further held that "although the
> factual setting of each case will be significant, our precedents indicate that a State
> normally can be held responsible for a private decision only when it has exercised
> coercive power or has provided such significant encouragement, either overt or
> covert, that the choice must in law be deemed to be that of the State.  Mere approval
> of or acquiescence in the initiatives of a private party is not sufficient to justify
> holding the State responsible for those initiatives . . . ."  *Id.* at 1004-05, 102 S. Ct.
> at 2786 (citations omitted) (emphasis added).

*Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1277-78 (11th Cir. 2003) (emphasis omitted).

The Defendant Coaches argue Plaintiffs are not able to produce evidence that shows they acted under color of state law.  Doc. 145 at 6-9, Doc. 147 at 6-9, Doc. 149 at 6-8, Doc. 151 at 6-8. Specifically, the Defendant Coaches argue their alleged conduct does not satisfy the public function test because Plaintiffs cannot produce evidence that shows the football players were given any power or performed functions that are traditionally the prerogative of the government.  Doc. 145 at 7, Doc. 147 at 7, Doc. 149 at 7, Doc. 151 at 7.  The Defendant Coaches argue their alleged conduct does not satisfy the nexus/joint action test because Plaintiffs cannot produce evidence that shows a symbiotic relationship.  *Id.*  The Defendant Coaches argue their alleged conduct does not satisfy the state compulsion test because Plaintiffs cannot produce evidence that shows any of them participated in, coerced, or significantly encouraged the offending conduct or Coach Eubanks, Coach Miller, or Coach Pope knew of any alleged instances of hazing or assault that Coach Riley is alleged to have known about and encouraged.  Doc. 145 at 7-9, Doc. 147 at 7-9, Doc. 149 at 7-8, Doc. 151 at 7-8.  Finally, the Defendant Coaches, in their reply brief, argue Plaintiffs have not provided authority that shows a Fourth Amendment violation occurs under circumstances that are similar to those alleged in this action.  Doc. 184 at 4.  However, arguments that are raised for the first time in a reply brief are treated as waived.  *Conn. State Dental Ass'n. v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1351 n.11 (11th Cir. 2009).

As to a causal connection between the Defendant Coaches' alleged conduct and the alleged constitutional deprivations, Plaintiffs argue Coach Riley failed to stop the students who carried out the assaults and carried out Coach Riley's "custom of hazing."  Doc. 178 at 9.  Plaintiffs argue Coach Riley witnessed the hazing of Garrian and assault of Jeremiah and failed to intervene, Coach

Riley and Coach Pope would confiscate phones and delete pictures or recordings of assaults, Coach Riley did not intervene in and watched Jeremiah's assault, Coach Riley was present for the incident that Garrian described, which occurred during his eighth-grade year, and Coach Riley told Lyman he had "sissyitis" when he returned from the doctor with a cast for his elbow injury. Doc. 178 at 9-10, 14-15. As for the remaining coaches, Plaintiffs argue Coach Pope witnessed the hazing of George Morris, R.K., Jr., stated Coach Eubanks and Coach Miller were in the fieldhouse when he was assaulted, and Coach Miller admitted he told students not to go to the doctor, and Coach Eubanks and Coach Miller were in the locker room when Garrian was assaulted. *Id.* at 10-14.

As to whether there is a causal connection between the Defendant Coaches' alleged failure to act and the alleged constitutional deprivations, the Court assumes, without deciding, Plaintiffs have met their burden to show a causal connection.

As to whether state action exists, Plaintiffs argue the Defendant Coaches' conduct satisfies the state compulsion test and the nexus/joint action test. Doc. 178 at 17-21. Plaintiffs argue the Defendant Coaches' conduct satisfies the state compulsion test because they exercised their coercive power to encourage the football players to execute the custom and practice of hazing through inaction that creates an inference they consented to, and affirmatively directed, the conduct. *Id.* at 18-19. Plaintiffs argue, as an example, the Defendant Coaches wielded coercive power over the football players when they were instructed not to go to a doctor unless they were "bleeding out" or could not breathe. *Id.* at 19. Plaintiffs argue the Defendant Coaches' conduct satisfies the nexus/joint action test because the nature of hazing within a sports team, particularly a high school sports team, requires an intertwinement between the coaches and players such that the coaches would be reasonably apprised of such happenings. *Id.* at 19-21. In support, Plaintiffs argue Garrian states, during his assault, Coach Riley told players to "knock it off dumb asses" but

then his assailants continued and Coach Riley saw, but did not stop, the assault.  *Id.* at 20-21.

The Court finds Plaintiffs have not produced evidence that shows state action.  The evidence shows Coach Riley told players to "knock it off" when he saw certain offending conduct, the players were reprimanded after George Morris was injured, and Coach Riley disciplined the players who assaulted Devon Sylvester.  Doc. 128-5 at 12-13, Doc. 128-6 at 18-19, Doc. 128-13 at 24-25, Doc. 131-1 at 9.  Plaintiffs have not produced evidence that shows more than inaction, much less active encouragement, of the alleged constitutional deprivations.  "Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives."  *Focus on the Family*, 344 F.3d at 1278.

In any case, the Court determines the Defendant Coaches are entitled to qualified immunity from Plaintiffs' Fourth Amendment claims that are brought against them.

Accordingly, each of the Defendant Coaches' motions for summary judgment as to Plaintiffs' claim for violation of the Fourth Amendment are granted, and Plaintiffs' motion for summary judgment against those parties on that claim is denied.

### 3. Count 3 - Violation of the Fourteenth Amendment

Count 3 is brought against the Defendant Coaches for violation of the Fourteenth Amendment.  Doc. 33 ¶¶ 75-77.

The Fourteenth Amendment includes five (5) sections, but the first section appears to be most consistent with Plaintiffs' allegations and it provides:

> Section 1**.**  All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. amend. XIV, § 1.

The due process clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The due process clause "was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998) (internal quotations and citations omitted). The substantive component of the due process clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)).

Only in certain limited circumstances does the Constitution impose affirmative duties of care on the states. *Doe v. Braddy*, 673 F.3d 1313, 1318 (11th Cir. 2012). As originally defined by the Supreme Court, those circumstances exist where (1) the state takes a person into custody, confining the person against his or her will, and (2) the states create the danger or renders a person more vulnerable to an existing danger. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 198-201, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989). However, the "stated-created danger" doctrine has since been superseded by the standard employed by the Supreme Court in *Collins*. *Waddell v. Hemerson*, 329 F.3d 1300, 1305 (11th Cir. 2003). Now, "conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense." *Id.* (citing *Collins*, 503 U.S. at 128).

*McKenzie v. Talladega City Bd. of Educ.*, 242 F. Supp. 3d 1244, 1255-56 (N.D. Ala. 2017).

Plaintiffs do not argue the minor plaintiffs were in a custodial relationship with any of the defendants. To be sure, the Eleventh Circuit has stated "compulsory school attendance laws do not constitute a restraint on personal liberty sufficient to give rise to [a duty to protect under the due process clause of the Fourteenth Amendment.]" *Davis v. Carter*, 555 F.3d 979, 982 n.2 (11th Cir. 2009). Therefore, for Plaintiffs to state a claim that any of the defendants had an affirmative duty of care, Plaintiffs must provide evidence of conduct that can be characterized as arbitrary or conscience shocking in a constitutional sense.

The Supreme Court has acknowledged that "the measure of what is conscience-shocking is no calibrated yard stick." *Lewis*, 118 S. Ct. at 1717. We know for certain, however, that a showing of negligence is insufficient to make out a constitutional due process claim. *Lewis*, 523 U.S. 833, 118 S. Ct. 1706, 1718, 140 L. Ed. 2d 1043 (1998). And even intentional wrongs seldom violate the Due

Process Clause.  Acts "intended to injure in some way unjustifiable by any government interest" are "most likely to rise to the conscience-shocking level." *Id.* But, even conduct by a government actor that would amount to an intentional tort under state law will rise to the level of a substantive due process violation only if it also "shocks the conscience."  *Dacosta v. Nwachukwa*, 304 F.3d 1045, 1048 (11th Cir. 2002).

"[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense."  *Lewis*, 118 S. Ct. at 1716 (1998) (quotation and citation omitted).  Determinations of what is egregious conduct must not be made in the glow of hindsight; decisions made by a government actor *must be egregious – that is, shock the conscience – at the time the government actor made the decisions*.  *See e.g. DeShaney*, 109 S. Ct. at 1006 (noting that, because State had no constitutional duty to protect child against his father's violence, its failure to do so – though calamitous in hindsight – did not constitute a violation of the Due Process Clause); *see also Rodriguez v. Farrell*, 280 F.3d 1341, 1352-53 (11th Cir. 2002) (concluding that hindsight could not be used to judge police officer's act of handcuffing suspect, but rather it was necessary to consider what the police officer knew or reasonably should have known at the time of the act).

In some cases, a state official's deliberate indifference will establish a substantive due process violation.  But, "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and [the] concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."  *Lewis*, 118 S. Ct. at 1718-19.  In [a] non-custodial setting, a substantive due process violation would, at the very least, require a showing of deliberate indifference to an extremely great risk of serious injury to someone in Plaintiffs' position.  *See McClendon v. City of Columbia*, 305 F.3d 314, 326 (5th Cir. 2002) (stating that Plaintiff was required to demonstrate that "the defendant state official *at a minimum* acted with deliberate indifference toward the plaintiff"); *see also Nix v. Frankly Cty. Sch. Dist.*, 311 F.3d 1373, 1376 (11th Cir. 2002) (concluding that deliberate indifference was insufficient to constitute a due-process violation in a non-custodial setting).

*Waddell v. Hendry Cty. Sheriff's Office*, 329 F.3d 1300, 1305-06 (11th Cir. 2003) (emphasis in original) (footnote omitted).

"Deliberate indifference requires the following: '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence.'" *Franklin v. Curry*, 738 F.3d 1246, 1250 (11th Cir. 2013) (quoting *Goodman v. Kimbrough*, 718 F.3d 1325, 1331-32 (11th Cir. 2013).  "'[O]nce it is established that the official is aware of this

substantial risk, the official must react to this risk in an objectively unreasonable manner.'" *Keith v. DeKalb County*, 749 F.3d 1034, 1047 (11th Cir. 2014) (citing *Marsh v. Butler County*, 268 F.3d 1014, 1029 (11th Cir. 2001) (en banc)).

The Eleventh Circuit has stated:

> We doubt that deliberate indifference can ever be "arbitrary" or "conscience shocking" in a non-custodial setting. We stated in dicta in *Nix* that we "ha[ve] been explicit" that it cannot. 311 F.3d at 1377. Yet, we later suggested that deliberate indifference might be sufficient in a non-custodial setting if, "at the very least," it involved "deliberate indifference to an extremely great risk of serious injury." *Waddell*, 329 F.3d at 1306. But *Waddell* then suggested that "the correct legal threshold for substantive due process liability" might be much higher than deliberate indifference. *Id.* at 1306 n.5. Although neither *Nix* nor *Waddell* created a binding rule, *see United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019), the weight of authority lies with *Nix*.
>
> "No case in the Supreme Court, or in this Circuit, . . . has held that . . . deliberate indifference is a sufficient level of culpability to state a claim of violation of substantive due process rights in a non-custodial context." *Waldron v. Spicher*, 954 F.3d 1297, 1310 (11th Cir. 2020). Indeed, in the public-school setting, we have allowed substantive-due-process claims to proceed only when they involved intentional, obviously excessive corporal punishment. *See Nix*, 311 F.3d at 1378; *see also, e.g.*, *Kirkland ex rel. Jones v. Green Cty. Bd. of Educ.*, 347 F.3d 903, 904-05 (11th Cir. 2003); *Neal* [*ex rel. Neal v. Fulton Cty. Bd. of Educ.*], 229 F.3d [1069,] 1076 [(11th Cir. 2000)].

*L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1330-31 (11th Cir. 2020).

The Eleventh Circuit has described "corporal punishment" as follows:

> We have not precisely defined "corporal punishment." *Black's Law Dictionary* 235-36 (6th ed. 1991) defines it simply as "[p]hysical punishment as distinguished from pecuniary punishment or a fine; any kind of punishment inflicted on the body." The touchstone of corporal punishment in schools appears to be the application of physical force by a teacher to punish a student for some kind of school-related misconduct. *See Ingraham*, 430 U.S. at 661, 97 S. Ct. at 1407.
>
> Many corporal punishment cases involve what might be called traditional applications of physical force, such as where school officials, subject to an official policy or in a more formal disciplinary setting, mete out spankings or paddlings to a disruptive student. *See Saylor v. Board of Educ.*, 118 F.3d 507, 511 (6th Cir. 1997); *Fee v. Herndon*, 900 F.2d 804, 806 (5th Cir. 1990); *Wise v. Pea Ridge Sch. Dist.*, 855 F.2d 560, 562 (8th Cir. 1988); *Garcia v. Miera*, 817 F.2d 650, 653 (10th

Cir. 1987); *Hall v. Tawney*, 621 F.2d 607, 609 (4th Cir. 1980). Not all corporal punishment cases arise under those circumstances, however, and may involve less traditional, more informally-administered, and more severe punishments. *See London v. Directors of DeWitt Pub. Schs.*, 194 F.3d 873, 875 (8th Cir. 1999) (school official's acts of dragging student across room and banging student's head against metal pole described as corporal punishment); *P.B. v. Koch*, 96 F.3d 1298, 1300 (9th Cir. 1996) (school principal's conduct in hitting student in mouth, grabbing and squeezing student's neck, punching student in chest, and throwing student headfirst into lockers was corporal punishment actionable as a constitutional violation); *Metzger v. Osbeck*, 841 F.2d 518, 519-20 (3d Cir. 1988) (school official's conduct consisting of grabbing student in chokehold and causing student to lose consciousness and fall to the pavement resulting in student breaking his nose and fracturing teeth analyzed under corporal punishment framework); *Carestio v. School Bd. of Broward County*, 79 F. Supp. 2d 1347, 1348 (S.D. Fla. 1999) (school employees' conduct in ganging up on student and beating him described as corporal punishment); *Gaither v. Barron*, 924 F. Supp. 134, 135-36 (M.D. Ala. 1996) (teacher's head-butting of student described as corporal punishment).

*Neal*, 229 F.3d at 1072.

For conduct to constitute excessive corporal punishment that rises to the level of arbitrary

and conscience-shocking behavior, the Eleventh Circuit has provided the following test:

[T]he plaintiff must allege facts demonstrating that (1) a school official intentionally used an amount of force that was obviously excessive under the circumstances, and (2) the force used presented a reasonably foreseeable risk of serious bodily injury. *See London*, 194 F.3d at 876-77; *Saylor*, 118 F.3d at 514; *P.B.*, 96 F.3d at 1304; *Metzger*, 841 F.2d 518; *Garcia*, 817 F.2d at 655; *Hall*, 621 F.2d at 613.

In determining whether the amount of force used is obviously excessive, we consider the totality of the circumstances. In particular, we examine: (1) the need for the application of corporal punishment, (2) the relationship between the need and amount of punishment administered, and (3) the extent of the injury inflicted. *See, e.g., Metzger*, 841 F.2d at 520 ("In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.").

*Neal*, 229 F.3d at 1075-76.

a.      **The Defendant Coaches**

The Defendant Coaches argue, since neither the Supreme Court nor the Eleventh Circuit have recognized a substantive due process claim that is based on deliberate indifference, summary judgment should be entered in their favor.  Doc. 145 at 15, Doc. 147 at 14-15, Doc. 149 at 14-15, Doc. 151 at 14-15.  Plaintiffs argue Coach Riley's custom of hazing can be construed as a form of excessive corporal punishment that the Eleventh Circuit has recognized rises to the level of arbitrary and conscience-shocking behavior, Plaintiffs' physical injuries equate with those injuries that were sustained by plaintiffs in cases that the Eleventh Circuit found to be conscience shocking, and in light of Ala. Code § 16-1-23, the Defendant Coaches understood their instigation and authorization of hazing was unlawful.  Doc. 178 at 23-27.

To support Plaintiffs' argument that they were subjected to excessive corporal punishment, they cite to two cases in which the Eleventh Circuit found such, *Neal ex rel. Neal v. Fulton County Board of Education*, 229 F.3d 1069 (11th Cir. 2000), and *Kirkland v. Greene County Board of Education*, 347 F.3d 903 (11th Cir. 2003).  In *Neal*, the Eleventh Circuit found excessive corporal punishment when a football coach knocked a student's eye out of its socket when he struck the student with a weight lock because the student hit another student with the same weight lock.  229 F.3d at 1072-73.  In *Kirkland*, the Eleventh Circuit found excessive corporal punishment when a principal repeatedly struck a student with a metal cane, including once on the head as he protected his chest, when he was not armed or physically threatening.  347 F.3d at 904-05.

Here, viewing Plaintiffs' evidence in a light most favorable to them, the Court cannot find excessive corporal punishment where the evidence does not show the Defendant Coaches directed any of the assaults.  Plaintiffs' evidence, viewed in a light most favorable to them, shows the Defendant Coaches witnessed some of the assaults but did not take steps to intervene and did not

actively direct the assailants. The Eleventh Circuit's test for conduct to constitute excessive corporal punishment that rises to the level of arbitrary and conscience-shocking behavior requires the school official to use an amount of force that was obviously excessive. *Neal*, 229 F.3d at 1075. The Court is not inclined to extend the test to include third parties' use of force that the school official witnesses and does not direct.

The only instance of one of the Defendant Coaches' use of force, when Coach Riley allegedly bumped Lyman with his stomach, when viewed in a light most favorable to Plaintiffs' evidence, does not constitute excessive corporal punishment that rises to the level of arbitrary and conscience-shocking behavior.

In any case, the Court determines the Defendant Coaches are entitled to qualified immunity from Plaintiffs' Fourteenth Amendment claims that are brought against them.

Accordingly, each of the Defendant Coaches' motions for summary judgment as to Plaintiffs' claim for violation of the Fourteenth Amendment are granted.

### b.    The Minor Plaintiffs' Parents

The Defendant Coaches argue the minor plaintiffs' parents do not detail their claim in either the First Amended Complaint or their response to the Defendant Coaches' motion for summary judgment as to those claims. Doc. 145 at 33-36, Doc. 147 at 32-35, Doc. 149 at 33-36, Doc. 151 at 32-34, Doc. 184 at 16-17. The minor plaintiffs' parents argue, pursuant to the Due Process Clause of the Fourteenth Amendment, they have a right as parents to make decisions concerning the care, custody, and control of their children. Doc. 178 at 34.

"[T]he Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 2060, 147 L. Ed. 2d 49 (2000). Here, Plaintiffs

have only cited case law that states the minor plaintiffs' parents have a right to the care, custody, and control of their children and have not argued or presented evidence that shows that right was infringed.   "[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations omitted).

Accordingly, each of the Defendant Coaches' motions for summary judgment as to the minor plaintiffs' parents' claim for violation of the Fourteenth Amendment is due to be granted.

**B.**     **State-Law Claims**

**1.**     **State-Agent Immunity**

The Defendant Coaches argue they are entitled to state-agent immunity as to Plaintiffs' state-law claims against them.  Doc. 145 at 18-21, Doc. 147 at 18-22, Doc. 149 at 19-22, Doc. 151 at 18-21.

The Alabama Supreme Court has stated the test for State-agent immunity as follows:

"A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's

(1) formulating plans, policies, or designs; or
(2) exercising his or her judgment in the administration of a department or agency of government, including but not limited to, examples such as:
  (a) making administrative adjudications;
  (b) allocating resources;
  (c) negotiating contracts;
  (d) hiring, firing, transferring, assigning, or supervising personnel; or
(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

Notwithstanding anything to the contrary in the foregoing statement of the rule, a
State agent shall not be immune from civil liability in his or her personal capacity

(1) when the Constitution or laws of the United States, or the Constitution of this
State, or laws, rules, or regulations of this State enacted or promulgated for the
purpose of regulating the activities of a governmental agency require otherwise; or
(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith,
beyond his or her authority, or under a mistaken interpretation of the law."

*Ex parte Butts*, 775 So. 2d 173, 177-78 (Ala. 2000) (emphasis omitted) (quoting *Ex parte*

*Cranman*, 792 So. 2d 392, 405 (Ala. 2000)); *see also* ALA. CODE § 36-1-12 (codifying the rule

that governs State-agent immunity and is stated in *Ex parte Cranman*).

[The Alabama Supreme Court] has established a "burden shifting" process when a
party raises the defense of State-agent immunity.  *Giambrone v. Douglas*, 874 So.
2d 1046, 1052 (Ala. 2003).  In order to claim State-agent immunity, a State agent
bears the burden of demonstrating that the plaintiff's claims arise from a function
that would entitle the State agent to immunity.  *Giambrone*, 874 So. 2d at 1052; *Ex
parte Wood*, 852 So. 2d 705, 709 (Ala. 2002).  If the State agent makes such a
showing, the burden then shifts to the plaintiff to show that the State agent acted
willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority.
*Giambrone*, 874 So. 2d at 1052; *Wood*, 852 So. 2d at 709; *Ex parte Davis*, 721 So.
2d 685, 689 (Ala. 1998).  "A State agent acts beyond authority and is therefore not
immune when he or she 'fail[s] to discharge duties pursuant to detailed rules or
regulations, such as those stated on a checklist.'"  *Giambrone*, 874 So. 2d at 1052
(quoting *Ex parte Butts*, 775 So. 2d [at] 178 [ ]).

*Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006).

"Willfulness" is the conscious doing of some act or omission of some duty under
knowledge of existing conditions accompanied with a design or purpose to inflict
injury.  Instruction 29.01, Alabama Pattern Jury Instructions-Civil (2d ed. 1993);
*see also Roe v. Lewis*, 416, So. 2d 750, 754 (Ala. 1982) (Willfulness "denotes an
intention to cause an injury").  Similarly, malice is defined as "[t]he intent, without
justification or excuse, to commit a wrongful act . . . ."  BLACK'S LAW DICTIONARY,
968 (7th ed. 1999).

*Ex parte City of Montgomery*, 272 So. 3d 155, 168 n.5 (Ala. 2018) (internal quotation marks

omitted) (quoting *Ex parte Nall*, 879 So. 2d 541, 546 (Ala. 2003)).  "Bad faith" is a "[d]ishonesty

of belief, purpose, or motive."  *Bad Faith*, BLACK'S LAW DICTIONARY (11th ed. 2019).

As to the Defendant Coaches' burden, they argue their alleged conduct is based on the fact

that they exercised their judgment in the administration of a department or agency of government and exercised judgment in the discharge of duties imposed by statute, rule, or regulation in the education of students.  Doc. 145 at 19-20, Doc. 147 at 19-20, Doc. 149 at 20-21, Doc. 151 at 19-20.  The Defendant Coaches argue coaching duties have specifically been recognized as a discretionary function by the Alabama Supreme Court in *Lennon v. Peterson*, 624 So. 2d 171 (Ala. 1993).  Doc. 145 at 20, Doc. 147 at 19-20, Doc. 149 at 20-21, Doc. 151 at 19-20.  Plaintiffs do not argue any of the Defendant Coaches have not met their burden to show Plaintiffs' claims arise from a function that would entitle them to state-agent immunity.  *See* Doc. 178.  Indeed, Plaintiffs state in their First Amended Complaint, "At all times relevant herein, each [defendant] was acting within the course and scope of his or her employment."  Doc. 33 ¶ 41.

The Defendant Coaches have only generally argued Plaintiffs' claims arise from a function that would entitle the Defendant Coaches to state-agent immunity without much explanation. Plaintiffs' allegations against the Defendant Coaches are they encouraged hazing among the football players to instill a form of discipline, which arguably is "exercising judgment in the discharge of duties imposed by statute, rule or regulation in . . . educating students," which includes "not only classroom teaching, but also supervising and educating students in all aspects of the educational process."  *Ex parte Trottman*, 965 So. 2d at 783 (quoting *Ex parte Cranman*, 792 So. 2d at 405).  Therefore, the Defendant Coaches have met their burden to show Plaintiffs' claims arise from a function that would entitle them to state-agent immunity.

The burden now shifts to Plaintiffs to present evidence that shows the Defendant Coaches acted either willfully, maliciously, fraudulently, in bad faith, or beyond their authority.  Plaintiffs argue the Defendant Coaches violated Plaintiffs' Fourth and Fourteenth Amendment rights, which defeats state-agent immunity, as well as violated Ala. Code § 16-1-23, which shows they acted

willfully, maliciously, in bad faith, and beyond their authority.  Doc. 178 at 29-30.

While Plaintiffs argue the Defendant Coaches' state-agent immunity is "eviscerated" because they "violated a statute, rule or the state or federal Constitutions," specifically the Fourth and Fourteenth Amendments and Ala. Code § 16-1-23, such language is not reflected in the state-agent immunity statute.  *See* ALA. CODE § 36-1-12(d)(1) ("Notwithstanding subsection(c), an education employee, officer, employee, or agent of the state is not immune from civil liability in his or her personal capacity if: (1) The Constitution or laws of the United States, or the Constitution of this state, or laws, rules, or regulations of this state enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise.").

As to whether any of the Defendant Coaches acted beyond their authority, the Fourth and Fourteenth Amendments and Ala. Code § 16-1-23 do not prescribe duties pursuant to detailed rules and regulations, such as those stated on a checklist.  *See Ex parte Estate of Reynolds*, 946 So. 2d at 452 ("A state agent acts beyond authority and is therefore not immune when he or she fails to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." (citations and internal quotation marks omitted)).  As to whether any of the Defendant Coaches' conduct was willful, malicious, and in bad faith, Plaintiffs have not discharged their burden to produce evidence that shows they intended to injure Plaintiffs.  Viewing the evidence in a light most favorable to Plaintiffs, their evidence shows the Defendant Coaches witnessed assaults on Plaintiffs but there is no evidence that shows the Defendant Coaches had a plan or intention to injure Plaintiffs.  Therefore, Plaintiffs have not met their burden to show the Defendant Coaches are not entitled to state-agent immunity.

Accordingly, each of the Defendant Coaches are entitled to state-agent immunity as to Plaintiff's state-law claims against him, which negates the need for a detailed analysis for each of

Plaintiffs' state-law claims that are brought against the Defendant Coaches: violation of Ala. Code § 16-1-23 (Count 5); assault and battery (Count 6); false imprisonment (Count 7); intentional infliction of emotional distress (Count 8); negligence (Count 9); negligence per se[6] (Count 10); and violation of Ala. Code § 16-1-24.1 (Count 11).

## V.   **CONCLUSION**

Based on the foregoing discussion and analysis, it is **ORDERED** as follows:

(1)     Defendant Kelly Eubanks' Motion for Summary Judgment (Doc. 144) is **GRANTED**, and Plaintiffs' claims against Defendant Coach Eubanks are **DISMISSED with prejudice**;

(2)     Defendant Robert Miller's Motion for Summary Judgment (Doc. 146) is **GRANTED**, and Plaintiffs' claims against Defendant Coach Miller are **DISMISSED with prejudice**;

(3)     Defendant Fred Riley's Motion for Summary Judgment (Doc. 148) is **GRANTED**, and Plaintiffs' claims against Defendant Coach Fred Riley are **DISMISSED with prejudice**;

(4)     Defendant Bobby Pope's Motion for Summary Judgment motion (Doc. 150) is **GRANTED**, and Plaintiffs' claims against Defendant Coach Bobby J. Pope are **DISMISSED with prejudice**;

(5)     Plaintiffs' Notice of Motion for Summary Adjudication of Issues on Claim Against Principal Lewis Copeland, Coach Fred Riley, Coach Bobby J. Pope, Coach Robert Miller, Coach Kelly Eubanks (Doc. 152) as it relates to Defendants Coach Fred Riley, Coach Bobby J. Pope, Coach Robert Miller, and Coach Kelly Eubanks is **DENIED**.

---

[6] Plaintiffs' negligence per se claim in Count 10 is premised on a violation of the "anti-hazing law" without specific reference to a statute, but that statute is § 16-1-23 and is titled "Hazing prohibited; penalty." *Compare* Doc. 33 at 28 *with* ALA. CODE. § 16-1-23.

**DONE** and **ORDERED** this the 21st day of March 2022.

 s/Terry F. Moorer             
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE